Dr. Aparna Vashisht-Rota
12396 Dormouse Road,
San Diego, California, 92129
USA
Phone: 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
Email: Aps.rota@gmail.com

UNITED STATES DISTRICT COURT

SOUTHERN CALIFORNIA

DR. APARNA VASHISHT-ROTA, an

individual,

                    Plaintiff,

        v.

HMS, Chris Howell, Frank Trocki, and Michael Hernandez,

Defendants.

Case No.: 3:20-cv-00321

PLAINTIFF'S MOTION TO SUBMIT DOCUMENTS IN SUPPORT OF HER COMPLAINT AND IN OPPOSITION TO #DKT 147 DUE TO CASE LAW

JUDGE: HON. JUDGE MONTENEGRO
DATE: OCTOBER 31, 2022
TIME: 1.30 P.M.

## **INTRODUCTION**

1.  10th Circuit Federal Ruling to Survive Motion To Dismiss for Dkt #128 (Exhibit 1: pp 17: Appellate Case: 20-1320 Document: 010110706275 Date Filed: 07/06/2022 Page: 17).

2.  Plaintiff submits several documents in support of her bias claims (Exhibit 2) in support of 192-3 and 128. Exhibit 3 for misappropriation of trade secrets.

# 1. POINTS AND AUTHORITIES

"For Plaintiff to show that the law was clearly established, there must be authority from the Supreme Court, the Tenth Circuit, or a clear majority of other circuit courts "deciding that the law was as the plaintiff maintains." *Id*. at 1255. (Appellate Case: 20-1320 Document: 010110706275 Date Filed: 07/06/2022 Page:14)

1. **AAA claims**: *Henry Schein, Inc. v. Archer & White Sales, Inc.,* 139 S. Ct. 524, 530 (2019) as to AAA. Plaintiff entitled to de novo review of whether the past two cases fall under the AAA/First/Second Agreement given the equitable rescission as a defense in the cross complaint as well deposition under oath no Utah agreements.

Plaintiff has rescinded from Utah at least 6 times
1. May 6th, 2017,
2. June 7th, 2017,
3. 2018 (wages case rescission isn't new),
4. July 23, 2019,
5. February 2020 (equitable rescission) with AB 51
6. April 2022,
7. January 21, 2022, AB 51 leave to amend to add Defendants

Although, Plaintiff has kept Ninth updated on Utah and requested that the cases be remanded back to see whether they can proceed under the First and Second Agreements, but procedurally, that may not be possible. Therefore, it simpler to refile those 19-55748 and 20-55302 causes of action under equitable remedies so she can have all claims she timely filed.

2. **AAA Award Letter**: *Vashisht-Rota v. Hernandez*, 2019.

3. **Leave to Amend***: 2021 UT 21 footnote 29. (Tenth Circuit).

4. **Due Process to Add Defendants/First Amendment**: *Appellate Case: 20-1320*

*Document: 010110706275 Date Filed: 07/06/2022 Page:* 1 (Tenth Circuit)

- Appellate Case: 20-1320 Document: 010110706275 Date Filed: 07/06/2022 Page: 17

- Plaintiff has noted lack of fair trial too many times

- Plaintiff has valid due process claims; inadequacy of forum, indispensable parties, add Defendants, leave to amend, and AB 51.

- The Order on #Dkt 147 should be vacated.

**1. FAIR TRIAL:** Case 3:19-cv-00512-L-AGS Document 11 Filed 06/14/19 PageID.236 Page 13 of 23. "II. PLAINTIFF CANNOT HAVE A FAIR TRIAL IN CACHE COUNTY, UTAH.." [ECF No. 9 P.3

**2. FAIR TRIAL:** Case 3:19-cv-00512-L-AGS Document 11 Filed 06/14/19 PageID.238 Page 15- 47 16 of 23, "TRIAL IN THE SELECTED FORUM WOULD BE SO GRAVELY DIFFICULT AND INCONVENIENT THAT IT WOULD EFFECTIVELY DEPRIVE THE PLAINTIFF OF HER DAY IN COURT." [ECF No. 9 P.3 ¶ 3]. Plaintiff has no connections nor ever been to Cache County. (Rota Decl. ¶2). Plaintiff is domiciled in California. Id. at ¶3. Plaintiff is a female of Indian origin. Id. Plaintiff will not receive a fair trial if she is forced to litigate her case in the small town of Cache County. Accordingly, Plaintiff should not have to endure litigating her claims to a jury who will likely be biased against her automatically. 5. Case 3:19-cv- 00512-L-AGS Document 11 Filed 06/14/19 PageID.240 Page 17 of 23 "As previously stated, it is highly unlikely Plaintiff will have a fair trial in the small town of Cache County, as she will be a complete outsider and not a well-known by members of the community like HMS and Supervisor Howell."

**3.RESCISSION NOT NEW:** Plaintiff has filed a previous complaint with causes of action related to unpaid wages (See Case 3:19-cv-00512-L-AGS Document 18 Filed 03/02/20 PageID.417 Page 3 of 10). Plaintiff states under oath that only the first two of the alleged four agreements are binding. (See Case 3:18-cv-02010-L-AGS Document 7-3 Filed 09/14/18

PageID.226 Page 2 of 3, paragraph 6, line 19-20.) Plaintiff notes that she 'rescinded' from the alleged Utah agreements Case 3:18-cv- 02010-L-AGS Document 7-2 Filed 09/14/18 PageID.222 Page 2 of 4). On that page, "Even if a court were to find that the Utah jurisdiction cause survives,.....have 'at will' language in them in Paragraph 1.5 "HMS reserves the right to terminate this agreement at any time for any reason or no reason .. '' In California, that language alone is enough to make Ms. Vashisht- Rota an employee. .. " Petitioner has also declared under oath in 170100325 that the case should be divided by the contracts.

- Plaintiff has filed for **equitable rescission as a defense** in this action.
- **AB 51:** If contract law values freedom of choice, then, the Court must equally consider and equally weigh her rescission of her initial choice that she rescinded, second, the world would be different if one could not change one's mind and coerced performance of a contract, she has declared under oath does not exist is unduly compromising Plaintiff's self-esteem, integrity, and self-respect. It may jeopardize Plaintiff's business, her autonomy and raises strongly the question whether Utah and that Court thinks Plaintiff is a slave with unreasonable restraints on trade, speech, livelihood, and with severe punishment removing the possibility of a fresh start. Nothing Plaintiff wrote or did warrants the proceedings and injustice as it presently stands.

5. **Emails:** *Pipkin v. Acumen*, 2020 (Tenth Circuit)

6. **Rule of Reason/TRO:** Case 3:21-cv-00683-IM Document 88 Filed 06/17/21
Page 1 of 22 (Ninth Circuit).

- Unfair competition Sherman Act §1; §51.9 harassment, AB 51; public policy, gender equity (not possible in Utah); Irreparable harm.
- See above on unreasonable restraints on trade/livelihood

## 2. UTAH POST INTERLOCUTORY APPEAL OR DISMISSAL[1]

_____

[1] **Reason to be determined:** Note that Plaintiff has technically withdrawn from that lawsuit at least 6 times as she has rescinded. Utah does not acknowledge any such moves from Plaintiff but moved to dismiss potentially on her email. Utah has refused to accept that she has already rescinded multiple times and deposed under oath.

Utah ALWAYS moves to gain money itself and did nothing on many such letters/emails such as to pay money, add claims, leave to amend, or anything for years at the appellate level.

Utah only acts if it can get away without providing rulings, money, and just do a CONTEMPT with nebulous orders when jurisdiction is in question. Plaintiff provided an alternate protective order that is clearer that she can follow and the one in place is overbroad, unsuitable, moot, and unclear. It conflicts with itself.

Documents/Orders that conflict with itself:

1. HMS Utah contract
2. Utah Protective Order
3. Utah TRO/Gag Order
4. Utah Honorable Judge Fonnesbeck's Default Order
5. Utah Honorable Judge Fonnesbeck's TRO/Gag Order (with Default Order)
6. So Called VL Order conflicts with Appellate Order 20210132 Alliant Subpoena
7. 20210132-CA subpoena costs for not giving HMS 14 days conflicts with Rule 65 (A) TRO gag order logic.
8. All the Orders are HMS points, all of the orders only take HMS side unlike most Orders issued, Plaintiff thinks Opposing Counsel writes these Orders.

The Court will note a filing from opposing counsel in the BlueChip Matter in which he lists all the 'filing' mistakes and guess what the Appellate just pulled up—Plaintiff's filings. Similar to BlueChip, Ms. Taj asked for apologies right before rulings and same for opposing counsel

Plaintiff submits Exhibit 2 that support her prior assertions of lack of a fair trial herein on page 3-4. Utah is biased and Plaintiff never could have had a fair trial there.

There is the issue of the period of the alleged Utah agreements.

1. **June 18, 2018 (Hon. Judge Allen Ruled) till July 23, 2019** (Deposition under oath that there is no contract).

2. **April 24th, 2017 till May 6th, 2017** when Plaintiff rescinded by email with an 'Alright Thank you from Mr. Howell. On July 23, 2019, Plaintiff declared under oath that she rescinded from both Utah agreements.

3. **June 2018 till February 2020** when Plaintiff used AB 51 to revert to the First and Second Agreement as is her right.

If 1-3, then

- Money due under Utah alleged Third Agreement 1.3.3. c and d for life.

- Plaintiff filed wages misdemeanor sanctions in Utah timely as collateral motions.

- Plaintiff has unjust enrichment and her intellectual property claims against the Utah parts.

- Utah part would be a precedent 1A/Third Agreement and unjust enrichment misappropriation of trade secrets against HMS' defamation etc. claims.

---

around the same time. Apologies" is the new "Filings". At this stage of the proceedings, it is premature and intimidating for Plaintiff to successfully file her claims even if not 100%.

PLAINTIFF'S MOTION TO SUBMIT DOCUMENTS IN SUPPORT OF HER COMPLAINT AND IN OPPOSITION TO #DKT 147 DUE TO CASE LAW JUDGE: HON. JUDGE MONTENEGRODATE: OCTOBER 31, 2022TIME: 1.30 P.M. - 6

4. **No Agreement** (Rule 2, rescission, counteroffer, fraud, deposition under oath) to allow claims to be under the First and Second Agreement—new trial, money due under 1.3.3 c and d due to rescission,

    A. **Utah Case dismissed lacking jurisdiction** (New trial already in CA) with attorney's fees to Appellant as per Judge Lorenz Order in Wages claim; and Utah Code §34-51-301.

    B. **Utah Code under unjust enrichment for misappropriation of trade secrets** (Exhibit 3). Plaintiff needs to add that claim under unjust enrichment to protect her intellectual property and trade secrets that she timely filed in Utah as well as sanctions under Utah code as no private cause of action in Utah.

    C. HMS' causes of action would proceed under the First and Second Agreement or continue under misappropriation with 1.3.3 c and d as an agreement upon valuation metric for the misappropriation.

  Dated this 25th day of September 2022.

Dr. Aparna Vashisht-Rota

EXHIBIT 1

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**July 6, 2022**

**FOR THE TENTH CIRCUIT**
_____

**Christopher M. Wolpert**
**Clerk of Court**

C1.G, on behalf of his minor son, C.G., the
aggrieved party,

     Plaintiff - Appellant,

v.                                                                            No. 20-1320

SCOTT SIEGFRIED, Superintendent of
Cherry Creek School District; CHRIS
SMITH, Chief of Staff for the Educational
Services Center of Cherry Creek School
District; RYAN SILVA, Principal of
Cherry Creek High School; KEVIN
UHLIG, Assistant Principal at Cherry
Creek High School; BRYNN THOMAS,
Dean at Cherry Creek High School;
CHERRY CREEK SCHOOL DISTRICT
NO. 5; CARLA STEARNS, Executive
Director of High School Education at
Cherry Creek School District,

     Defendants - Appellees.

--------------------

AMERICAN CIVIL LIBERTIES UNION;
AMERICAN CIVIL LIBERTIES UNION
OF COLORADO; FOUNDATION FOR
INDIVIDUAL RIGHTS IN EDUCATION;
CATO INSTITUTE; ELECTRONIC
FRONTIER FOUNDATION; NATIONAL
SCHOOL BOARD ASSOCIATION;
COLORADO ASSOCIATION OF
SCHOOL BOARDS; KANSAS
ASSOCIATION OF SCHOOL BOARDS;
NEW MEXICO SCHOOL BOARDS

ASSOCIATION; WYOMING SCHOOL
BOARDS ASSOCIATION; UTAH
SCHOOL BOARDS ASSOCIATION,

     Amici Curiae.

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:19-CV-03346-RBJ)**

_____

Jamie Hubbard of Stimson, Stancil, LaBranche, Hubbard, L.L.C. (Andrew McNulty of Kilmer, Lane & Newman, L.L.P., with her on the briefs), Denver, Colorado, for Plaintiff - Appellant.

Jonathan Fero, (and M. Johnathan Koonce of Semple, Farrington, Everall & Case, P.C., on the brief), Denver, Colorado, for Defendants - Appellees.

Vera Eidelman (and Ben Wizner of American Civil Liberties Union Foundation, New York, New York; Mark Silverstein and Sara Neel, American Civil Liberties Union of Colorado, Denver, Colorado, with her on the brief), for Amici Curiae American Civil Liberties Union and American Civil Liberties Union of Colorado.

Ilya Shapiro of Cato Institute, Washington, D.C.; Darpana Sheth and Ronald G. London of Foundation for Individual Rights in Education, Philadelphia, Pennsylvania, on the brief for Amici Curiae Foundation for Individual Rights in Education and Cato Institute.

Sophia Cope, David Greene and Mukund Rathi of Electronic Frontier Foundation, San Francisco, California, on the brief for Amici Curiae Electronic Frontier Foundation.

Francisco M. Negrón, Jr., Chief Legal Officer, of National School Boards Association, Alexandria, Virginia; W. Stuart Stuller of Caplan and Earnest, L.L.C., Boulder, Colorado, on the brief for Amici Curiae National School Boards Association, et al.

_____

Before **MATHESON**, **KELLY**, and **McHUGH**, Circuit Judges.

_____

**KELLY**, Circuit Judge.

_____

Plaintiff-Appellant Cl.G., on behalf of his minor son, C.G., appeals from the district court's dismissal of his case against Defendants-Appellees Cherry Creek School District (District or CCSD) and various employees thereof for alleged constitutional violations stemming from C.G.'s suspension and expulsion from Cherry Creek High School (CCHS).  Cl.G. v. Siegfried, 477 F. Supp. 3d 1194 (D. Colo. 2020).  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings.

## Background

On the evening of Friday, September 13, 2019, C.G. was off campus at a thrift store with three friends.  Cl.G., 477 F. Supp. 3d at 1200.  He took a picture of his friends wearing wigs and hats, including "one hat that resembled a foreign military hat from the World War II period."  Id.  C.G. posted that picture on the social media platform Snapchat and captioned it, "Me and the boys bout [sic] to exterminate the Jews."  Id. (quoting Aplt. App. 46).  C.G.'s post (the photo and caption) was part of his private "story," an online feed visible only to Snapchat users connected with C.G. on that platform.  Aplt. App. 45–47.  Posts on a user's Snapchat story are automatically deleted after 24 hours, but C.G. removed this post after a few hours. Cl.G., 477 F. Supp. 3d at 1200.  He then posted on his Snapchat story, "I'm sorry for that picture it was ment [sic] to be a joke."  Id. at 1200–01.

One of C.G.'s Snapchat "friend[s]"[1] took a photograph of the post before C.G. deleted it.  Id.  at 1201.  She showed it to her father, and he called the police, who visited C.G.'s house and found no threat.  Id.  Referencing prior anti-Semitic activity and indicating that the post caused concern for many in the Jewish community, a CCHS parent emailed the school and community leaders about the post.  Id.

On Monday, September 16, 2019, Dean of Students Brynn Thomas told C.G. that he was suspended for five days while the school investigated.  Id.  Two days later, the school extended C.G.'s suspension five days to facilitate an expulsion review, and then another 11 days to allow for completion of that review.  Id. at 1202. On October 7, 2019, CCSD held an expulsion hearing, and the hearing officer recommended expulsion.[2]  Id. at 1202–03.  Fourteen days after the hearing, Superintendent Scott Siegfried informed C.G. that he was expelled for one year for violating District policies:

> (1) JICDA(13) prohibiting verbal abuse in a school building or on school property (overruling the hearing officer's finding that JICDA(13) did not apply);
> (2) JICDA(19) regulating "behavior on or off school property which is detrimental to the welfare, safety or morals of other students or school personnel";

---

[1] "Friends" on Snapchat are users who have connected on the platform and can therefore see one another's "private" stories.

[2] C.G.'s parents provided the school with: (1) "a letter from C.G. accepting full responsibility[,] . . . apologizing for his behavior, explaining that it was an impulsive lapse of judgment not intended to hurt anyone, and stating that he had recently spent time educating himself about Jewish history and talking with Jewish community members and advocacy groups"; (2) "a letter from C.G.'s parents reiterating C.G.'s journey of education and reticence"; and (3) "letters from community members who know C.G. and his family requesting that CCHS turn this into 'a learning opportunity.'"  Cl.G., 477 F. Supp. 3d at 1202.

(3) ACC-R prohibiting intimidation, harassment, or hazing by directing an obscene comment or gesture at another person or insulting or challenging another person or by threatening another person; and
(4) JKD-1-E, which allows for suspension, expulsion or denial of admission for behavior on or off school property that is detrimental to the welfare or safety of other pupils or of school personnel including behavior that creates a threat of physical harm.

Id. at 1203 (quoting Aplt. App. 57).  Upon C.G.'s appeal, the Board affirmed the Superintendent's decision.  Id.

Plaintiff filed suit under 42 U.S.C. § 1983 claiming: (1) violations of C.G.'s rights under the First and Fourteenth Amendments against CCHS/CCSD officials for C.G.'s suspension and expulsion; (2) the same violations against the District for adopting policies in violation of the First Amendment; (3) violations of C.G.'s Fourteenth Amendment procedural due process rights against all Defendants for C.G.'s suspension and expulsion; (4) the same violations asserted in claim (3) against the District for adopting policies in violation of the Fourteenth Amendment; and (5) violations of the First and Fourteenth Amendments against all Defendants for conspiracy to violate C.G.'s constitutional rights.[3]  Id. at 1204.

Defendants filed a motion to dismiss Plaintiff's Amended Complaint (Complaint) for failure to state a claim under Federal Rule of Procedure 12(b)(6) or to grant individual Defendants qualified immunity.  See Aplt. App. 73–87.  The district court determined that Tinker v. Des Moines Independent Community School

---

[3] Plaintiff originally included the District's Board of Education as a Defendant, but having already named the District as a party, Plaintiff later dismissed the Board as redundant.  Cl.G., 477 F. Supp. 3d at 1204.

District, 393 U.S. 503 (1969), applied to off-campus speech, though it noted that the

pervasiveness of social media had limited the utility of the distinction between off-

campus and on-campus speech.  Cl.G., 477 F. Supp. 3d at 1204–06.  The district

court held that it was foreseeable that C.G.'s post could cause substantial disruption

and interfere with the rights of others.  Id. at 1209–10.  Concluding further that "the

school did have authority to discipline C.G. for his Snapchat post" and CCSD's

policies were facially valid, it dismissed Plaintiff's First Amendment claims.  Id. at

1208–11.  Finding that Defendants had provided adequate process in disciplining

C.G. and that Plaintiff had abandoned his facial challenge to the District's policies, it

also dismissed Plaintiff's due process claims.  Id. at 1211–16.  Last, the district court

dismissed Plaintiff's conspiracy claim for lacking a constitutional violation.  Id. at

1216.

On appeal, Plaintiff argues that the First Amendment limits school authority to

regulate off-campus student speech, particularly speech unconnected with a school

activity and not directed at the school or its specific members.  Plaintiff relies heavily

on Mahanoy Area School District v. B.L., 141 S. Ct. 2038 (2021), decided after the

district court's decision in this case.  According to the Plaintiff, Mahanoy reaffirmed

existing principles that a school normally cannot regulate off-campus student speech,

so the individual Defendants are not entitled to qualified immunity.  Plaintiff

contends that CCSD's policies are facially unconstitutional and overbroad because

they do not incorporate this distinction.  Finally, Plaintiff argues that C.G.'s due

process rights were violated because he was not afforded adequate notice or opportunity to be heard regarding his suspensions and First Amendment rights.

Defendants maintain that C.G. was lawfully disciplined for what amounts to off-campus hate speech. According to Defendants, although originating off campus, C.G.'s speech still spread to the school community, disrupted the school's learning environment, and interfered with the rights of other students to be free from harassment and receive an education. Defendants also contend that C.G. was provided all the process that was due.

## Discussion

We review dismissal under Rule 12(b)(6) for failure to state a claim de novo. Reznik v. inContact, Inc., 18 F.4th 1257, 1260 (10th Cir. 2021). In this review, we accept a complaint's well-pleaded factual allegations as true, "view all reasonable inferences in favor of the nonmoving party, and liberally construe the pleadings." Id. If a complaint "state[s] a claim to relief that is plausible on its face," it survives a Rule 12(b)(6) motion. Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## I. Regulation of Student Speech

Schools may restrict student speech only if it "would substantially interfere with the work of the school or impinge upon the rights of other students." Tinker, 393 U.S. at 509; Thompson v. Ragland, 23 F.4th 1252, 1258 (10th Cir. 2022). A school can also regulate student speech where it reasonably forecasts such disruption.

7

Thompson, 23 F.4th at 1256.  "[S]pecial characteristics call for special leeway when schools regulate speech that occurs under its supervision."  Mahanoy Area Sch. Dist. v. B.L., 141 S. Ct. 2038, 2045 (2021).  But in considering student speech that occurs off campus and is unconnected to any school activity, a school: (1) can "rarely stand in loco parentis"; (2) "will have a heavy burden to justify intervention" when political or religious speech is involved; and (3) must especially respect "an interest in protecting a student's unpopular expression."  Id. at 2046.

The Mahanoy Court "d[id] not . . . set forth a broad, highly general First Amendment rule stating just what counts as 'off campus' speech and whether or how ordinary First Amendment standards must give way off campus to a school's special need to prevent, e.g., substantial disruption of learning-related activities or the protection of those who make up a school community."  Id. at 2045.  Instead, it identified the above "three features of off-campus speech that often, even if not always, distinguish schools' efforts to regulate that speech from their efforts to regulate on-campus speech."  Id. at 2046.

Mahanoy "provide[s] one example" of "where, when, and how these features mean the speaker's off-campus location will make the critical difference."  Id.  In Mahanoy, minor student B.L. posted two photos on her Snapchat.  Id. at 2043.  The first photo showed B.L. and a friend raising middle fingers and was captioned: "Fuck school fuck softball fuck cheer fuck everything."  Id.  The second photo was blank and captioned: "Love how me and [another student] get told we need a year of jv before we make varsity but tha[t] doesn't matter to anyone else?"  Id.  Fellow

8

students who were B.L.'s friends on Snapchat could see this post.  Id.  The images

circulated, and B.L. was suspended from the junior varsity cheerleading squad.  Id.

The Court first analyzed B.L.'s speech and determined that it "did not involve

features that would place it outside the First Amendment's ordinary protection."  Id.

at 2046–47.  The Court found it important that B.L.: (1) spoke "outside of school

hours from a location outside the school"; (2) "did not identify the school in her posts

or target any member of the school community with vulgar or abusive language"; and

(3) "transmitted her speech through a personal cellphone, to an audience consisting

of her private circle of Snapchat friends."  Id. at 2047.  The Court explained that

these features, "while risking transmission to the school itself, nonetheless . . .

diminish the school's interest in punishing B.L.'s utterance."  Id. (citation omitted).

The Court then weighed the school's possible interests in prohibiting B.L.'s

speech.  Id. at 2047–48.  That B.L.'s speech was, "[g]eographically speaking, off-

campus speech" rendered insufficient the validity of her school's "anti-vulgarity

interest" and meant that the school did not stand in loco parentis.  Id. at 2047.  Also,

some students being upset by the post and discussing it during class for a few days

"d[id] not meet Tinker's demanding standard" of "'substantial disruption' of a school

activity or a threatened harm to the rights of others that might justify the school's

action."  Id. at 2047–48 (quoting Tinker, 393 U.S. at 514).  Mahanoy clarified that

risk of transmission to the school does not inherently change the off-campus nature

of all speech on social media.  Id. at 2047.

<u>Mahanoy</u>'s framework for assessing school regulation of off-campus speech on social media controls our analysis here.  In many respects and based on the Complaint, this case is materially similar.  Like B.L.'s speech, C.G.'s speech would generally receive First Amendment protection because it does not constitute a true threat,[4] fighting words, or obscenity.  <u>See id.</u> at 2046–47.  Defendants argue that C.G.'s post is uniquely regulable because it is "hate speech targeting the Jewish community" and "not just a crude attempt at a joke about the Holocaust."  Aplee. Br. at 20.  But offensive, controversial speech can still be protected.  <u>See Mahanoy</u>, 141 S. Ct. at 2055–56 (Alito, J., concurring).

Like B.L., C.G.: (1) spoke "outside of school hours from a location outside the school"; (2) "did not identify the school in [his] post[] or target any member of the school community with vulgar or abusive language"; and (3) "transmitted [his] speech through a personal cellphone, to an audience consisting of [his] private circle

---

[4] True threats are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."  <u>Virginia v. Black</u>, 538 U.S. 343, 359 (2003).  "[A] reasonable person in the circumstances [must] understand [the statement] as a declaration of intention, purpose, design, goal, or determination to inflict bodily injury on another."  <u>United States v. Dillard</u>, 795 F.3d 1191, 1200 (10th Cir. 2015) (quoting <u>United States v. Heineman</u>, 767 F.3d 970, 972 (10th Cir. 2014)).  "[T]he threat must be a serious one, 'as distinguished from words as mere political argument, idle talk or jest.'"  <u>Heineman</u>, 767 F.3d at 972–73 (quoting <u>United States v. Viefhaus</u>, 168 F.3d 392, 395 (10th Cir. 1999)).

As Plaintiff pointed out at oral argument and in the Complaint, school officials apparently did not consider C.G. to have authored a threat.  On the Monday morning following his post, C.G. drove himself to school, parked in the school parking lot, and walked past security to his first-period class with his backpack (which was not searched) before he was escorted to Dean Thomas's office.  Aplt. App. at 48.

of Snapchat friends." Id. at 2047 (majority opinion).  These characteristics of C.G.'s speech, "while risking transmission to the school itself, nonetheless . . . diminish the school's interest in punishing [his] utterance." Id. (citation omitted).

Further, like the school in Mahanoy, CCHS's possible interests in prohibiting C.G.'s speech would not defeat his First Amendment protections.  See id. at 2047–48. Defendants argue that their disciplinary actions were appropriate because they "must consider the rights of other students to be free from harassment and receive an effective education." Aplee. Br. at 21–22.  But the school cannot stand in loco parentis here.  That doctrine applies "where the children's actual parents cannot protect, guide, and discipline them." Mahanoy, 141 S. Ct. at 2046.  Mahanoy is clear that schools may not invoke the doctrine to justify regulating off-campus speech in normal circumstances.  See id.  Based on the Complaint, there is nothing abnormal in this case to prevent following this rule.

Next, CCHS argues that it had a reasonable expectation of substantial disruption (which it claims did in fact occur) and/or interference with other students' rights to access education[5] under Tinker.  Aplee. Br. at 16–22; Aplt. App. 77–79. First, Defendants provide the following reasons to support a reasonable forecast of substantial disruption regarding C.G.'s initial suspension: (1) that Principal Ryan Silva received emails about the post; (2) that the post had been widely circulated

---

[5] Defendants do not develop an argument for interference with other students' rights, so we address only their substantial disruption arguments.  See Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir. 2007).

throughout the area's Jewish community; and (3) that the post had scared, angered, and saddened a family who said their son was worried about having a class with C.G. Aplt. App. 74–75.  After the initial suspension, Defendants stress that: (1) Principal Silva sent a message to CCHS students, parents, and staff; (2) news outlets covered the incident; (3) three more parents contacted CCHS; and (4) CCHS used one advisory period to discuss C.G.'s post and promote conversation about harmful speech.  Aplt. App. 51, 75–76.

These facts do not support a reasonable forecast of substantial disruption that would warrant dismissal of the Complaint.  See Mahanoy, 141 S. Ct. at 2047–48. CCHS only provides an email chain with one family.  Aplt. App. 88–91.  Principal Silva needed more to substantiate his "feel[ing] [that] the learning environment ha[d] been impacted."  Aplt. App. 88; see Taylor v. Roswell Indep. Sch. Dist., 713 F.3d 25, 37 (10th Cir. 2013).  Moreover, "impact[]" does not necessarily equal substantial disruption.  Aplt. App. 88.

Defendants rely on West v. Derby Unified School District No. 260, 206 F.3d 1358 (10th Cir. 2000), to claim that the school has expertise deserving of deference and that the context of previous anti-Semitic incidents at the school[6] must be considered.  Aplee. Br. at 17–18.  But that case involved a student drawing a confederate flag on campus in a school district that had adopted a policy in response

---

[6] The record attests one previous incident: "the suspension of 3 students last December for threatening to use assault rifles to shoot the Jews."  Aplt. App. 91; Aplt. Reply Br. at 9 & n.1.

12

to previous racial incidents, some of which included confederate flags and the student in question.  <u>West</u>, 206 F.3d at 1361–63.  That case materially differs from this one because C.G. was off campus and Defendants lack documented context facilitating similar disciplinary action or previous, similar behavior by C.G.

Moreover, C.G.'s post did not include weapons, specific threats, or speech directed toward the school or its students.  Thus, even pre-<u>Mahanoy</u>, this case materially differs from the five cases Defendants cite to prove that other circuits have applied <u>Tinker</u> to off-campus speech.  Those cases all addressed specific threats directed at a school, its students, or its officials.[7]  Defendants cannot claim a reasonable forecast of substantial disruption to regulate C.G.'s off-campus speech by simply invoking the words "harass" and "hate" when C.G.'s speech does not constitute harassment and its hateful nature is not regulable in this context.

CCHS's argument that substantial disruption actually occurred is equally unconvincing.  <u>See</u> Aplee. Br. at 17; Aplt. App. 79.  We cannot consider CCHS's choice to discuss C.G.'s post during an advisory period (a schedule block twice a week implemented specifically for dealing with such matters) substantial disruption.  <u>See</u> Aplt. App. 51–52.  Neither can news reports nor four emails from parents be

---

[7] <u>See</u> <u>Bell v. Itawamba Cnty. Sch. Bd.</u>, 799 F.3d 379, 384–85, 389–93 (5th Cir. 2015); <u>Wynar v. Douglas Cnty. Sch. Dist.</u>, 728 F.3d 1062, 1070–71 (9th Cir. 2013); <u>Kowalski v. Berkeley Cnty. Schs.</u>, 652 F.3d 565, 567 (4th Cir. 2011); <u>D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. No. 60</u>, 647 F.3d 754, 764–65 (8th Cir. 2011); <u>Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist.</u>, 494 F.3d 34, 35 (2d Cir. 2007).  Some of these cases may evidence the rare instance where a school could stand <u>in loco parentis</u>.

evidence of substantial disruption.  These facts fall short of "Tinker's demanding standard."  Mahanoy, 141 S. Ct. at 2048.

Because CCHS cannot stand in loco parentis and the Complaint alleges no reasonable forecast of substantial disruption or actual disruption, Plaintiff has properly alleged that Defendants' discipline of C.G. for his off-campus speech is a First Amendment violation that cannot be dismissed at this stage.

**II. Qualified Immunity**

Individual Defendants also claim that they are entitled to qualified immunity. See Aplee. Br. at 22–23.  Because Plaintiff has properly pled a constitutional violation, individual Defendants at this time can only receive qualified immunity if their conduct was not clearly established as unlawful.  See Thompson, 23 F.4th at 1255.  The question is whether, by addressing "the defendant's conduct as alleged in the complaint," the reasonable school official would know that disciplining C.G. for posting offensive content online and off campus that did not target the school or its members was unlawful.  Id. at 1256 (quoting Behrens v. Pelletier, 516 U.S. 299, 309 (1996)).

For Plaintiff to show that the law was clearly established, there must be authority from the Supreme Court, the Tenth Circuit, or a clear majority of other circuit courts "deciding that the law was as the plaintiff maintains."  Id. at 1255.  As of September and October 2019, the Supreme Court had not yet addressed a case involving school regulation of online, off-campus speech.  The Court did not consider this issue until Mahanoy, and it did not address the question of qualified

14

immunity in that case because the school district was the only defendant.  See 141 S. Ct. 2038.  Before September 2019, this court had only addressed an online, off-campus speech case at a university.  See Yeasin v. Durham, 719 F. App'x 844, 852 (10th Cir. 2018) (unpublished).  We found that it was not clearly established that a university student could not be expelled in part for online, off-campus speech.  Id.

In November 2019, weeks after C.G.'s expulsion, we noted in Hunt v. Board of Regents of the University of New Mexico "unmistakable gaps in the case law, including whether: (1) Tinker applies off campus; [and] (2) the on-campus/off-campus distinction applies to online speech."  792 F. App'x 595, 606 (10th Cir. 2019) (unpublished).[8]  We thus did not find it clearly established that a university could discipline a student for offensive online, off-campus speech.  Id. at 601–02. But in 2022, in Thompson v. Ragland, we determined that it was clearly established[9] that a university student could not be disciplined for "express[ing] her displeasure with [a] professor" and "suggest[ing] that her classmates leave 'honest' end of term evaluations."  23 F.4th at 1253.  There, the student's speech could not be regulated on campus, so it was clearly established that regulating it off campus was unlawful. Id. at 1261–62.

---

[8] Plaintiff filed suit in this case in 2016 concerning conduct in late 2012 and resulting disciplinary action in early 2013.  See Hunt, 792 F. App'x at 597–99.

[9] Even though Thompson was decided this year, it evaluated conduct that occurred in early 2019, before the conduct at issue in this case.  See 23 F.4th at 1254–55.

Because the district court did not address the question of qualified immunity, we remand for the district court to consider this issue in the first instance. Underwood v. Bank of Am. Corp., 996 F.3d 1038, 1056–57 (10th Cir. 2021).

### III. Plaintiff's Facial Challenge to CCSD's Policies

Plaintiff claims that CCSD policies JICDA(13), JICDA(19), ACC-R, and JDK-1-E violate the First Amendment in permitting suspension and expulsion "for speech that occurs off-campus, unconnected to a school-sponsored event or activity." Aplt. App. 60. Our determination that C.G. has properly pled a First Amendment violation means that his as-applied challenge successfully withstands dismissal at this stage. Because "[i]t is not the usual judicial practice . . . [and not] generally desirable" to reach a facial challenge after ruling for the plaintiff on an as-applied one, we do not address C.G.'s facial challenge for overbreadth. See Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 484–86 (1989). We note, however, that C.G. has waived any overbreadth argument as to CCSD policies JICDA(13), JICDA(19), and ACC-R because he did not reference or cite them in his opening brief. Aplt. Br. at 36–41; see Kitchen v. Herbert, 755 F.3d 1193, 1208 (10th Cir. 2014).

### IV. Plaintiff's Procedural Due Process Rights

Plaintiff alleges that Defendants denied C.G. procedural due process in his suspensions and expulsion. Aplt. App. 63–65. Defendants argue that C.G. demands process beyond what the Constitution requires. Aplee. Br. at 29–33.

We assess C.G.'s initial, five-day suspension under Goss v. Lopez. 419 U.S. 565, 581 (1975). For suspensions of one to ten days, a student must "be given oral or

16

written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Id. Opportunity under Goss must be meaningful to be considered actual opportunity. West, 206 F.3d at 1364.

Plaintiff alleges that C.G. was removed from his first-period class and taken to Dean Thomas's office, where he remained for hours. Aplt. App. 48–49. The Complaint further claims that CCSD "officials . . . decided to suspend [him]" "[b]efore hearing anything from C.G." Aplt. App. 48; see also Aplt. Br. at 41. We consider it axiomatic that an opportunity for C.G. "to present his side of the story," Goss, 419 U.S. at 581, could not have been meaningful and satisfied Goss if a disciplinary decision had already been made. Cf. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 543 (1985). Taking, as we must, these well-pled allegations as true and construing reasonable inferences in Plaintiff's favor, Reznik, 18 F.4th at 1260,[10] it is certainly plausible that C.G. was not given a meaningful opportunity to explain his side of the story before officials made a disciplinary decision. This is all Plaintiff needs to survive a motion to dismiss on this claim.

---

[10] The district court relied upon the Complaint's allegations that C.G. was notified of the suspension and that he was in the Dean's office for hours to conclude that he had sufficient notice and an opportunity to be heard. C1.G., 477 F. Supp. 3d at 1212. Defendants argue that "[i]t does not take an inferential leap . . . to conclude from these allegations that [C.G.] had ample opportunity to tell his side of the story." Aplee. Br. at 30. But on a motion to dismiss in this context, we cannot draw factual inferences against the plaintiff. Therefore, we cannot draw the inference that C.G. had an opportunity to present his side of the story while he was in the Dean's office. See Pace v. Swerdlow, 519 F.3d 1067, 1073 (10th Cir. 2008).

Twombly, 550 U.S. at 570.  Accordingly, we reverse the district court's dismissal of this claim.

Goss also governs analysis of the five-day extension of C.G.'s suspension. See 419 U.S. at 581.  The district court found no due process violation here because it held that Defendants complied with due process requirements in meting out C.G.'s initial suspension.  Cl.G., 477 F. Supp. 3d at 1212.  Our determination that Plaintiff has plausibly alleged that Defendants violated C.G.'s procedural due process rights with the initial suspension affects that rationale and conclusion.  On remand, the district court must reconsider whether Defendants provided C.G. with a meaningful opportunity to present his side of the story.  We note some concern with the fact that C.G.'s mother — after being notified of the both the five-day and the 11-day suspension extensions — asked for a meeting with the school and was denied because there would be an expulsion hearing.  Aplt. App. 52–55.

The final suspension extension that stretched C.G.'s suspension to 21 days and C.G.'s expulsion are governed by the three-factor test from Mathews v. Eldridge, 424 U.S. 319 (1976).  See Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1240 (10th Cir. 2001).  This suspension extension "allow[ed] for completion of the expulsion review process," Aplt. App. 53, which had been under way since CCHS officials began a push for expulsion review when Plaintiff was removed from class for his initial suspension.  Aplt. App. 49, 52.

Following Mathews, we weigh: (1) C.G.'s interest in returning to school and avoiding further reputation harm; (2) the likely value of additional or substitute

procedure to allow C.G. to protest further disciplinary action and/or obtain further consideration of his First Amendment rights; and (3) the administrative and fiscal burden of such procedure for Defendants.  See Watson, 242 F.3d at 1240.  Plaintiff admits that "C.G. had the opportunity to present his side of the story" at the expulsion hearing but maintains that this "cannot sanitize the repeated constitutional violations that came before it."  Reply Br. at 15.  Further, Plaintiff argues that Defendants needed to consider C.G.'s First Amendment rights but ignored them. Aplt. Br. at 45–47; Reply Br. at 15.  Defendants claim that they provided C.G. with all required due process.  Aplee. Br. at 29–34.  Defendants assert that they considered C.G.'s First Amendment rights, despite the fact that "the hearing officer did not make findings on that as a matter of law."  Aplee. Br. at 32.  According to Defendants, "factual findings are enough" because CCSD's policies reflect the proper legal standard for regulating student speech.  Aplee. Br. at 32.

Plaintiff's proper pleading of a due process violation, Defendants' possible misconceptions of their ability to regulate student speech under the First Amendment, and the district court's consequent inquiry on remand may affect the Mathews analysis.  Accordingly, we vacate the district court's dismissal of C.G.'s further procedural due process claims for reconsideration.  The district court may also address claims of qualified immunity for individual Defendants, see, e.g., Brown v. Montoya, 662 F.3d 1152, 1171 (10th Cir. 2011); Aplee. Br. at 24–25, 34–35, and in Superintendent Siegfried's case, absolute immunity, Aplee. Br. at 35.

### V. Plaintiff's Facial Challenge to CCSD's Policies for Fourteenth Amendment Violations

The district court correctly dismissed Plaintiff's facial challenge here because he abandoned it by not addressing it in his response to Defendants' motion to dismiss.  Cl.G., 477 F. Supp. 3d at 1215; see also Aplt. App. 114–30.  Additionally, Plaintiff's briefing of the issue on appeal is inadequate.  See Bronson, 500 F.3d at 1104.

### VI. Conspiracy Under 42 U.S.C. § 1983

The district court dismissed Plaintiff's conspiracy claim because it found that "he failed to establish a constitutional violation."  Cl.G., 477 F. Supp. 3d at 1216.  Because Plaintiff has properly pled a constitutional violation, we remand Plaintiff's conspiracy claim to the district court to evaluate in the first instance.  Underwood, 996 F.3d at 1056–57.

### Conclusion

Plaintiff has properly pled that Defendants violated C.G.'s First Amendment rights by disciplining him for his post.  Accordingly, we reverse the district court's dismissal of Plaintiff's first claim and do not reach Plaintiff's related facial challenge.  We also reverse the district court's dismissal of Plaintiff's claim of a procedural due process violation under Goss for C.G.'s initial suspension.  The district court's dismissal of Plaintiff's second alleged due process violation under Goss for C.G.'s first suspension extension is consequently vacated for reconsideration, as are the final suspension extension and expulsion.  We affirm the

dismissal of Plaintiff's further facial challenges to CCSD's policies.  Finally, we

remand the questions of qualified and absolute immunity and Plaintiff's conspiracy

claim for consideration in accordance with this court's decision.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert
Clerk of Court

Jane K. Castro
Chief Deputy Clerk

July 06, 2022

Mr. Jamie Hubbard
Stimson Stancil LaBranche Hubbard
1652 North Downing Street
Denver, CO 80218

Mr. Andrew McNulty
Killmer, Lane & Newman
1543 Champa Street, Suite 400
Denver, CO 80202

**RE:** **20-1320, C1.G v. Siegfried, et al**
Dist/Ag docket: 1:19-CV-03346-RBJ

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14
days after entry of judgment. Please note, however, that if the appeal is a civil case in
which the United States or its officer or agency is a party, any petition for rehearing must
be filed within 45 days after entry of judgment. Parties should consult both the Federal
Rules and local rules of this court with regard to applicable standards and requirements.
In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length,
and no answer is permitted unless the court enters an order requiring a response. *See* Fed.
R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing
petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:      Sophia Sabrina Cope
           Vera Eidelman
           Jonathan Fero
           Matthew Johnathan Koonce
           Sara R. Neel
           Francisco Maria Negron Jr.
           Darpana M. Sheth
           Mark Silverstein
           W. Stuart Stuller
           Ben Wizner

CMW/na

EXHIBIT 2

Chick-fil-A banned from second airport in two weeks

OUT NEWS

# Chick-fil-A banned from second airport in two weeks

"Chick-fil-A embraces all people, regardless of race, gender, ethnicity, sexual orientation or gender identity," a company spokeswoman said.



— A Chick-fil-A restaurant in Springfield, Virginia on July 26, 2012. Alex Wong / Getty Images file

 SAVE

April 4, 2019, 4:32 PM PDT / Updated April 4, 2019, 10:19 PM PDT

**By Janelle Griffith**

For the second time in two weeks, Chick-fil-A has been blocked from opening a location at an airport.

Plans for a Chick-fil-A restaurant at the Buffalo Niagara International Airport in New York were nixed late last week, a New York state lawmaker said.

Democratic Assemblyman Sean Ryan of Buffalo said the airport's food vendor notified him that they would not add a Chick-fil-A restaurant to the food court.

Ryan applauded the decision, saying that the owners of the fast-food chain have a history of supporting and funding anti-LGBTQ organizations.

## Get the Morning Rundown

Get a head start on the morning's top stories.

| Enter your email | **SIGN UP** |
|---|---|

THIS SITE IS PROTECTED BY RECAPTCHA PRIVACY POLICY | TERMS OF SERVICE

"The views of Chick-fil-A do not represent our state or the Western New York community, and businesses that support discrimination have no place operating in taxpayer-funded public facilities," he said in a statement.

## Recommended



OUT NEWS

**Yeshiva University petitions Supreme Court in bid to prohibit official LGBTQ club**



OUT NEWS

**California may act as U.S. refuge for transgender youths**

In late March, the San Antonio City Council voted against allowing Chick-fil-A to open a restaurant at San Antonio International Airport, over what it called the company's "legacy of anti-LGBT behavior."

Earlier last month, ThinkProgress published a report based on newly released tax filings that claimed Chick-fil-A donated $1.8 million to anti-LGBTQ groups in 2017, including one that allegedly bars employees from "homosexual acts."

Chick-fil-A said in a statement that "recent coverage about Chick-fil-A continues to drive an inaccurate narrative about our brand."

"We want to make it clear that our sole focus is on providing delicious food and welcoming everyone — not being a part of a national political conversation," the statement said. "We do not have a political or social agenda. More than 145,000 people from different backgrounds and beliefs represent the Chick-fil-A brand. We embrace all people, regardless of religion, race, gender, ethnicity, sexual orientation or gender identity."

---



Janelle Griffith

Janelle Griffith is a national reporter for NBC News focusing on issues of race and policing.

---

ABOUT

CONTACT                                        CA NOTICE

HELP                                           TERMS OF SERVICE

CAREERS                                        NBC NEWS SITEMAP

AD CHOICES                                     ADVERTISE

PRIVACY POLICY

© 2022 NBC UNIVERSAL



# Women's Equality in Utah

Why Utah Is Ranked as the Worst State,
and What Can Be Done

December 2, 2021

WHITE PAPER | No. 4
Commissioned by Zions Bank



UtahState University.

# Women's Equality in Utah:

## Why Utah Is Ranked as the Worst State, and What Can Be Done

Susan R. Madsen & Greg P. Madsen  |  December 2, 2021

## Introduction

For the fourth year in a row, WalletHub has named Utah as the worst state in the nation for women's equality in their report "2021's Best & Worst States for Women's Equality," released August 23, 2021.[1] To ascertain where women receive the most equal treatment, WalletHub's analysis compared the 50 states across 17 key indicators of women's equality. The indicators ranged from the gap between the number of female and male executives, to the disparity in unemployment rates for women and men, to gender differences in education and health.

WalletHub is not alone in ranking Utah at the bottom of lists that analyze how women fare in the nation. For example, in 2014, 24/7 Wall St. ranked Utah the lowest of "The 10 Worst States for Women" in a report that considered, among other factors, the gender wage gap, poverty rate, percentage of women in the state legislature, and infant mortality rate.[2] In 2013, the Center for American Progress report "The State of Women in America" ranked Utah 49th of 50 states with an "F" grade;[3] this analysis considered 36 factors related to women's economic security, leadership, and health. In addition, economists from the University of Chicago, Northwestern University, and National University of Singapore conducted an in-depth study based on a nationwide questionnaire measuring sexist attitudes—beliefs that isolate or devalue women.[4] The resulting 2019 publication ranked Utah as the second-most sexist state, and researchers found that Utah women's internalized sexism appeared to play a unique role.

Yet, research continues to show that organizations and entities will increasingly thrive when both men and women hold leadership roles and are provided equitable opportunities and access to resources.[5] Gender inclusivity benefits not only businesses, but also entities such as churches, state legislatures, city councils, the state government, and society at large. Studies show that there are numerous benefits to attracting, retaining, promoting, and empowering women within organizations and entities. In fact, this topic is central to current discussions around meeting the current and future needs of Utah's thriving economy. And, more generally, the United Nations continues to report that gender equality is "critical to all areas of a healthy society, from reducing poverty to promoting the health, education, protection and the well-being of girls and boys."[6]

When focused specifically on the most recent WalletHub report and rankings, the questions then become:

1. What are the specific metrics that WalletHub uses for their state-by-state rankings?
2. What do these metrics tell us about Utah women?
3. What can Utah decision makers and residents do to improve women's equality in Utah?

---

[1] McCann, A. (2021, August 23). *Best & worst states for women's equality.* WalletHub. https://wallethub.com/edu/best-and-worst-states-for-women-equality/5835

[2] Frohlich. T. C. (2014, October 16). *The 10 worst states for women.* 24/7 Wall St. https://247wallst.com/special-report/2014/10/16/the-10-worst-states-for-women-2/4/

[3] Chu, A. & Posner, C. (2013, September 25). *The state of women in America.* Center for American Progress. https://www.americanprogress.org/issues/women/reports/2013/09/25/74836/the-state-of-women-in-america/

[4] Ingraham, C. (2018, August 21). *Utah is the second-most sexist state, researchers say—and women's internalized sexism appears to play a unique role here.* The Salt Lake Tribune. https://www.sltrib.com/news/2018/08/21/researchers-identify-most/

[5] Madsen, S. R. (2015, January 12). *Why do we need more women leaders in Utah?* Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/10-why-do-we-need-more-women-leaders.pdf

[6] United Nations. (n.d.). *Gender equality: Why it matter*s. Sustainable Development Goals. https://www.un.org/sustainabledevelopment/wp-content/uploads/2016/08/5_Why-It-Matters-2020.pdf

The purpose of this white paper is to provide a deeper analysis of these questions to understand why Utah was ranked last—yet again—in the WalletHub study, and what Utahns can do to shift the following aspects: the negative national rankings of women's equality in the state, the harmful perceptions that abound related to Utah not being a good place for women, and Utah women's lived experiences in terms of gender inequality. Frankly, improving this ranking is merely a proxy for addressing critical disparities and inequities in the state. To explore the three questions and gain a deeper understanding of each key indicator, we attempted to locate the original WalletHub data sources to conduct our own analysis. And, in a few cases, we were able to locate more current data.

Zions Bank commissioned the Utah Women & Leadership Project (UWLP) to conduct this research due to the Project's focus on producing relevant, trustworthy, and applicable research for decision makers and residents at large. This report is also aligned with the overall UWLP mission of strengthening the impact of Utah girls and women.

## Context

Several contextual aspects are important to note in setting the stage for this report. First, the WalletHub study is focused solely on the U.S. with a comparison among states, but it is important to note that other countries do much better than the U.S. on women's equality. Although there has been substantial progress through the years, many U.S. women still struggle with unequal treatment in society. The World Economic Forum publishes a "Global Gender Gap Report" each year, and in 2021, the U.S. ranked 30th of 156 counties on gender equality, up from its 53rd ranking in 2020.[7] The report is based on a Global Gender Gap Index that measures four key dimensions (economic participation and opportunity, educational attainment, health and survival, and political empowerment). Geographically, according to the report, "the global top 10 continues to be dominated by Nordic countries, with Iceland, Norway, Finland and Sweden in the top five. The top 10 is completed by one country from Asia Pacific (New Zealand, 4th), two Sub-Saharan countries (Namibia, 6th, and Rwanda, 7th), one country from Eastern Europe (the new entrant to the top 10, Lithuania, 8th), and two Western European countries (Ireland, 9th, and Switzerland, 10th, another first-time entrant to the top 10)."[8]

Second, it is important to note the additional challenges women have disproportionately experienced during the worldwide COVID-19 pandemic.[9] In the U.S. and around the world, women were initially laid off at a greater rate than men and re-employed more slowly.[10] This is indeed true in Utah where, according to the Kem C. Gardner Policy Institute at the University of Utah, from 2019 to 2020 jobs held by women declined at a rate more than double that of men, and unemployment rose more for females than males.[11] Even though Utah's economy rebounded quickly, the short- and long-term impacts of the pandemic still linger and continue to influence women's careers, decisions, and lives more generally. More details about the impact of COVID-19 on Utah women and work can be found in six UWLP reports: Changes, Burnout, and Hope;[12] Career Advancement Challenges;[13] Childcare and

---

[7] World Economic Forum. (2021, March). *Global gender gap report 2021: Insight report.* https://www3.weforum.org/docs/WEF_GGGR_2021.pdf

[8] World Economic Forum. (2021, March). p. 9.

[9] McKinsey & Company & Lean In. (2021, September). *Women in the workplace 2021.* https://www.mckinsey.com/featured-insights/diversity-and-inclusion/women-in-the-workplace

[10] Cerullo, M. (2021). *Nearly 3 million U.S. women have dropped out of the labor force in the past year.* CBS News. https://www.cbsnews.com/news/covid-crisis-3-million-women-labor-force/

[11] Kem C. Gardner Policy Institute. (2021, March). *COVID-19 impacts by gender.* https://gardner.utah.edu/wp-content/uploads/C19Impacts-FS-Mar2021.pdf

[12] Hansen, J., Hartwell, C., & Madsen, S. R. (2021, April 6). *The impact of COVID-19 on Utah women and work: Changes, burnout, & hope.* Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/30-impact-of-covid-19-on-utah-women-work-changes-burnout-hope.pdf

[13] Christensen, M., & Madsen, S. R. (2021, May 5). *The impact of COVID-19 on Utah women and work: Career advancement challenges.* Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/32-covid-19-career-advancement-challenges.pdf

Homeschooling;[14] Caregiver Experiences;[15] Resilient Mindset and Wellbeing;[16] and Health Impacts[17] (see footnotes for details).

Third, more than 60% of Utah's population are members of The Church of Jesus Christ of Latter-day Saints,[18] and this religion has a profound influence on the actions, attitudes, and beliefs of its members. The Latter-day Saint Church emphasizes family formation, and, while recognizing equality between partners in marriage, it also emphasizes that genders have different roles—men and fathers to provide and protect, and women and mothers to nurture and teach their children.[19] This division of effort and focus continues to influence the labor force decisions of many Utah residents and most likely impacts how Utah scores on several of the metrics measured in the WalletHub survey (e.g., gender wage gap, corporate leadership representation, and hours worked outside the home). It is also important to recognize that WalletHub's ranking and weighting system may not include other potential equality metrics that could shed a more positive light on Utah women's contributions in various domains, including the home and community.

Finally, the fact that WalletHub has identified Utah as the worst state for women regarding women's equality does not mean that it is the worst state for women more generally. WalletHub has two annual state ranking reports that focus on women. The report analyzed herein is focused on women's *equality*, where Utah ranked 50th of 50 states. The other report centers on "Best & Worst States for Women"[20] more generally, where Utah ranks much better—28th. This ranking includes women's economic and social wellbeing (Utah=32) and women's health and safety (Utah=24). Only a few of the metrics from that index are repeated in the women's equality index. Importantly, neither ranking directly addresses metrics that focus specifically on women of color. Although we do not analyze the results of the second report ("Best & Worst States for Women") in this paper, Appendix A lists the metrics used to determine these rankings. In terms of the "Best and Worst States for Women's Equality," it is interesting to note that there was a nearly 50-point gap in the total scores between the top state—Nevada—at 77.55 and Utah's score of 29.85 (of 100 points possible)[21] on the women's equality ranking. However, while Nevada is the best and Utah is the worst state for women's equality, Utah ranks significantly higher than Nevada in the "Best & Worst States for Women," where Utah ranks 28th and Nevada 44th. In addition, while Utah slightly closed the women's equality gap with 49th-ranked Idaho in 2021, Utah lags by 7.52 points.[22]

---

[14] Hartwell, C., Hansen, J., & Madsen, S. R. (2021, June 2). *The impact of COVID-19 on Utah women and work: Childcare and homeschooling*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/33-covid-19-childcare-homeschooling.pdf

[15] Christensen, M., & Madsen, S. R. (2021, July 14). *The impact of COVID-19 on Utah women and work: Caregiver experiences*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/35-covid-19-caregiver-experiences.pdf

[16] Hansen, J., Hansen, J., Hartwell, C., & Madsen, S. R. (2021, August 18). *The impact of COVID-19 on Utah women and work: Resilient mindset and wellbeing*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/36-covid-19-resilient-mindset-wellbeing.pdf

[17] Christensen, M., Madsen, S. R., Dyckman, J., & McAdams-Jones, D. (2021, September 1). *The impact of COVID-19 on Utah women and work: Health impacts*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/37-covid-19-health-impacts.pdf

[18] The Church of Jesus Christ of Latter-day Saints. (2021). *Utah*. https://newsroom.churchofjesuschrist.org/facts-and-statistics/state/utah

[19] The Church of Jesus Christ of Latter-day Saints. (1995). *The family: A proclamation to the world*. https://www.churchofjesuschrist.org/study/scriptures/the-family-a-proclamation-to-the-world/the-family-a-proclamation-to-the-world?lang=eng

[20] McCann, A. (2021, March 1). *Best & worst states for women*. WalletHub. https://wallethub.com/edu/best-and-worst-states-for-women/10728

[21] Jacobs, B. (2021, August 23). *Utah ranked worst state for women's equality—again*. The Salt Lake Tribune. https://www.sltrib.com/news/2021/08/23/utah-ranked-worst-state/

[22] McCann, A. (2021, August 23).

## Research Methods

This study comprises a three-part data gathering and analysis process.

*First,* this research investigates WalletHub's "2021's Best & Worst States for Women's Equality" report released on August 23, 2021.[23] To rank women's equality, WalletHub compared the 50 states across 17 key indicators of women's equality and evaluated the states on workplace environment, education and health, and political empowerment. They analyzed the 17 metrics, each of which are highlighted below with their corresponding weights. According to WalletHub, "Each metric was graded on a 100-point scale, with a score of 100 representing the most favorable conditions for women's equality."[24] For all metrics, they compared the differences between women and men. The report's author explained that for certain metrics—where women showed an advantage over men—they treated the state as having gender equality. They then determined each state's weighted average across all metrics to calculate its overall score to rank-order their sample. The data WalletHub used to create their rankings were collected from a variety of sources: U.S. Census Bureau, U.S. Bureau of Labor Statistics, Equal Employment Opportunity Commission, National Women's Law Center, Institute for Women's Policy Research, National Center for Education Statistics, Centers for Disease Control & Prevention, and Center for American Women and Politics.

*Second*, we contacted WalletHub directly on multiple occasions to request further data and clarification. Although they would not share their proprietary algorithm, they did provide a Utah-specific spreadsheet that included results and ranks for each of the 17 key indicators, which was not available online. They also provided the results for the best and worst states that helped us set a baseline for each indictor and provided data sources used for the eight indicators we were not able to locate.

*Third*, we located original sources measuring and reporting the metrics incorporated into the WalletHub women's equality analysis. On many metrics, we found the exact data source utilized by WalletHub. However, as there is significant complexity in the analysis of each metric, our data and data source could have differed from the WalletHub data based on time frame, target population, inclusions, exclusions, or a host of other elements. We then calculated our own scores with the data collected from all sources, and, although some of our final scores were slightly different from those of WalletHub (ours were slightly higher), Utah was still ranked last with Idaho in the next-to-last position. This confirmed our calculations were close to WalletHub's final analysis, and these calculations provide the foundation from which to answer the three questions posed in the introduction of this report. In the analysis that follows, rankings in the summary tables are WalletHub calculations, as are the best and worst scores. The point totals for each are UWLP calculations. WalletHub published combined points based on the three areas—workplace environment, education and health, and political empowerment—but they did not publish or provide scores on the 17 individual metrics.

## Analysis and Findings

To determine women's equality, WalletHub compared the 50 states across 17 key indicators categorized in three primary areas: (1) Workplace Environment, (2) Education & Health, and (3) Political Empowerment. This section analyzes the data by area and key indicator. As mentioned previously, all metrics compared the differences between women and men, with the total state score representing scores out of 100 points possible, with 100 being the most favorable for women's equality.[25] Although Idaho's data are not discussed in depth in this report, we have included Idaho in the tables below because they were ranked overall as the second-worst state for women's equality and are of particular interest to Zions Bank, who commissioned this report. We have also included tables in the appendices that summarize WalletHub's findings, along with our own analysis for Utah (see Appendix B) and Idaho (see Appendix C). Our review and explanation of the three primary areas and 17 related metrics, along with recommendations on how to improve Utah's scores for each, follows.

---

[23] McCann, A. (2021, August 23).
[24] McCann, A. (2021, August 23).
[25] McCann, A. (2021, August 23).

# WORKPLACE ENVIRONMENT (40 POINTS)

Utah ranked 44th overall in the "Workplace Environment" section of WalletHub's report, while Idaho ranked 41st. Ten key indicators comprise this area, and scores of each were combined to comprise 40 of the 100 points available for the overall state equality measure. Each key indicator will be discussed in turn.

1. **Income Disparity** (~12.63 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -25.50% | 45 | 1.52 |
| Best State | Maryland | -10.90% | 1 | 12.63 |
| Worst State | Wyoming | -27.50% | 50 | 0.00 |
| Neighbor State | Idaho | -25.80% | 47 | 1.29 |

For this indictor, "income" refers to median weekly earnings. The percentage in the "Measure" column indicates the percentage that women earn compared to men's wages. The WalletHub report shows Utah women earning 25.5% less than men,[26] while other gender pay gap reports have shown Utah having an even larger pay gap (~30%).[27] The best state for income disparity is Maryland, where women, on average, earn 10.9% less than men. The worst-ranked state is Wyoming, where women earn 27.5% less than men. An annualized analysis of March 2021 payroll reports by the National Women's Law Center (NWLC) has Wyoming and Utah with 35% and 30% disparities in compensation, respectively. The NWLC also has Utah ranked lower than WalletHub's ranking, at 49th, but increases Utah's women's equality points to 2.43. In addition to assessing the wage gap, another important income metric for Utah women is their overall pay when compared to women nationally. The NWLC data also indicate that Utah women working full time on average earn $39,784 per year, which ranks 34th among the states for women's income. Men in Utah earn an average of $57,117 per year, which puts Utah men in 16th position nationally.[28]

***Recommendations:***  Raise the minimum wage in Utah by $2.00. First, based on 2019 data, 8.1% of men and 14.9% of women earn at or near minimum wage.[29] Because of the higher percentage of women, each $1.00 per hour added to the minimum wage would shrink Utah's wage gap percentage by approximately 0.25%. Therefore, each $1.00 increase in the minimum wage would increase Utah's point score by 0.17. Utah's current minimum wage is $7.25, so raising it to $9.25 would increase the WalletHub score by 0.34.

Second, establish a stand-alone equal pay act. Based on a recent in-depth analysis of all 50 states' public policies on the state equal pay laws ("Addressing the Gender Pay Gap in Utah with State Equal Pay Laws"),[30] UWLP analysts recommend a stand-alone equal pay act comparable to what already exists in most states that would provide the following provisions: (a) a private right of action for aggrieved employees, (b) at least a one-year statute of limitations, (c) antiretaliation protections, (d) pay transparency protection, and (e) a salary history ban. Each provision could be enacted independently. The report also recommends conducting a comprehensive, Utah-specific study on the causes and effects of Utah's gender pay gap.

---

[26] McCann, A. (2021, August 23).

[27] Winkel, R., Darowski, E. S., Christensen, M., & Madsen, S. R. (2021, October 5). *Utah gender wage gap: A 2021 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/31.pdf

[28] National Women's Law Center. (2021, March). *Wage gap overall state rankings*. https://nwlc.org/wp-content/uploads/2021/03/Overall-Wage-Gap-State-By-State-2021-v2.pdf

[29] U.S. Census Bureau. (2019). *Earnings in the past 12 months (in 2019 inflation-adjusted dollars)*. https://data.census.gov/cedsci/table?q=S2001&g=0100000US%240400000&tid=ACSST5Y2019.S2001&hidePreview=true

[30] Gould, L. J. (2021, June 29). *Addressing the gender pay gap in Utah with state equal pay laws*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/wp/no-2.pdf

More general recommendations recently published in the research snapshot "Utah Gender Wage Gap: A 2021 Update"[31] include encouraging women in Utah to complete postsecondary certificates and degrees at all levels, including graduate education. In addition, teen and young adult Utah women need resources and support to help them navigate family and work options and to plan education and career goals. Cultural norms or attitudes that prevent or deter young women from this decision-making process—that suggest moral implications for women who work outside the home or that put work and family priorities at odds without considering that success can be attainable in both areas—need to be evaluated, discussed openly, and adjusted. Women of all ages would benefit from a greater awareness of the career options available to them, including occupations and industries that are currently dominated by men and are higher paying. Additionally, women need access to organizations that instruct and support those who wish to re-launch into careers after time spent away from the workforce.

Utah's well-respected business community could provide additional support for female-owned businesses, including equitable access to funding, which can help narrow the gender wage gap. Forward-thinking companies would also do well to find ways to support female talent and develop female leadership within their organizations; they can also remove structural and cultural barriers to retaining that female talent. Finally, women can benefit from a variety of professional development opportunities, including negotiation training. These broader recommendations could impact the pay gap as well as other indicators also highlighted in this report.

2. **Higher Income Disparity** (~4.21 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -13.00% | 48 | 0.23 |
| Best State | Maine | -6.20% | 1 | 4.21 |
| Worst State | New Jersey | -13.40% | 50 | 0.00 |
| Neighbor State | Idaho | -8.40% | 19 | 2.92 |

For this indictor, "higher income" refers to median annual earnings of $100,000 or more. The figure in the "Measure" column above shows the difference between the percentage of full-time working men and women earning more than $100,000 per year. According to our calculations of U.S. Census data,[32] 18.9% of Utah men have "high income," while only 5.9% of Utah women have that level of compensation. The 13.0% disparity between Utah men and women places the state in 48th position. According to U.S. Census payroll data, the best state in this metric is Maine, where 13.1% of men and 6.9% of women working full time earn more than $100,000 per year. The state with the widest gap is New Jersey, where 31% of men and 17.6% of women earn more than $100,000, making the disparity between men and women 13.4%.[33] For this key indicator, our analysis matched WalletHub's report.

***Recommendations***: Increase the number of women who earn higher incomes. Currently, 21,887 Utah women have incomes above $100,000, representing 5.9% of all full-time working women. Each additional 3,700 women who earn over $100,000 would increase the rate 1%, adding 0.60 to Utah's total score.

More general recommendations also include continued work with girls and young women—and those who influence them—to envision a myriad of choices when considering college and university certificates, degrees, and future occupations. Most Utah women do not pursue careers in highly compensated fields such as science, technology, engineering, math (STEM), sales, law, and business management. In addition, Utah employers who are proactive in terms of offering flexible and family-

---

[31] Winkel, R., Darowski, E. S., Christensen, M., & Madsen, S. R. (2021, October 5).

[32] U.S. Census Bureau. (2019). *Earnings in the past 12 months (in 2019 inflation-adjusted dollars)*. https://data.census.gov/cedsci/table?q=S2001&g=0100000US%240400000&tid=ACSST5Y2019.S2001&hidePreview=true

[33] U.S. Census Bureau. (2019).

friendly benefits are better able to hire, engage, retain, and promote female employees into higher-paying positions within their organizations.[34] Such policies could include remote work/flexibility with work location, flexibility with working hours, paid maternity and paternity leave, paid family leave, professional part-time and job-sharing roles, programs for returning workers, childcare resources and support, and tuition reimbursement. Legislation that encourages, supports, and rewards businesses with these policies can also impact these employment efforts as well.

3. **Disparity in Share of Executive Positions** (~4.21 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -1.37% | 46 | 0.92 |
| Best State | Wyoming | -0.26% | 1 | 4.21 |
| Worst State | New Jersey | -1.66% | 50 | 0.00 |
| Neighbor State | Idaho | -0.95% | 23 | 2.17 |

This indicator reflects the number of working individuals who hold executive positions as a percentage of full-time workers by gender. Executive titles include positions such as CEO, CFO, COO, Vice President, and Director. According to datasets from the U.S. Equal Employment Opportunity Commission, in Utah, 6,668 men hold executive positions, representing 2.1% of working men, while 1,831 women hold executive positions, representing 0.8% of working women.[35] Hence, Utah men are almost three times more likely than Utah women to hold an executive role. The state with the narrowest difference between men and women in executive representation is Wyoming, where the percentage differential is slightly over 0.25%; the worst state is New Jersey, where the differential is 1.7%. For this key indicator, the findings of our analysis were identical to those of WalletHub.

*Recommendations*: Promote more women executives. For every 130 additional women executives, Utah's score will raise by 1/10th of a percent, increasing Utah's point total by 0.3 points. We recommend working toward increasing the number of women in executive positions by at least 780 Utah women, which would add 1.80 points in this category.

In addition to those highlighted in the previous section, additional general recommendations include efforts to increase awareness of, along with tools to mitigate, conscious and unconscious bias for all Utah residents. Employers can also initiate the exploration of invisible systemic sexism and racism that are often intertwined with the procedures, processes, and systems that often do not benefit all employees equitably. In addition, we recommend career development initiatives and programs that encourage and prepare women for executive roles.

4. **Disparity in Share of Minimum–Wage Workers** (~2.11 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -10.00% | 1 | 2.11 |
| Best State | Utah | -10.00% | 1 | 2.11 |
| Worst State | Delaware | 66.00% | 50 | 0.00 |
| Neighbor State | Idaho | 60.00% | 47 | 0.19 |

[34] Scribner, R. T., Vargas, M., & Madsen, S. R. (2020, December 2). *Flexible and family-friendly policies at Utah's "Best Places to Work."* Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/27-flexible-family-friendly-policies-utah-best-places-to-work.pdf

[35] U.S. Equal Employment Opportunity Commission. (2018). *2018 job patterns for minorities and women in private industry (EEO-1) raw datasets.* https://www.eeoc.gov/statistics/2018-job-patterns-minorities-and-women-private-industry-eeo-1-raw-datasets

On this metric, we located the exact data used in WalletHub's analysis, supplied by the National Women's Law Center.[36] This metric compares the number of full-time individuals in each state earning minimum wage by gender. However, because Utah has so many more men (634,400) than women (369,454) working full-time, year-round, according to 2019 U.S. Census data,[37] this metric—showing a disparity of 10%—is not particularly useful. Hence, because of the way WalletHub calculated their points, more men earning minimum wage than women gives Utah the best ranking in the nation for the gender ratio of workers in minimum wage jobs. The worst state is Delaware, where the number of women in minimum wage jobs exceeds the number of men by 66%. WalletHub allotted only 2.11 points to this metric, and Utah received all possible points.

**Recommendations:** As Utah received all possible points on this metric, no immediate or longer-term actions can be taken to improve Utah's score on the WalletHub women's equality report.

More generally, however, Utah's minimum wage matches the federal minimum wage of $7.25 per hour, which has not changed since 2009. Increasing it would raise the earnings and family income of most low-wage workers—thousands of whom are women—lifting some families out of poverty.[38] Some experts fear that it could cause other low-wage workers to become jobless, but with Utah's thriving economy and employee shortage, this should not pose a significant concern. We also recommend increasing investments in training and upskilling opportunities for women that will result in higher-paying employment.

5. **Unemployment Rate Disparity** (~4.21 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | 0.50% | 26 | 3.25 |
| Best State | Wyoming | -1.60% | 1 | 4.21 |
| Worst State | New Jersey | 2.20% | 50 | 0.00 |
| Neighbor State | Idaho | 0.70% | 32 | 2.87 |

This measure compares unemployment rates for women and men. According to the U.S. Bureau of Labor Statistics, the 2020 unemployment rate for Utah women was 5.1%, while the unemployment rate for Utah men was 4.6%, leaving a disparity of 0.5%.[39] More specifically, in 2020, there were 686,000 Utah women employed and 37,000 unemployed and seeking work. The best state for this metric is Wyoming, where the unemployment rate for women was 1.6% lower than the rate for men. The worst state for this metric was New Jersey, where the rate for women was 2.2% higher than for men. Although Utah stands in the middle of the 50 states on this disparity metric, the unemployment rate for Utah women is 6th-lowest in the nation. Our data analysis and ranking mirror WalletHub for this measure.

**Recommendations:** Reduce the unemployment rate for women and pay a living wage. Finding jobs for 686 women reduces the unemployment rate by 0.1%, which increases Utah's total by 0.19 points. Of course, women, their families, and the state as a whole benefit when women who are looking for employment find stable work that provides a living wage.

---

[36] National Women's Law Center. (2021). *Women and the minimum wage, state by state.* https://nwlc.org/wp-content/uploads/2018/08/Women-Minimum-Wage-2021.pdf
[37] National Women's Law Center. (2018). *Women in the low-wage workforce by state.* https://nwlc.org/wp-content/uploads/2018/06/women-in-low-wage-workforce-by-state-2018-1.pdf. The low-wage workforce is defined here as occupations with median wages of $11.50 or less per hour based on U.S. Department of Labor, U.S. Bureau of Labor Statistics.
[38] Congressional Budget Office. (2021). *How increasing the federal minimum wage could affect employment and family income.* https://www.cbo.gov/publication/55681
[39] U.S. Bureau of Labor Statistics. (2020). *Geographic profile of employment and unemployment, 2020.* https://www.bls.gov/opub/geographic-profile/home.htm

More generally, we recommend, as was mentioned previously, increasing investments in training and upskilling opportunities for women, including initiatives related to STEM, trade, and business occupational readiness. In addition, encouraging women to complete postsecondary certificates and degrees at all levels, including graduate education, is directly linked to the reduction of unemployment for women. Utah women also need resources and support to assist them in navigating the intersection between work and family, as well as planning for future education and career goals.

6. **Entrepreneurship Rate Disparity** (~4.21 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -44.68% | 39 | 0.69 |
| Best State | Alaska | -29.30% | 1 | 4.21 |
| Worst State | Massachusetts | -47.70% | 50 | 0.00 |
| Neighbor State | Idaho | -36.94% | 12 | 2.46 |

This metric compares the number of women-owned businesses with the number of men-owned businesses. The U.S. Census Bureau collects and publishes data on women- and men-owned private businesses as part of their Annual Business Survey.[40] For each state, they publish the total number of private businesses, the number of male- and female-owned businesses that exist, along with sales volume, number of employees, and total payroll. The WalletHub analysis was done solely on the number of firms, gender-based totals as a percent of the total number of privately-owned businesses. Utah, based on the 2017 Annual Business Survey, had 10,215 women-owned businesses, 39,451 male-owned businesses, and 65,430 total, with some being co-owned by men and women. Men owned 60.3% of businesses, women owned 15.6%, with the difference being 44.68%, as shown above. The best state for this metric is Alaska, where the disparity in the calculation is only 29.3%, while the worst state is Massachusetts where the disparity is 47.7%. Idaho is better than Utah, with a disparity of 36.9%, while Utah, at 44.7%, ranks of 39th among the states. Our data source, rankings, and analysis match WalletHub for this measure.

*Recommendations*: Prioritize the creation of women-owned businesses. Adding 1,000 additional women-owned businesses in Utah would reduce the disparity by 2.2%, which would increase the state's women's equality score by half a point.

More general recommendations include continued support and expansion of the Women's Business Center of Utah and women-focused initiatives connected to Utah's Small Business Development Centers, the Business Resource Centers, and Chambers throughout the state. Utah is also the home to a host of women's networks and groups focused on women and business.[41] Utah has numerous academic courses and programs at public and not-for-profit colleges and universities that provide in-depth knowledge and skills to succeed in business creation and growth. Some Utah academic centers are beginning to focus on initiatives specifically for women, which is critical. In addition, efforts to increase women's access to venture capital will be foundational for Utah to become an optimal environment for women wanting to start and grow thriving businesses. Finally, additional work and resources related to policy, professional development, networking, and other best practices more broadly for women continue to be important.[42]

---

[40] U.S. Census Bureau, (2017). *Annual Business Survey.* https://data.census.gov/cedsci/table?q=ABSCS2017.AB1700CSA01&y=2017&d=ECNSVY%20Annual%20Business%20Survey%20Annual%20Business%20Survey&tid=ABSCS2017.AB1700CSA01&hidePreview=true

[41] See the Utah Women & Leadership Project's webpage titled "Utah Women Groups and Networks: https://www.usu.edu/uwlp/resources/utah-womens-groups

[42] Townsend, A., Madsen, S. R., & Wallace, A. M. (2020). *The status of women and entrepreneurship in Utah: A 2020 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/22-status-of-women-and-entrepreneurship.pdf

7. **Disparity in Average Number of Work Hours** (~2.11 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -17.78% | 50 | 0.00 |
| Best State | Nevada | -9.16% | 1 | 4.21 |
| Worst State | Utah | -17.78% | 50 | 0.00 |
| Neighbor State | Idaho | -17.07% | 47 | 0.17 |

For this indicator, "Average Number of Work Hours" pertains to full-time workers. According to the U.S. Census Bureau, full-time women employees in Utah work an average of 33.3 hours per week, while full time-men in Utah work an average of 40.5 hours per week, representing a 17.8% difference; Utah ranks as the worst state on this metric.[43] The highest-scoring state for this metric is Nevada, where the difference is only 9.0%. In Idaho, men work 41.5 hours on average, while women work 34.5, a difference of 17.1%. Our data analysis and ranking match WalletHub on this measure. Interestingly, WalletHub notes that this key indicator disadvantages men because they work more hours. Again, the WalletHub ranking focuses on the disparity between men and women in all metrics.

**Recommendations:** To move Utah up from last place, women need to increase their paid working time per week by 26 minutes. Each hour's increase in weekly employment beyond that would decrease the discrepancy by almost 2.5% and would increase Utah's total by 0.63 points.

More generally, Utah has a higher fertility rate than the national average, which impacts parents' employment decisions. However, the research is clear that when employers offer flexible and family-friendly policies—such as remote work/flexibility with work location, flexibility with working hours, paid maternity and paternity leave, paid family leave, professional part-time and job-sharing roles, programs for returning workers, and childcare resources and support—parents are better able to be more productive and thrive in their chosen occupations.[44] Legislation that encourages, supports, and rewards businesses with these policies can also impact these employment efforts as well. The limitation with this measurement is that it does not consider unpaid labor performed by women. Utah women spend an average of 5.5 hours per day in unpaid work vs. 3.2 hours per day for Utah men, which is a wider gap than the national average.[45] If women are to increase their hours doing paid work, it should be balanced by a complementary increase in the unpaid work performed by men, which would reduce the likelihood of women experiencing overwork and burnout.

8. **Job Security Disparity** (~2.11 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | 2.77% | 1 | 2.11 |
| Best State | Maryland | 6.67% | 12 | 2.11 |
| Worst State | Rhode Island | -3.73% | 50 | 0.00 |
| Neighbor State | Idaho | 0.62% | 1 | 2.11 |

This metric, in our opinion, is not ideal for measuring what WalletHub was hoping to capture. Overall, unemployment rates improved from 2018 to 2019. WalletHub indicated that they analyzed 2018 and 2019 unemployment data provided by the U.S. Bureau of Labor Statistics and developed this metric based on whether men or women benefitted the most from the changes that occurred in the

---

[43] U.S. Census Bureau. (2019). *Mean usual hours worked in the past 12 months for workers 16 to 64 years.* https://data.census.gov/cedsci/table?q=B23020&g=0100000US%240400000&tid=ACSDT5Y2019.B23020&hidePreview=true

[44] Scribner, R. T., Vargas, M., & Madsen, S. R. (2020, December 2).

[45] Madsen, S. R., & Scribner, R. T. (2017, June 5). *Unpaid care work among Utah women.* Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/21.pdf

unemployment rate.[46] From whatever the rate of unemployment was in 2018, if women improved more than men by 2019, the rate is positive. If not, the rate is negative. In Utah, unemployment rates for women dropped from 3.7% in 2018 to 2.7% in 2019, a 1% improvement. In the same period, unemployment for men improved from 2.9% to 2.5%, a 0.4% increase. Therefore, using this form of analysis, women benefitted 0.6% more than men. Because Utah women's improvement in unemployment was larger than the improvement for men, Utah earned full points for this metric, as did every state in which women's progress exceeded men's. However, our analysis and ranking are significantly different from WalletHub's findings. In addition, this metric is based on older data, which have not considered the impacts of COVID-19 on women at work (see Appendix D for a list of UWLP reports on this topic).

***Recommendations*:** It is hard to say why this change is labeled "job security," and it is likewise difficult to develop a strategy to maintain or improve this metric going forward other than to mention that any strategies that families, organizations, and governments can utilize to strengthen job security for all Utahns will benefit women and their families.

9. **Economic Security Disparity** (~2.11 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -1.00% | 1 | 2.11 |
| Best State | Nevada | -1.00% | 1 | 2.11 |
| Worst State | Louisiana | -8.00% | 50 | 0.00 |
| Neighbor State | Idaho | -2.00% | 9 | 1.81 |

This metric is based on the Basic Economic Security Tables (BEST) Index published by the Institute for Women's Policy Research (IWPR),[47] which measures the amount of income working adults of different family configurations need in order to be economically secure. Economic security means having "enough income to meet basic monthly expenses—such as housing, food, transportation and childcare expenses—and save for emergencies and retirement." For each state, the IWPR index indicates the percentages of men and women who enjoy economic security. In every state, men have higher economic security than women. Among Utahns aged 19–64, 66% of women and 67% of men enjoy economic security, a discrepancy of 1%, which ties with Nevada and Vermont as the best of the states. The worst state is Louisiana, where 71% of men and 63% of women enjoy economic security, a disparity of 8%. Our data analysis and ranking are identical to those of WalletHub on this metric.

***Recommendations*:** Although Utah's performance on this metric is excellent, the data need to be updated for the impact of COVID-19 and the rising cost of housing and childcare. According to a Utah IWPR Fact Sheet published in October of 2018,[48] a single working adult with employment-based benefits (such as health insurance and a retirement plan) needs an hourly wage of $13.31 for full-time work (176+ hours per month) to have basic economic security from earned income, which is well above the state minimum wage ($7.25). Working single adults with benefits need approximately $2,342 per month or $28,104 per year. A working adult with one preschooler and one school-aged child needs an hourly wage of $29.34—or an income of $5,163 per month or $61,956 per year—to be economically secure. Of course, working adults without employment-based benefits need even higher incomes to have basic economic security. As mentioned, this information was published before the recent dramatic increase of housing costs, so more recent data are needed.

---

[46] U.S. Bureau of Labor Statistics. (2019). *Expanded state employment status demographic data.* https://www.bls.gov/lau/ex14tables.htm

[47] Institute for Women's Policy Research. (2018). *Basic economic security in the United States.* https://iwpr.org/job-quality-income-security/basic-economic-security-in-the-united-states/

[48] Institute for Women's Policy Research. (2018, October). *Basic economic security in Utah: How much income do working adults need?* https://iwpr.org/wp-content/uploads/2020/08/R583_Utah.pdf

10. **Disparity in Poverty Rate** (~2.11 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | 1.60% | 3 | 1.82 |
| Best State | Alaska | 1.20% | 1 | 2.11 |
| Worst State | Mississippi | 4.10% | 50 | 0.00 |
| Neighbor State | Idaho | 1.80% | 12 | 1.67 |

Utah ranks third in disparity in poverty. However, our data analysis and ranking differ from WalletHub on this metric. Data published in 2019 by the Kaiser Family Foundation (KFF)[49] indicate that 10.6% of Utah's non-elderly women (younger than 65) live at or below the poverty line, compared to 8.3% of non-elderly men. Based on the disparity between men and women, KFF data rank Utah 11th in terms of the smallest disparity. Kaiser ranks Idaho best, with the difference between men and women's poverty rate of 0.8%, while WalletHub ranks Idaho as 12th. KFF's data align with WalletHub in that Mississippi ranks the worst among the 50 states, but they calculate the difference at 7.0% (14.1% men vs. 21.1% women). KFF cites U.S. Census Bureau data, which indicate the overall poverty rate for Utah in 2019 was 8.9%;[50] this puts Utah in second position behind New Hampshire for the lowest overall poverty rate.

It is also important to note that poverty rates are notably worse for certain groups in Utah. For example, in 2016, we reported that minority women are much more likely to live in poverty, as shown here by race or ethnic group: Black (20.3%), Asian/Pacific Islander (21.3%), "Other" or two or more races (21.3%), Hispanic (25.9%), and Native American (36.1%).[51] Other demographic factors, including age, location of residence (rural/urban), and individual living situation also influence the way Utah women experience poverty. For example, in the United States, women aged 65 and over are more likely to be impoverished than men their age, at 12.1% vs. 7.4%, respectively. The higher incidence of poverty among female seniors exists in Utah as well: 8.9% of women live below the poverty line vs. 4.4% of men. Experts attribute some of the disparity to the fact that many women who are now retired worked lower-wage jobs and were less likely to be eligible for retirement benefits. Those factors, combined with women's generally longer life span, contribute to Utah women seniors' higher poverty rates.[52]

***Recommendations***: Reducing the disparity in our unemployment differential between men and women by 4/10s of a percent would give us full points on this metric, an increase of 0.3 points on the women's equality score.

Even though Utah does comparatively well on this metric, thousands of women in Utah still live in poverty, and the tight housing market makes living in poverty a reality for more women. In fact, 37.5% of single mothers with children under 18 and 46.9% who have children under five live in poverty.

**Section Summary**

As mentioned, Utah ranked 44th overall in the "Workplace Environment" section of WalletHub's report. Ten key indicators comprise this section, and combined scores make up 40 of the 100 points available for the overall state equality measure. This first section includes complex key indicators that are weighted

---

[49] Kaiser Family Foundation. (2019). *Nonelderly adult poverty rate by sex*. https://www.kff.org/other/state-indicator/adult-poverty-rate-by-sex/?currentTimeframe=0&sortModel=%7B%22colId%22%3A%20%22Location%22%2C%22sort%22%3A%22asc%22%7D

[50] U.S. Census Bureau. (n.d.). *Poverty thresholds*. https://www.census.gov/data/tables/time-series/demo/income-poverty/historical-poverty-thresholds.html

[51] Madsen, S. R., & Scribner, R. T. (2016). *Poverty among Utah women*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/14.pdf

[52] Madsen, S. R., & Scribner, R. T. (2016).

differently, and there is a significant difference between indicators in terms of the amount of work it will take to improve the related WalletHub score. The box below includes one key recommendation for each of the ten sections discussed, along with the points, if applicable, Utah would gain toward the 100 points allotted through the WalletHub metric.

---

**Workplace Environment Recommendations**

1. Raise the minimum wage by $2.00. (+ 0.34)
2. Increase the number of women who earn over $100,000 by 3,700. (+ 0.20)
3. Add 780 women to executive positions within the state. (+ 1.80)
4. Find solutions to shift more women out of minimum wage jobs.
5. Find jobs for 686 women to reduce the unemployment rate by 0.1%. (+ 0.19)
6. Add 1,000 additional women-owned business in Utah. (+ 0.50)
7. Support female employees by creating flexible and family-friendly policies.
8. Continue efforts regarding job security metrics.
9. Focus on economic security for Utah women.
10. Reduce the disparity between men and women in poverty by 0.4%. (+ 0.30)

---

## EDUCATION & HEALTH (40 POINTS)

Utah ranked 50th overall in the "Education & Health" section of WalletHub's report, while Idaho ranked 49th. The three key indicators in this section were combined to make up 40 of the 100 points available for the overall state equality measure. Each of the key indicators carries a maximum of 13.33 points.

### 11. **Disparity in Advanced Educational Attainment** (~13.33 Points)

| Description | State | Measure | Rank | Points |
|-------------|-------|---------|------|--------|
| Where We Stand | Utah | -4.90% | 50 | 0.00 |
| Best State | Kentucky | 2.76% | 1 | 13.33 |
| Worst State | Utah | -4.90% | 50 | 0.00 |
| Neighbor State | Idaho | -1.80% | 47 | 5.40 |

According to WalletHub, "Advanced Educational Attainment" refers to the share of the population aged 25 and older with an advanced degree (higher than a bachelor's degree).[53] In most states, and in the U.S. in general, women are earning the majority of college degrees. Women earn 57% of bachelor-level diplomas, 60% of master's degrees, and 51.7% of doctorates.[54] In the United States, 13.5% of women earn graduate degrees. Using U.S. Census Bureau educational attainment data, we get slightly different figures than those of WalletHub. In Utah, 9.2% of women and 13.5% of men earn a college degree above bachelors, either a masters or doctorate.[55] The gap in Utah is 4.3%, which is much wider than that of any other state. In fact, there are only seven other states in which men's graduate degree attainment exceeds women's, and the state with the next-widest gap to Utah is Idaho,

---

[53] McCann, A. (2021, August 23).
[54] Sawyer, K., & Valerio, A. M. (2018). *Making the case for male champions for gender inclusiveness at work. Organizational Dynamics, 47*(1), 1–7. https://doi.org/10.1016/j.orgdyn.2017.06.002
[55] U.S. Census Bureau. (2019). *Age by educational attainment.* https://data.census.gov/cedsci/table?q=education&d=ACS%201-Year%20Estimates%20Subject%20Tables&tid=ACSST1Y2019.S1501

where men's attainment exceeds women's by only 1.5%. The best state for this metric is North Carolina, where women's graduate or professional degree attainment exceeds men's by 4.5%.

*Recommendations:* Increase the percentage of Utah women completing graduate degree programs. Further, engage in efforts, initiatives, and programs to encourage more girls and women to participate in and complete graduate degrees. This metric is one of the most significant factors in Utah's scoring and ranking last on the women's equality index. However, moving the needle on this metric is complex. In fact, in order to add a fraction of a point to WalletHub's overall total for Utah, the disparity between men and women's advanced degree attainment would have to be reduced from 4.9% to less than 1.8%.

Of course, efforts to encourage girls and women to obtain graduate degrees have a far greater purpose than getting a better ranking with WalletHub, and, for Utah to match the levels of education for other states, we need to encourage and support girls and women toward pursuing graduate degrees. Along with numerous other benefits, obtaining a graduate degree is also linked to higher pay.[56]

12. **Disparity in Math Test Scores** (~13.33 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -2.0 | 43 | 6.67 |
| Best State | Kentucky | 4.0 | 1 | 13.33 |
| Worst State | Idaho | -4.0 | 50 | 0.00 |
| Neighbor State | Idaho | -4.0 | 50 | 0.00 |

WalletHub keeps the source and calculation of math scores confidential, so it was challenging to reverse engineer their metric. They did inform us that Utah ranks 41st in math disparity, and that Kentucky is the best state while Idaho is the worst. Using 2019 data as reported on the Nation's Report Card, which differ slightly from WalletHub data, Utah 8th grade girls score two points lower on the math assessment exam than do Utah 8th grade boys.[57] The best state for this metric is North Carolina, where girls score five points higher than boys, and, different from the WalletHub data, the worst state is Alaska, where girls score five points lower than boys. Using the Nation's Report Card data, Utah ranks 46th in disparity, while Idaho ranks 49th. While the two produce similar numbers, there is not perfect alignment between the two data sources.

*Recommendations:* Shrinking the disparity in math scores by one point would increase Utah's overall score by 2.67 points.

13. **Disparity in Doctor Visit Affordability** (~13.33 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | 3.70% | 41 | 7.46 |
| Best State | Vermont | -1.20% | 1 | 13.33 |
| Worst State | Texas | 8.40% | 50 | 0.00 |
| Neighbor State | Idaho | 5.20% | 48 | 5.08 |

The Centers for Disease Control and Prevention collects and publishes statistics on behavioral risk factors.[58] This metric measures the share of adults who felt they could not afford a doctor's visit due

[56] College Board. (2020, January 14). *A college education pays off: New College Board report.*
https://newsroom.collegeboard.org/college-education-pays-new-college-board-report
[57] The Nation's Report Card. (2019). *NAEP report card: Mathematics.*
https://www.nationsreportcard.gov/math_2017/states/gaps/?grade=8
[58] Centers for Disease Control. (2019). *Behavioral risk factor surveillance system.*
https://chronicdata.cdc.gov/Behavioral-Risk-Factors/Behavioral-Risk-Factor-Surveillance-System-BRFSS-P/dttw-5yxu

to costs. In Utah, 16.2% of women and 12.5% of men indicated that at some time in 2019 they did not go to a needed doctor visit because of cost, putting women at a 3.7% disadvantage. The best state for this metric is Vermont where more men (9.9%) than women (8.7%) felt they could not afford a visit, while the worst state is Texas, where the disparity is 8.4%. Idaho has a 5.2% difference—17.1% for women and 11.9% for men. Our data on this metric are identical to those of WalletHub.

*Recommendations:* Reducing this disparity related to women's perceptions of the affordability of doctor's visits in Utah by 50%—from -3.70% to -1.85%—would increase the women's equality score by 2.93 points. Implementing programs and policies that help qualifying individuals and families cover doctor visits will improve scores on this metric.

## Section Summary

As mentioned, Utah ranked 50th overall in the "Education & Health" section of WalletHub's report, while Idaho ranked 49th. Three key indicators that comprised this section were combined to make up 40 of the 100 points available for the overall state equality measure, with each indicator carrying a maximum of 13.33 points. The box below includes one key recommendation for each element, along with the points Utah would gain toward the 100 points allotted through the WalletHub metric.

---

### Education & Health Recommendations

1. Increase the percentage of Utah women completing graduate degree programs. (+ 0.10-13.33)
2. Shrink the disparity in math scores by one point. (+ 2.70)
3. Reduce the disparity related to Utah women's perceptions of the affordability of doctor visits by 50%. (+ 2.93)

---

## POLITICAL EMPOWERMENT (20 POINTS)

In the "Political Empowerment" section of WalletHub's report, Utah ranked 49th overall, while Idaho ranked 34th. Four key indicators were included in this area; the four equally weighted scores make up 20 of the 100 points of state equality measures. The four are described below.

14. **Disparity in Share of Lawmakers in U.S. Senate** (~5.00 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -100% | 21 | 0.00 |
| Best State | Minnesota | 200% | 1 | 5.00 |
| Worst State | 30 States Have 0 | -100% | 21 | 0.00 |
| Neighbor State | Idaho | -100% | 21 | 0.00 |

All states have two U.S. Senators, and currently in Utah those two seats are held by Mitt Romney and Mike Lee. Four states (Minnesota, Nevada, New Hampshire, and Washington) have two women senators, while 16 states have one man and one woman serving in those positions. The 30 remaining states, including Utah, have no female representation. Utah has never elected a woman to serve in the U.S. Senate.

*Recommendations***:** Electing one woman U.S. Senator would add five points to Utah's overall women's equality score. This is one area in which Utah would make substantial and immediate progress toward shifting Utah's score upward on the WalletHub ranking for women's equality.

Generally, continuing to support Utah initiatives and efforts designed to raise the political aspirations of girls and women and to provide training, support, and development for women to successfully run

for office—and win—can prepare the next generation of women political leaders. In addition, assertively addressing sexism and discrimination amongst political parties—from caucuses to statewide leadership—will help shift the tide in Utah for all key indictors in this section.

15. **Disparity in Share of Lawmakers in U.S. House of Representatives** (~5.00 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -100% | 37 | 0.00 |
| Best State | Wyoming | 100% | 1 | 5.00 |
| Worst State | 14 States Have 0 | -100% | 37 | 0.00 |
| Neighbor State | Idaho | -100% | 37 | 0.00 |

Since Utah gained statehood, only four women have served in Congress, and two of the four served a single term[59]: Rep. Reva Z. Beck Bosone (1949–1953), Rep. Karen Shepherd (1993–1995), Rep. Enid Greene Waldholtz (1995–1997), and Rep. Mia Love (2015–2019). Of the 439 Representatives currently serving in the U.S. House, 120 (27.3%) are women. Utah has four Representatives, John Curtis, Blake Moore, Burgess Owens, and Chris Stewart. Utah and 13 other states, including Idaho, have no female Representatives in the U.S. House. Three states (Wyoming, Delaware, and New Mexico) have elected only women to represent the state in the U.S. House.

***Recommendations:*** Electing one woman to Congress would add 2.50 points to Utah's overall women's equality score and electing two women would add 5 points. Again, this is one of the places Utah would make immediate progress toward shifting Utah's score upward on the ranking for women's equality.

In addition to the recommendations for Key Indicator #14, conducting rigorous research to unearth details of the existing political culture can help bring awareness to both the positive and negative environment and how it encourages or discourages engagement among women. It will also bring to light changes that need to occur to ensure that all Utahns—no matter gender or race/ethnicity—will be treated fairly and ethically in their ability to run for and be elected to public office.

16. **Disparity in Share of Lawmakers in State Legislature** (~5.00 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -68.3% | 40 | 0.65 |
| Best State | Nevada | 52.00% | 1 | 5.00 |
| Worst State | West Virginia | -86.40% | 50 | 0.00 |
| Neighbor State | Idaho | -54.20% | 22 | 1.17 |

Rutgers Eagleton Institute of Politics[60] reports that 2,290 women hold seats in state legislatures, of 7,383 possible positions; therefore, women hold 31% of the total representation. In 2020, Utah was ranked 32nd in terms of women serving in the state legislature, and that ranking decreased to 40th in 2021, as Utah experienced a 2% decrease in female representation compared to the prior year.[61] One additional woman recently took the seat of a male legislator who resigned in November of 2021. Currently, 17.2% of Utah senators, or 5 of 29 (4 D, 1 R), and 28% of the House of Representatives, or 21 of 75 (12 D, 9 R), are female. Overall, in 2021, 25% (26 of 104) of Utah legislators are women. The best state for this metric is Nevada, where women have been elected to 38 of 63, or 60.3%, of all

---

[59] Payne, H., Christensen, M., & Madsen, S. R. (2021, February 3). *The status of women in Utah politics: A 2021 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/29-status-of-women-in-utah-politics-2021.pdf

[60] Rutgers Eagleton Institute of Politics. (2021). *Women in state legislatures 2021*. https://cawp.rutgers.edu/women-state-legislature-2021

[61] Payne, H., Christensen, M., & Madsen, S. R. (2021, February 3).

seats. The worst state is West Virginia, where women fill just 16 of 134, or 11.9%, of all seats. In Idaho, women fill 33 of 105 seats, or 31.4% of total representation. While our own analysis of state legislature representation was slightly different, we also found that Utah ranked 40th (1.59 points) and Idaho 22nd (2.56 points).

*Recommendations*: Each woman elected to the Utah legislature would add nearly a tenth of a point to Utah's overall women's equality score for WalletHub. Hence, it would take ten additional women elected for each point added to the score. Adding at least four women senators and three women representatives will provide enough women for what the literature calls a "tipping point"—where a critical mass is represented and seen as more of an influence in the governing body. It would also increase the WalletHub points by 0.88.

17. **Disparity in Share of State-Elected Executives** (~5.00 Points)

| Description | State | Measure | Rank | Points |
|---|---|---|---|---|
| Where We Stand | Utah | -75.00% | 39 | 2.00 |
| Best State | Oregon | 300% | 1 | 5.00 |
| Worst State | 11 States at 0 | -100% | 50 | 0.00 |
| Neighbor State | Idaho | -25.00% | 12 | 4.29 |

At the national level, 2021 data show that women now hold 30.3% (94 of 310) of statewide executive offices (SEO) (51 D, 41 R, 2 NP), compared to 24.4% in 2017. Currently, two states (Tennessee and Maine) have only a single state elected official, while six states have 10 or more. Utah has five elected SEO seats: governor, lieutenant governor, attorney general, treasurer, and auditor. There is currently one woman serving in Utah SEO, as Deidre Henderson won the 2020 election for lieutenant governor. Of the five statewide offices up for election in 2020—governor/lieutenant governor, attorney general, state auditor, and state treasurer—both the Democratic and Republican parties nominated a female candidate for lieutenant governor. The best state for this metric is Oregon, where four of five state elected officials are women. Alaska and nine other states have no women serving as elected executives. In Idaho, three of the seven elected state executives are women. While our calculations differed slightly from WalletHub's, the points awarded for Utah and Idaho are 2.00 and 4.29, respectively. In our own analysis, Utah ranks at 33rd, with Idaho falling to 14th.

*Recommendations*: Adding another female to an elected statewide executive office in Utah would increase the overall women's equality score by 2 points.

## Section Summary

As mentioned, Utah ranked 49th in the "Political Empowerment" section of WalletHub's report, while Idaho ranked 34th. The four combined key indicators in this section comprise 20 of the 100 points available for the overall state equality measure. Each of the key indicators in this section is worth five points. The box below includes one key recommendation for each of the four indicators in this section, along with the points Utah would gain toward the 100 points allotted through the WalletHub metric.

---

### Political Empowerment Recommendations

1. Elect a woman for one of the two seats in the U.S. Senate. (+ 5.00)
2. Elect women for two of four seats in the U.S. House of Representatives. (+ 5.00)
3. Elect 7 additional women to the Utah House and Senate. (+ 0.88)
4. Elect 1 additional woman to a statewide executive office. (+ 2.00)

---

17

## Conclusion & Final Recommendations

The purpose of this white paper is to explore what Utahns can do to shift the negative national rankings of women's equality in the state, the harmful perceptions that abound related to Utah not being a good place for women, and Utah women's lived experiences in terms of gender inequality. To do this, we conducted an in-depth analysis of the most recent WalletHub report, "2021's Best & Worst States for Women's Equality," to assist us in answering three questions:

1. What are the specific metrics that WalletHub uses for their state-by-state rankings?
2. What do these metrics tell us about Utah women?
3. What can Utah decision makers and residents do to improve women's equality in Utah?

We explored WalletHub's 17 key indicators categorized in three primary areas—Workplace Environment, Education & Health, and Political Empowerment. Related to the last question, what Utah decisions makers and residents can do to improve women's equality in Utah, we have not only included recommendations in each key indicator section, but we have also included one key recommendation for each indicator at the end of each of the three primary area sections. In the box that follows, we have included our top 10 recommendations for Utah decisions makers, particularly in terms of shifting the negative national rankings of women's equality in the state. These are generally listed in the order of the highest point values related to the WalletHub metrics.

---

### Top 10 Recommendations for Utah Decision Makers

1. Elect a woman for one of the two seats in the U.S. Senate. (+ 5.00)
2. Elect women for two of four seats in the U.S. House of Representatives (+ 5.00)
3. Reduce the disparity related to Utah women's perceptions of the affordability of doctor's visits by 50%. (+ 2.93)
4. Shrink the disparity in math scores by one point. (+ 2.67)
5. Elect one additional woman to a statewide executive office. (+ 2.00)
6. Add 780 women to executive positions within the state. (+ 1.80)
7. Elect 7 additional women to the Utah House and Senate. (+ 0.88)
8. Add 1,000 additional women-owned business in Utah. (+ 0.50)
9. Narrow the gender pay gap. (+ 0.10-12.63)
10. Increase the percentage of Utah women completing graduate degree programs. (+ 0.10-13.33)

---

Intriguingly, all four of the "Political Empowerment" key indicators made it to the top 10 recommendations, which means that progress in this area can immediately move Utah out of its last-place ranking. All three of the indicators from the "Education & Health" section are also included, along with three of 10 from "Workplace Environment." Increasing the percentage of Utah women completing graduate degree programs and narrowing the gender pay gap can make a substantial impact for Utah as well, but instead of providing specific point values, we offer a range; progress on these metrics with their related points, are complex discussions beyond the scope of this report.

In addition to Utah data, this report also includes some data on Idaho as well (see Appendix C for a summary of key indicators, measures, ranks, and points for WalletHub and our UWLP analysis). Appendix D includes a list of UWLP reports on Utah women regarding subjects such as business, COVID-19, economics, education, gender-based violence, general leadership, government, health and wellbeing, nonprofit organizations, political and civic engagement, and "What Can I Do?" (each has a hyperlink to the actual report). Next, Appendix E provides a summary of findings on other research topics related to Utah women. Finally, Appendix F includes a final summary of best and worst states for women's equality by primary area with both WalletHub and UWLP rankings and points.

Importantly, reports like this highlight a critical dilemma that is often the elephant in the room. Yes, Utah ranks as the worst state in the nation for women's equality, measured by WalletHub metrics. And scores of some of these metrics may directly or indirectly link to the fact that more than 60% of Utah residents are members of The Church of Jesus Christ of Latter-day Saints. Clearly, the division of effort and focus on the family continues to influence the decisions of many Utah residents and most likely impacts how Utah scores on several of the metrics measured in the WalletHub survey. As mentioned previously, WalletHub's ranking system did not include other potential equality metrics that could shed a more positive light on Utah women's important contributions in the home, community, and beyond. Yet, it remains clear that for more of Utah's women to thrive, gender inequality needs to be tackled.

The questions then become: Can Utah create a unique path forward that will improve gender equity and equality, while also respecting the circumstances and choices of women and families? And, if so, what might that distinctive path forward look like? Although this report looks specifically at the WalletHub metrics, there may be other metrics to consider as well. Again, shifting the ranking simply serves as a proxy for making meaningful changes in the state so that all women—and Utahns as a whole—can experience equitable access to opportunities of all kinds that will help them better thrive. As Utah decision makers and residents join to find ways to strengthen the impact of girls and women more effectively, more Utah women and families will feel connected to our state's well-known mantra—"This Is the Place."

---

Zions Bank commissioned Dr. Susan R. Madsen and the Utah Women & Leadership Project (UWLP) to conduct this research. The Project's mission is to strengthen the impact of Utah girls and women, with a foundational focus on producing relevant, trustworthy, and applicable research for decision makers and residents at large. For questions, email Dr. Madsen at susan.madsen@usu.edu, and find other research publications at http://utwomen.org/.

*Authors:* Dr. Susan R. Madsen is considered one of the top global scholars and thought leaders on the topic of women's leadership, has authored or edited seven books, and has published hundreds of articles, chapters, and reports. Her research has been cited in the *U.S. News and World Report*, *The Atlantic*, *The New York Times*, *Parenting Magazine*, *Chronicle of Higher Education*, and *The Washington Post.* She is also a regular contributor to *Forbes* and local and state newspapers. Professor Madsen is the Karen Haight Huntsman Endowed Professor of Leadership in the Jon M. Huntsman School of Business at Utah State University and the Founding Director of the Utah Women & Leadership Project; she also serves on many nonprofit and community boards. Dr. Greg. P. Madsen recently completed his Ph.D. in global leadership at Indiana Tech University, with his dissertation focused on "Men's Perception of Gender Bias and the Relationship Between Psychological Standing and Willingness to Engage as an Ally." He is currently a product manager of heavy mining equipment at Wheeler Machinery Company, the Caterpillar dealer headquartered in Salt Lake City.

*Acknowledgements*: Special thanks to Scott Anderson (CEO, Zions Bank) for his insight in envisioning this report. Zions continues to be a pioneer in both banking and supporting efforts related to advancing Utah women in the workplace, community, and beyond. Also, thanks to Marin Christensen, Robbyn Scribner, Deb Thornton, and Angie Kleven for their valuable feedback and insights.

*Copyright © 2021 Utah Women & Leadership Project*

## Appendix A
## WalletHub "Best & Worst States for Women" Metric Categories

WalletHub also publishes a state-by-state ranking on the "Best & Worst States for Women"[62] more generally, where Utah ranks much better (28th of 50) compared to the "Best & Worst States for Women's Equality." Idaho ranks 40th of 50. This ranking includes women's economic and social wellbeing (Utah=32; Idaho=48) and women's health and safety (Utah=24; Idaho=26). The list below includes the metrics used to determine the state rankings for this broader index, which was not analyzed in this report.

*Women's Economic & Social Well-Being*

- Median earnings for female workers
- Unemployment rate for women
- Job security for women
- Share of women living in poverty
- Unaffordability of doctor's visit
- Share of women-owned businesses
- "Economic clout" of women-owned firms
- High school graduation rate for women
- Friendliness toward working moms
- Friendliness toward women's equality
- Share of women who voted in the 2016 presidential election

*Women's Health Care & Safety*

- COVID-19 positive testing rate in the past week
- COVID-19 death rate during the past week
- Equality of women's hospitals
- Share of women ages 18–44 who reported having one or more people they think of as their personal doctor or health care provider
- Female uninsured rate
- Share of women with good or better health
- Women's preventive health care
- Share of physically active women
- Share of women who are obese
- Baby-friendliness
- Depression rate for women
- Suicide rate for women
- Women's life expectancy at birth
- Female homicide rate
- Prevalence of rape victimization among women

---

[62] McCann, A. (2021, March 1). *Best & worst states for women*. WalletHub. https://wallethub.com/edu/best-and-worst-states-for-women/10728

## Appendix B
## UTAH—Summary of Key Indicators, Measures, Ranks, and Points

| UTAH | WalletHub Current Analysis | | | UWLP Current Analysis | | |
|---|---|---|---|---|---|---|
| Key Indicators | Measure | Rank | Points | Measure | Rank | Points |
| Income Disparity | -25.50% | 45 | 1.52 | -30.00% | 49 | 2.43 |
| Higher Income Disparity | -13.00% | 48 | 0.23 | -13.00% | 48 | 0.23 |
| Disparity in Share of Executive Positions | -1.37% | 46 | 0.92 | -1.37% | 46 | 0.91 |
| Disparity in Share of Minimum-Wage Workers | -10.00% | 1 | 2.11 | -10.00% | 1 | 2.11 |
| Unemployment Rate Disparity | 0.50% | 26 | 3.25 | 0.50% | 32 | 3.25 |
| Entrepreneurship Rate Disparity | -44.68% | 39 | 0.69 | -44.68% | 39 | 0.69 |
| Disparity in Average Number of Work Hours | -17.78% | 50 | 0.00 | -17.78% | 50 | 0.00 |
| Job Security Disparity | 2.77% | 1 | 2.11 | 0.60% | 12 | 1.73 |
| Economic Security Disparity | -1.00% | 3 | 2.11 | -1.00% | 1 | 2.11 |
| Disparity in Poverty Rate | 1.60% | 3 | 1.82 | 2.30% | 10 | 1.60 |
| Disparity in Advanced Educational Attainment | -4.90% | 50 | 0.00 | -4.30% | 50 | 0.00 |
| Disparity in Math Test Scores | -2.00% | 43 | 6.67 | -2.00% | 49 | 8.00 |
| Disparity in Perception of Doctor Visit Affordability | 3.70% | 41 | 7.46 | 3.70% | 41 | 7.46 |
| Disparity in Share of Lawmakers in U.S. Senate | -100% | 21 | 0.00 | -100% | 21 | 0.00 |
| Disparity in Share of Lawmakers in U.S. House | -100% | 37 | 0.00 | -100% | 37 | 0.00 |
| Disparity in Share of Lawmakers in State Legislature | -68.30% | 40 | 0.65 | -52.00% | 40 | 1.59 |
| Disparity in Share of State-Elected Executives | -75.00% | 39 | 2.00 | -60.00% | 33 | 2.00 |
| Overall Scores | | 50 | 31.54 | | 50 | 34.50 |

*Note:* WalletHub's reported total came to 29.85, but in our attempts to recreate their scale, item by item (without having all their original sources), our calculations came to 31.54 (see 4th column). When we updated some sources to more current data (columns 5–7), our total came to 34.50.

## Appendix C
## IDAHO—Summary of Key Indicators, Measures, Ranks, and Points

| IDAHO | WalletHub Current Analysis | | | UWLP Current Analysis | | |
|---|---|---|---|---|---|---|
| Key Indicators | Measure | Rank | Points | Measure | Rank | Points |
| Income Disparity | -25.80% | 47 | 1.29 | -25.00% | 45 | 4.86 |
| Higher Income Disparity | -8.40% | 19 | 2.92 | -8.40% | 21 | 2.92 |
| Disparity in Share of Executive Positions | -.95% | 23 | 2.17 | -.95% | 23 | 2.17 |
| Disparity in Share of Minimum-Wage Workers | 60.00% | 47 | 0.19 | 60.00% | 47 | 0.19 |
| Unemployment Rate Disparity | 0.70% | 32 | 2.87 | -0.70% | 32 | 2.87 |
| Entrepreneurship-Rate Disparity | -36.94% | 12 | 2.46 | -36.94% | 12 | 2.46 |
| Disparity in Average Number of Work Hours | -17.07% | 47 | 0.17 | 17.07% | 47 | 0.17 |
| Job Security Disparity | 0.62% | 1 | 2.11 | 0.80% | 6 | 2.11 |
| Economic Security Disparity | -2.00% | 9 | 1.81 | -2.00% | 9 | 1.81 |
| Disparity in Poverty Rate | 1.80% | 12 | 1.67 | 0.80% | 1 | 2.11 |
| Disparity in Advanced Educational Attainment | -1.80% | 47 | 5.40 | -1.50% | 49 | 4.24 |
| Disparity in Math Test Scores | -4.00% | 50 | 0.00 | -4.00% | 49 | 2.67 |
| Disparity in Perception of Doctor Visit Affordability | 5.20% | 48 | 5.08 | -5.20% | 48 | 5.08 |
| Disparity in Share of Lawmakers in U.S. Senate | -100% | 21 | 0.00 | -100% | 21 | 0.00 |
| Disparity in Share of Lawmakers in U.S. House | -100% | 37 | 0.00 | -100% | 37 | 0.00 |
| Disparity in Share of Lawmakers in State Legislature | -54.17% | 22 | 1.17 | 31.40% | 22 | 2.56 |
| Disparity in Share of State-Elected Executives | -25.00% | 12 | 4.29 | 42.86% | 14 | 4.29 |
| Overall Scores | | 49 | 33.62 | | 49 | 40.51 |

*Note:* WalletHub's reported total came to 37.37, but in our attempts to recreate their scale, item by item (without having all their original sources), our calculations came to 33.62 (see 4th column). When we updated some sources to more current data (columns 5–7), our total came to 40.51.

## Appendix D
## UWLP Reports on Utah Women by Topic Area

| Area | Report Titles & Hyperlinks |
|---|---|
| Business | Flexible and Family-Friendly Policies at Utah's "Best Places to Work" (2020) |
| | The Status of Women and Entrepreneurship in Utah: A 2020 Update |
| | Strategies that Male Allies Use to Advance Women in the Workplace (2019) |
| | The Status of Women Leaders in Utah Business: A 2018 Update |
| | Entrepreneurship & Women-Owned Businesses: Recommendation Report (2018) |
| | The Status of Women and Entrepreneurship in Utah (2016) |
| | Utah Women and STEM (2016) |
| | The Status of Women Leaders in Utah Businesses (2014) |
| COVID-19 (2021 Reports) | The Impact of COVID-19 on Utah Women and Work: Health Impacts |
| | The Impact of COVID-19 on Utah Women and Work: Resilient Mindset and Wellbeing |
| | The Impact of COVID-19 on Utah Women and Work: Caregiver Experiences |
| | The Impact of COVID-19 on Utah Women and Work: Childcare and Homeschooling |
| | The Impact of COVID-19 on Utah Women and Work: Career Advancement Challenges |
| | The Impact of COVID-19 on Utah Women and Work: Changes, Burnout, & Hope |
| Economic | Utah Gender Wage Gap: A 2021 Update |
| | Utah Is Changing: Should Our Leave Laws Follow Suit? (2021) |
| | Addressing the Gender Pay Gap in Utah with State Equal Pay Laws (2021) |
| | Women and Finances: What Utahns Need to Know (2020) |
| | Women & Finance: Recommendation Report (2019) |
| | Childcare: What Utahns Need to Know (2018) |
| | The Gender Wage Gap in Utah (2017) |
| | Gender Wage Gap: Recommendation Report (2017) |
| | Unpaid Care Work Among Utah Women (2017) |
| | Unpaid Care Work: Recommendation Report (2017) |
| | Childcare: Recommendation Report (2017) |
| | Poverty Among Utah Women (2016) |
| | Labor Force Participation Among Utah Women (2016) |
| | Labor Force Participation: Recommendation Report (2016) |
| Education | The Status of Women Leaders in Utah Higher Education: A 2021 Update |
| | Utah Women in STEM Education: A 2019 Update |
| | Utah Women's Postsecondary Education Roundtable: Recommendations to Governor Gary R. Herbert & The Utah Legislature (2018) |
| | Utah Women in Higher Education: A Progress Report, 2018 |
| | Utah Women in Higher Education, 2000–2017 (2018) |
| | The Status of Women Leaders in Utah Education: A 2017 Update |
| | The Status of Women Leaders in Utah Education (2014) |
| | Utah Women in STEM (Science, Technology, Engineering & Math) (2013) |
| | College Enrollment and Graduation: A Utah Women and Education Update (2013) |
| | Educational Attainment: A Utah Women and Education Update (2013) |
| | Utah Women's College Task Force Recommendation (2012) |
| | The College Attendance Decisions of Young Women in Utah (2011) |
| | The Influence of Other Significant People on a Young Woman's College Decision (2011) |
| | The Influence of Religion and Values on a Young Woman's College Decision (2011) |
| | The Influence of Aspirations on a Young Woman's College Decision (2011) |
| | The Influence of Finances on a Young Woman's College Decision (2011) |
| | The Influence of School Activities and Leadership Roles on a Young Woman's College Decision (2011) |
| | The Influence of College Preparation Activities on a Young Woman's College Decision (2011) |
| | The Influence of Teachers on a Young Woman's College Decision (2011) |
| | The Influence of School Counselors and Administrators on a Young Woman's College Decision (2011) |
| | The Influence of a Mother on a Daughter's College Decision (2011) |
| | The Influence of a Father on a Daughter's College Decision (2011) |

| | |
|---|---|
| | The Benefits of Higher Education for Women in Utah (2011)<br>Introduction: Women and Education Research Snapshots (2011)<br>Women and Higher Education in Utah: A Glimpse at the Past and Present (2010)<br>The Value of Higher Education for Women in Utah (2010) |
| **Gender-Based Violence** | Sexual Harassment: What Utahns Need to Know (2018)<br>Domestic Violence Among Utah Women (2017)<br>Sexual Assault Among Utah Women (2016) |
| **General Leadership** | The Leadership Development Gained by Women Serving Full-Time Missions (2020)<br>Women, Confidence, and Leadership: What Do Utah Women Leaders Think? (2015)<br>Why Do We Need More Women Leaders in Utah? (2015) |
| **Government** | Women Leaders in Utah Government – Their Paths to Power (2020)<br>The Status of Women Leaders in Government – Utah Cities and Towns (2020)<br>The Status of Women Leaders in Government – Utah Counties (2020)<br>The Status of Women Leaders in Government – State of Utah (2020)<br>The Status of Women on Utah State Boards and Commissions: A 2019 Update<br>The Status of Women on Utah State Boards and Commissions (2016) |
| **Health & Wellbeing** | Utah Girls, Young Women, and Physical Activity (2021)<br>Substance Use Disorders Among Utah Women (2018)<br>Utah Women and Mental Health (2017)<br>Cosmetic Surgery and Body Image Among Utah Women (2017)<br>Mammography Among Utah Women (2017)<br>Access to Healthcare: Recommendation Report (2017) |
| **Nonprofit Organizations** | The Status of Women Leaders in Utah Nonprofits: A 2018 Update<br>The Status of Women Leaders in Utah Nonprofits (2014) |
| **Political & Civic Engagement** | An Analysis of Utah Media: Women & Politics (2021)<br>The Status of Women in Utah Politics: A 2021 Update<br>Perceptions of Women Elected Officials in Utah: Challenges, Benefits, and Lessons Learned (2021)<br>A Historical View of Women in Utah's Top Political Roles (2020)<br>Voting and Civic Engagement Among Utah Women: A 2019 Update<br>The Status of Women on Utah State Boards & Commissions: A 2019 Update<br>The Status of Women in Utah Politics: A 2017 Update<br>The Status of Women on Utah State Boards and Commissions (2016)<br>Voting and Civic Engagement Among Utah Women (2016)<br>Female Political Representation: Recommendation Report (2016)<br>The Status of Women in Utah Politics (2014) |
| **"What Can I Do" Series** | What Mayors Can Do to Strengthen the Impact of Utah Girls and Women<br>What City Council Members Can Do to Strengthen the Impact of Utah Girls and Women<br>What Diversity, Equity, and Inclusion Specialists Can Do to Strengthen the Impact of Utah Women of Color<br>What Leaders in the Interfaith Community Can Do to Strengthen the Impact of Utah Girls and Women<br>What Therapists Can Do to Strengthen the Impact of Utah Girls and Women<br>What Media Professionals Can Do to Strengthen the Impact of Utah Girls and Women<br>What Academic Advisors Can Do to Strengthen the Impact of Utah Girls and Women<br>What Women in Medicine Can Do to Strengthen the Impact of Utah Girls and Women<br>What Athletic Coaches Can Do to Strengthen the Impact of Utah Girls and Young Women<br>What Young Women Leaders Can Do to Strengthen the Impact of Utah Girls and Teens<br>What Utah Fathers Can Do to Strengthen the Impact of Their Daughters<br>What Elementary School Administrators Can Do to Strengthen the Impact of Utah Girls<br>What Utah Mothers Can Do to Strengthen the Impact of Their Daughters<br>What Women's Networks and Groups Can Do to Strengthen the Impact of Utah Girls/Women<br>What Male Allies Can Do to Strengthen the Impact of Utah Women in Workplace Settings<br>What School Counselors Can Do to Strengthen the Impact of Utah Young Women<br>What Business Leaders Can Do to Strengthen the Impact of Utah Girls and Women |

## Appendix E
## Summary of Other Research on Utah Women

| Focus Area | Status |
|---|---|
| Childcare[63] | Fifty-two percent of Utah children under age six have all available parents in the workforce. In state-by-state rankings, Utah fares poorly in several categories. Utah was ranked as the second least affordable state for infant and toddler care in a center, the third least affordable state for infant care in a family care setting, and the least affordable state in the U.S. for three months of full-time care for a school-aged child. However, another report ranked Utah as the second most affordable state overall for childcare center affordability, so sources are mixed. In addition to affordability, availability is a critical challenge in Utah. COVID-19 has exacerbated the childcare issues in Utah and beyond.[64] |
| Civic Engagement[65] | For the past 14 years in a row, Utah has ranked first in the nation for percentage of residents who regularly volunteer at 51% (a full 20 points higher than the national average of 30.3%). Nationally, women's volunteer rates are six percentage points higher than men's (27.8% vs. 21.8%), and this gap seems to hold for Utah as well. |
| College Graduation[66] | Utah men and women have different degree attainment and completion patterns. The recent data show that women now edge out men in three categories (some college, no degree; associate degree; and bachelor's degree), while men surpass women in graduate degree attainment. The percent of the population holding only a bachelor's degree has been nearly equal for Utah men and women for the past several years, holding steady at about 20% for each since 2010. |
| Cosmetic Surgery[67] | National media and scholars have puzzled over the high levels of plastic surgery among Utah women, and a national magazine even called Salt Lake City the "Vainest City in America." Many wonder why Salt Lake City, capital of one of the most religious states in the nation, would employ more plastic surgeons per capita than Los Angeles. Years ago, *Forbes* magazine reported that Salt Lake City residents spent more than ten times the amount residents of similarly sized cities spent on cosmetics and skincare products. |
| Domestic Violence[68] | One in three Utah women will experience some form of domestic violence in her lifetime, and our rate is slightly higher than the national average (32.4% vs 28.8%). More than 40% of adult homicides in Utah since 2000 have been domestic violence related. A recent survey shows that 86% of Utah women believe domestic violence is a problem in their communities, and 63% believe violence against women is increasing. |
| Entrepreneurship[69] | In 2016, Utah was ranked 8th in the U.S. for women-owned businesses, 11th in growth by number of firms, 4th in growth by revenue, and 30th in growth by employment. By |

[63] Scribner, R. T., & Madsen, S. R. (2018, September 5). *Childcare: What Utahns need to know*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/25.pdf

[64] Hartwell, C., Hansen, J., & Madsen, S. R. (2021, June 2). *The impact of COVID-19 on Utah women and work: Childcare and homeschooling*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/33-covid-19-childcare-homeschooling.pdf

[65] Madsen, S. R., Pierucci, D. C., & Scribner, R. T. (2021, October 27). *Voting and civic engagement among Utah women: A 2021 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/32.pdf

[66] Jeppsen, C. (2018, March). *Utah women in higher education: A progress report. Women in the Economy Commission and the Utah*. Women & Leadership Project. https://www.utah.gov/women/documents/Utah-Women-in-higher-education-brief.pdf

[67] Madsen, S. R., Dillon, J., & Scribner, R. T. (2017, April 10). *Cosmetic surgery and body image among Utah women*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/20.pdf

[68] Madsen, S. R., Turley, T., & Scribner, R. T. (2017, February 6). *Domestic violence among Utah women*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/18.pdf

[69] Townsend, A. T., Madsen, S. R., & Wallace, A. M. (2020, May 5). *The status of women and entrepreneurship in Utah: A 2020 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/22-status-of-women-and-entrepreneurship.pdf

| | |
|---|---|
| | 2019, the state's thriving economy contributed to Utah's ascent to 6th in the nation in economic clout for women-owned businesses, 5th for revenue growth (19.2%), 10th in employment growth (7.6%), and 12th in growth by number of firms (12%). In 2019, Salt Lake City was also ranked the #1 metropolitan area in the growth of employment vitality in women-owned businesses. |
| Finances[70] | Only 30% of women and 35% of men worldwide show a basic level of financial literacy. There are no gender data available for Utah. Nearly half of Utah women over age 65 are either single or married with a spouse absent (80,000 women total), hence individual financial literacy is critical, especially for senior women. In Utah, the share of payday loans taken out by women is 55%. |
| Gender Wage Gap[71] | In Utah, women earn approximately 30% less than men, ranking close to last in most state comparisons. Nationally, women earn 16–18% less than men (see key indicator #1 in the report for more details). |
| Labor Force Participation[72] | Women comprise 44% of the total labor force in Utah, while they comprise 47% nationally. Overall, 59% of Utah women aged 16+ are in the labor force, compared to 58% in the U.S. Utah is first in the nation for women who work part-time (37% compared to 28% nationally). |
| Mammography[73] | Studies in past years have shown Utah to be among the five lowest states in the nation for mammography screening rates. In 2014, only 64.5% of Utah women aged 40 and older had received a mammogram within the two previous years, compared with 72.3% of U.S. women. |
| Mental Health[74] | Although one recent in-depth study showed Utah ranking slightly below the national average in the percentage of adults who suffer from poor mental health, the state regularly reports rates higher than the national average for depression. Another recent study ranked Utah last out of all 50 states. Utah women, like women nationally, are diagnosed with depression at much higher rates than men. 29.1% of Utah women with less than a high school degree report poor mental health vs. 13.9% of college graduates. Many Utah women suffer with postpartum major depression. |
| Physical Activity[75] | For school-aged children, 28% of boys meet the recommended physical activity levels set by the state of Utah, compared to only 14% of girls. Based on a different set of standards for adults, globally 37.1% of women are insufficiently physically active compared to 23.4% of men; this trend is also found in Utah, where 19.4% of women are insufficiently physically active compared to 17.6% of men. |
| Poverty[76] | Although Utahns in general experience lower rates of poverty than the national average (11.3% in Utah vs. 14.7% nationwide), Utah women are more likely than Utah men to live in poverty, especially women who are heads of households and/or single parents. Overall, Utah women live in poverty at a lower rate (12.2%) than the national average (16%), and minority women in Utah are much more likely to live in poverty compared to White women. |
| Sexual Assault[77] | Nearly one in two women in the U.S. will experience some form of sexual violence |

---

[70] Scribner, R. T., & Madsen, S. R. (2020, April 1). *Women and finances: What Utahns need to know*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/29.pdf

[71] Winkel, R., Darowski, E. S., Christensen, M., & Madsen, S. R. (2021, October 5). *Utah gender wage gap: A 2021 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/31.pdf

[72] Madsen, S. R., & Scribner, R. T. (2016, December 2). *Labor force participation among Utah women*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/17.pdf

[73] Madsen, S. R., Barnes, E., & Scribner, R. T. (2017, March 1). *Mammography among Utah women*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/19.pdf

[74] Scribner, R. T., & Madsen, S. R. (2017, November 1). *Utah women and mental health*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/23.pdf

[75] Buesser, K., Myrer, R., & Madsen, S. R. (2021, August 2). *Utah girls, young women, and physical activity*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/30.pdf

[76] Madsen, S. R., & Scribner, R. T. (2016, November 7). *Poverty among Utah women*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/14.pdf

| | victimization in her lifetime (broadly defined), and Utah has the same overall rate. Studies show that one in three Utah women has been sexually assaulted, and one in six women report having been raped. According to the U.S. Department of Justice, rape occurs in Utah at a rate higher than the national average. |
|---|---|
| Sexual Harassment[78] | Approximately 85–95% of those who experience sexual harassment do not file a formal legal complaint, and studies show that around 70% do not even report the incidents within their own organizations. Anywhere from 25–85% of women have experienced workplace sexual harassment. In Utah, the rate of formal charges regarding sexual harassment is roughly in line with national averages: both Utah and the U.S. averaged 3–4 charges of sexual harassment per 100,000 population for the last four years, and only 16 states had fewer per capita charges than Utah in 2017. |
| State Boards & Commissions[79] | In 2019, 32.7% of Utah state boards and commissions seats were held by women, an increase of 4.6% since 2016. Increasing diversity on these boards and commissions is a top priority of the Cox-Henderson Administration, so we expect this percentage has already increased since January of 2021. Comparable national data cannot be found. |
| STEM[80] | In 2016, Utah women held only 23.5% of STEM sector jobs vs. 28.8% for women nationally. Utah ranked last in the U.S. for the percent of women employed in STEM. |
| STEM Education[81] | The total number of students in Utah public institutions who completed STEM degrees has increased through the years, including the number of women who earn these degrees. However, as a percentage of the total graduating class, women increased only 1% (from 20% to 21%) between 2012 and 2017. The share of degrees earned by women in Utah remains substantially lower than men in all STEM categories and below the national average for women getting STEM degrees. |
| Substance Use[82] | In 2016, Utahns died from a drug overdose at a rate (per 100,000 population) that was above the national average; Utah was the 19th highest state that year. Regarding use of all illicit drugs more generally, Utah rates are below the national average, but when considering only the misuse of prescription drugs, the rate for Utahns is higher than the national average. A 2014 study of prescription opioid use during pregnancy, among women receiving Medicaid, showed that Utah had the highest rate in the nation for pregnant women receiving an opioid prescription, at twice the national rate. |
| Unpaid Care Work[83] | U.S. women who participate in unpaid work average 4.92 hours per day vs. 3.79 hours per day for U.S. men. The gap in Utah is wider: Utah women spend 5.55 hours per day in unpaid work vs. 3.22 hours for Utah men. In Utah, and in most countries around the world, the daily combined hours of paid and unpaid work are higher for women. |
| Voting[84] | In 2020, 66.6% of eligible female voters in Utah voted compared to 68.4% of U.S. women—the highest rate achieved over a 14-year period. Utah ranked 33rd of 51 (including the District of Columbia) for the percentage of eligible female voters voting. |

[77] Madsen, S. R., Turley, T., & Scribner, R. T. (2016, November 7). *Sexual assault among Utah women*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/15.pdf

[78] Scribner, R. T. Madsen, S. R., & Thackeray, A. (2018, March 1). *Sexual harassment: What Utahns need to know*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/24.pdf

[79] Madsen, S. R., & Roper, M. (2019, November 5). *The status of women in Utah state boards & commissions: A 2019 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/20-status-of-women-on-utah-state-boards-commissions-2019.pdf

[80] Madsen, S. R., Goryunova, E., & Scribner, R. T. (2016, December 2). *Utah women and STEM*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/16.pdf

[81] Hanewicz, C., Thackeray, S., & Madsen, S. R. (2019, August 1). *Utah women in STEM education: A 2019 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/19-women-in-stem-2019.pdf

[82] Utah Women & Leadership Project. (2018, November 1). *Substance use disorders among Utah women*. https://www.usu.edu/uwlp/blog/2018/substance-use-disorders-among-utah-women

[83] Madsen, S. R., & Scribner, R. T. (2017, June 5). *Unpaid care work among Utah women*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/21.pdf

[84] Madsen, S. R., Pierucci, D. C., & Scribner, R. T. (2021, October 27). *Voting and civic engagement among Utah women: A 2021 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/snapshot/32.pdf

| Women in Politics[85] | Utah has no women in its delegation to Congress, while one of five Utah state executive office seats is held by a woman, and 24% of the state legislative seats are held by women. Other statistics: Women hold 15% of Utah county commission and council seats; 53.3% of the predominately full-time elected positions of clerk/auditor, treasurer, recorder, and assessor; 17% of Utah's mayoral posts; and 29.3% of council member seats. Although some progress has been made, all are below the national averages. |
|---|---|
| Women Leaders in Business[86] | Utah is significantly lower than the national average in terms of women who are corporate CEOs, presidents, top manager/director (if headquarters is outside of Utah), board of directors' members, and board chairs (see report for specific percentages). |
| Women Leaders in Government[87] | Women hold 39.3% of supervisory, managerial, and leadership positions in Utah State Government; 42.5% of supervisory, managerial, and executive leadership positions in Utah's county governments; and 29.1% of supervisory, managerial, and executive leadership positions in Utah's municipal governments. We did not find comparable data in the U.S. or in other states or regions of the country. |
| Women Leaders in Higher Education[88] | Progress has been made for women in Utah higher educational leadership: 33% of college and university presidents are women (33% nationally), along with 36.4% of presidents' cabinets (37.3% nationally), 33.3% of chief academic officers/provosts (44% nationally), 42.9% associate/assistant chief academic officers (50% nationally), 33.3% vice presidents (40% nationally); and 38.2% academic dean (40% nationally). |
| Women Leaders in K-12[89] | In 2017, 41.5% of Utah state and district leadership positions were filled by women. At that time, 73.3% (48.6% nationally) leaders at the State Board of Education were women, 47.4% (44.0% nationally) on district boards of education, and 12.2% (27% nationally) of district superintendents. At the school level, 19.2% of high school principals, 31.1% of high school assistant principals, 34.3% of middle/junior high principals, 41% of middle/junior high assistant principals, and 56.1% of elementary school principals were women; these are slightly below the national average. |
| Women Leaders in Nonprofits[90] | In 2017, 57% of nonprofit chief executives in Utah were women (compared to 72% nationally). In that same year, 45.3% of board members of nonprofits were women (compared to 48% nationally). In Utah, when a nonprofit has a female chief executive, it is more likely that there is a higher percentage of women serving on their board. |

[85] Payne, H., Christensen, M., & Madsen, S. R. (2021, February 3). *The status of women in Utah politics: A 2021 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/29-status-of-women-in-utah-politics-2021.pdf

[86] Madsen, S. R., Quayle, S., & Scribner, R. T. (2018, May 2). *The status of women leaders in Utah business: A 2018 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/17-status-of-women-leaders-in-utah-business-2018.pdf

[87] Townsend, A., & Madsen, S. R. (2020, August 4). *The status of women leaders in government – State of Utah*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/23-status-of-women-leaders-in-government-utah.pdf; Townsend, A., & Madsen, S. R. (2020, September 2). *The status of women leaders in government – Utah counties*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/24-status-of-women-leaders-in-government-utah-counties.pdf; Townsend, A., & Madsen, S. R. (2020, October 6). *The status of women leaders in government – Utah cities and towns*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/25-status-of-women-leaders-in-government-utah-cities-towns.pdf

[88] Hauck, N. E., Hill, J. C., Townsend, A., & Madsen, S. R. (2021, April 21). *The status of women leaders in Utah higher education: A 2021 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/31-women-leaders-utah-higher-education-2021.pdf

[89] Madsen, S. R., Goryunova, E., & Hew-Len, A. (2017, September 6). *The status of women leaders in Utah education: A 2017 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/15-status-of-women-leaders-in-utah-education-2017.pdf

[90] Madsen, S. R., Hew-Len, A., & Thackeray, A. (2018, February 5). *The status of women leaders in Utah nonprofits: A 2018 update*. Utah Women & Leadership Project. https://www.usu.edu/uwlp/files/briefs/16-status-of-women-leaders-in-utah-nonprofits-2018.pdf

## Appendix F
## Final Summary of Best & Worst States for Women's Equality
## (UWLP & WalletHub)

**1.   Workplace Environment**

| Best States | UWLP Rank | W-Hub Rank | Points | Worst States | UWLP Rank | W-Hub Rank | Points |
|---|---|---|---|---|---|---|---|
| Hawaii | 1 | 1 | 35.23 | Wyoming | 46 | 40 | 17.61 |
| Vermont | 2 | 2 | 33.79 | Alabama | 47 | 48 | 16.93 |
| Nevada | 3 | 3 | 32.39 | New Jersey | 48 | 50 | 16.09 |
| Alaska | 4 | 5 | 30.61 | Louisiana | 49 | 49 | 16.07 |
| Maryland | 5 | 4 | 29.07 | Utah | 50 | 44 | 15.46 |

**2.   Education & Health**

| Best States | UWLP Rank | W-Hub Rank | Points | Worst States | UWLP Rank | W-Hub Rank | Points |
|---|---|---|---|---|---|---|---|
| Vermont | 1 | 5 | 39.99 | Kansas | 46 | 47 | 22.52 |
| Kentucky | 2 | 2 | 36.92 | Texas | 47 | 48 | 19.39 |
| Tennessee | 3 | 4 | 35.78 | Alaska | 48 | 45 | 18.83 |
| Rhode Island | 4 | 8 | 35.57 | Utah | 49 | 50 | 15.46 |
| Connecticut | 5 | 15 | 34.99 | Idaho | 50 | 49 | 11.99 |

**3.   Political Empowerment**

| Best States | UWLP Rank | W-Hub Rank | Points | Worst States | UWLP Rank | W-Hub Rank | Points |
|---|---|---|---|---|---|---|---|
| Nevada | 1 | 1 | 20.00 | Maryland | 46 | 41 | 3.82 |
| Maine | 2 | 2 | 19.15 | Utah | 44 | 49 | 3.59 |
| Michigan | 3 | 3 | 17.42 | North Dakota | 48 | 47 | 2.96 |
| Washington | 4 | 4 | 17.22 | Alabama | 49 | 48 | 2.81 |
| Minnesota | 5 | 5 | 17.14 | Louisiana | 50 | 50 | 2.33 |

**Overall Best & Worst States for Women's Equality**

| State | UWLP Rank | W-Hub Rank | UWLP Points | W-Hub Points |
|---|---|---|---|---|
| Nevada | 1 | 1 | 82.55 | 77.55 |
| Vermont | 2 | 3 | 81.09 | 68.67 |
| Maine | 3 | 4 | 79.80 | 67.72 |
| New York | 4 | 5 | 77.45 | 67.20 |
| Hawaii | 5 | 2 | 77.33 | 69.36 |
| Oklahoma | 46 | 43 | 50.10 | 47.70 |
| Texas | 47 | 48 | 47.78 | 41.95 |
| Alabama | 48 | 44 | 47.29 | 47.01 |
| Idaho | 49 | 49 | 40.51 | 37.37 |
| Utah | 50 | 50 | 34.50 | 29.85 |

Utah offenders can now raise issues of race and bias at their sentencing



☰  SEARCH          *The Salt Lake Tribune*          SUBSCRIBE          LOG IN          SUBSCRIBE          👤

# Utah offenders can now raise issues of race and bias at their sentencing



(Al Hartmann | Tribune file photo) A Utah State Corrections officer looks through glass at a wing of cells in the Oquirrh unit at the Utah State Prison in Draper in 2014.

By Jessica Miller  | July 25, 2020, 5:15 a.m.  | Updated: July 24, 2020, 9:56 p.m.

Minorities who have been charged with crimes in Utah can now argue that they should get a more lenient sentence if they can show they have been affected by racial bias in the criminal justice system.

The Utah Sentencing Commission approved the new guideline in January — but it doesn't appear that many defense attorneys have tried to make the argument in court yet.

At a sentencing hearing, judges generally look at many factors, such as a defendant's age or their criminal history. Now, defense attorneys can also bring up racial issues as they

argue for leniency.

Marshall Thompson, who now works with the Board of Pardons, was the director of the sentencing commission when members first debated the rule last fall. He said recently that, though it's a small tweak, he hopes it will have a positive impact in addressing racial inequities in Utah.

"If police or anyone else in the criminal justice system displayed some bias in a specific case, a sentencing judge could mitigate the sentence," he said. "Just knowing that you could be held accountable for racial bias at sentencing will hopefully bring some improvements, even if it isn't ultimately argued in court."

The move came after state data showed a troubling trend: Despite sweeping criminal justice reforms passed by Utah legislators in 2015, the percentage of racial minorities among new prisoners was on the rise.

The 2015 legislation, intended to reduce a bloated prison population and emphasize rehabilitation, did help some offenders — but they were mostly white people.

Data showed in the year before the reform, 34% of new prisoners were ethnic minorities. Three years later, that jumped to more than 43%.

It dipped slightly the following year, but the number alarmed Utah officials and prompted the rule change that would allow judges to take a defendant's race into account when deciding punishment.

The guidelines say someone must convince a judge that the offender's minority group is overrepresented in Utah's prison, and there is some reason to believe that bias — whether conscious or unconscious — affected the case.

It should be assumed that all bias is unconscious, the guideline states, meaning that someone did not intend to treat someone differently because of race. But the guideline notes that even if a bias wasn't intentional, it still has the same damaging effect.

notes that even if a bias wasn't intentional, it still has the same damaging effect.

University of Utah law professor Shima Baradaran Baughman said the guideline is a good idea in theory, saying some judges might be sympathetic to the argument that racial bias contributed to someone's arrest and conviction. But it could backfire with a judge less swayed by the new rule.

"This could be one step we take in Utah — among many other needed steps — to ensure racial parity in criminal justice," Baughman said.

The law professor noted implicit racial bias is "an everyday part of life," and that extends to the criminal justice system. The clearest case of bias, she said, is with an arrest: Studies have shown that police are more likely to arrest people of color for crimes committed at roughly the same rate by white people, like drugs or speeding.

"These initial interactions with police can lead to a criminal record that then enters more people of color into the criminal justice system," Baughman said. "Once people of color enter the criminal justice system — with an arrest or conviction — it is difficult for them to get a fair shake."

Baughman said she and other academics have proposed removing racial identification from police reports, so prosecutors are blind to race when making charging decisions. That practice is already being used in the San Francisco district attorney's office.

When Utah's rule change was proposed last year, some involved in the state's criminal justice system expressed concern that it doesn't provide enough guidance. There's concern that it will be impossible for a defense attorney or overworked public defender to actually prove bias in the courtroom. And some asked: Would it be unfair to treat minorities differently and punish them less harshly than white people for the same crimes?

Jason Groth, with the American Civil Liberties Union of Utah, said the proposed change addresses the symptoms of racial bias but doesn't address the root causes. There should be more data publicly available, he said, not just about who ends up in prison. Are people of color arrested more often in certain neighborhoods? Do white people get better plea

deals than minorities? That's the data that should be used, he said, in deciding policy changes to address racial disparities. But that kind of data is not readily available in many Utah police stations and prosecutor offices.

Absent that information, Groth predicts it may be tough for a defense attorney to successfully argue that their client was treated differently because of unconscious bias.

"Implicit bias is going to be extremely hard to show without data analysis," he said. "It's really hard to figure out what's going on in someone's brain."



**jmiller@sltrib.com**
Follow @jm_miller

**Donate to the newsroom now.** The Salt Lake Tribune, Inc. is a 501(c)(3) public charity and contributions are tax deductible

💬 COMMENTS: (14)

---

 WORLD TABLE.

FEATURED COMMENTS

 **67**
**MelloVox**

So the people in prison were unjustly convicted based on race and committed no crime ?

---

 **90**
**dan76**

'It should be assumed that all bias is unconscious, the guideline states, meaning that someone did not intend to treat someone differently because of race.'
Interesting.

View all 14 comments

## RELATED STORIES

NEWS

Fatal car chase stems from a seat belt violation, Ogden police say

NEWS

One man dead and three officers injured in a traffic stop that turned into a police chase

NEWS

Utah justice court judge known for advocating for Asian Americans has died

RELIGION

MormonLeaks founders pay $15,000 to settle copyright suit with the Jehovah's Witnesses

## THE LATEST

The Triple Team: Jazz figure out offense vs. Clippers, a key Rudy Gobert highlight, and what Quin Snyder's players say about him

Rudy Gobert's gigantic night helps Utah Jazz overcome slow start, earn ninth consecutive win

Injury to starting Utah State point guard reaches further than 79-70 loss to Boise State

Utah police officer's wife, accused of posting racist comment online, was impersonated, department says

Episode 15: 'The Real Housewives of Salt Lake City' raise the issue of racism again

Leaders of armed groups advocate for Utah bill increasing punishment for rioters

## CONNECT

Facebook

Twitter

Instagram

YouTube

RSS

## SUBSCRIPTIONS

Subscribe to print + digital

Subscribe to digital only

Free digital for print subscribers

Email newsletters

Login to your print account

Login to your digital account

Subscription FAQs

Help and contact info

## ABOUT US

History and mission

Our nonprofit model

Board and advisers

Officers and staff

First Amendment Society

Donors and tax filing

Privacy policy

California privacy

Editorial policies and ethics

## MORE

Advertise with us

Legal notices

Store

Podcasts

Archives

Story tip line

Support The Tribune

Donate

Cookie Preferences

  

ABOUT US

TERMS OF SERVICE

PRIVACY POLICY

EDITORIAL POLICY

ADVERTISE

CONTACT US

HELP

COOKIE PREFERENCES

SUPPORT

EMAIL NEWSLETTERS

PODCASTS

NEWS TIPS

APP STORE

GOOGLE PLAY

DONATE

Report a missed paper by emailing subscribe@sltrib.com or calling 801-237-2900

For e-edition questions or comments, contact customer support 801-237-2900 or email subscribe@sltrib.com

sltrib.com © 1996-2021 The Salt Lake Tribune. All rights reserved.



Independent. Nonprofit. Pulitzer Prize winner.

SEARCH    *The Salt Lake Tribune*    SUBSCRIBE    LOG IN    SUBSCRIBE

# Utah ranked worst state for women's equality — again

The Beehive State slightly closed the gap with Idaho, ranked 49th, but continues to lag behind its northern neighbor, according to WalletHub.



(Illustration by Christopher Cherrington | The Salt Lake Tribune)

By Becky Jacobs | Aug. 23, 2021, 8:23 a.m. | Updated: Aug. 25, 2021, 12:11 p.m.

For the fourth year in a row, Utah has been named the worst state for women's equality, as it still lags behind the state ranked 49th — Idaho.

WalletHub released its "2021's Best & Worst States for Women's Equality" on Monday

empowerment. There was a nearly 50-point gap in the total scores between the top state — Nevada — at 77.55 and Utah's score of 29.85.

"Being last again does not feel great," said Kelly Whited Jones, president of the Utah Equal Rights Amendment Coalition. "It's painful for me to read those numbers and understand what that translates to in people's lives and families' lives."

"When women are unequal," she said, "families are unequal."

There is a "juxtaposition" between Utah's strong economy during the coronavirus pandemic, and the fact that women in the state "are still faring the worst in the United States," said Gabriella Archuleta, director of public policy at YWCA Utah.

"I think part of it is that we're a state" that has "a lot of children," she said, "but we don't want to give any supports to women to have children and to be able to stay in the workforce."

In addition to the culture in the state, Archuleta said there also seems to be a "lack of willingness to address and support women in an equitable way."

The Salt Lake Tribune fact-checked Utah's reputation as the worst state for women's equality, as part of a series published in July, examining the status of women in the Beehive State.

**[Take the quiz:** See if you can tell whether this quote is about Utah women in 1964 or 2019.**]**

The data showed that while women in Utah had improved over the years across different metrics — gender wage gap, political representation, education and top jobs — they still lagged behind their peers in other states.

"Women ... are still second class in Utah," Christine Durham, Utah's Supreme Court and

☰ SEARCH        The Salt Lake Tribune        SUBSCRIBE        LOG IN        SUBSCRIBE        👤

of professional success. They just lag behind on all the markers."

**[Read more:** Here's what local female leaders in Utah think about their state's reputation as the worst state for women's equality.**]**

More than 150 readers responded to an online survey in July from The Tribune about the ways they think that Utah could improve the lives of women in the state. Some of the common themes included eliminating the gender wage gap, increasing the number of women in business and politics, and supporting women in pursuing college degrees — all categories that factored into WalletHub's rankings.

**Best and worst states for women's equality in 2021**

For the fourth year in a row, Utah was named the worst state in the nation for women's equality. States were ranked based on workplace environment, education and health and political empowerment.



SEARCH    The Salt Lake Tribune    SUBSCRIBE    LOG IN    SUBSCRIBE



(Christopher Cherrington | The Salt Lake Tribune)

## How Utah fared in the WalletHub study

The biggest difference between Idaho's score of 37.37 and Utah's score, 29.85, is in the political empowerment category, which looks at the number of women elected to federal and state legislatures and state executive jobs.

Except for a brief period in the early 2000s, Utah has ranked in the bottom half of U.S. states since 1977 for its female representation in the state legislature, according to Rutgers' Center for American Women and Politics.

Currently, 25 women serve in the Utah Legislature, making up 24% of the 104-member body. In 2020, there were 27 female state lawmakers — a record high.

In Idaho, 33 women serve in the state Legislature, making up 31% of the 105 total lawmakers.





(Christopher Cherrington | The Salt Lake Tribune)

Neither Utah nor Idaho have female lawmakers in Congress. Two Republican women —
former state Rep. Becky Edwards and Ally Isom, former deputy chief of staff for Gov.
Gary Herbert and spokesperson for The Church of Jesus Christ of Latter-day Saints —
have jumped into the 2022 race to challenge Utah Senator Mike Lee.

In 2020, Utahns elected their second female lieutenant governor, Deidre Henderson.
Before her, only two women have served in Utah's five statewide executive offices,
according to the Utah Women and Leadership Project: Jan Graham, as attorney general,
and Olene Walker, as lieutenant governor and then governor.



SEARCH · The Salt Lake Tribune · SUBSCRIBE · LOG IN · SUBSCRIBE



(Francisco Kjolseth | The Salt Lake Tribune) Lt. Gov. Deidre Henderson addresses those gathered for the 15th Annual Governor's Native American Summit held on the Utah Valley University campus on Friday, Aug. 6, 2021.

The gap between Utah and Idaho has shrunk, though, in the workplace environment category. In the 2020 list, Idaho ranked 28th, while Utah placed 47th. In 2021, Idaho was 41st and Utah ranked 44th.

Income disparity plays the largest role in the workplace environment category, according to WalletHub's explanation of its metrics, and is based on median weekly earnings. Using this metric, Utah tied with North Dakota at 45th on the list for the largest income gap.

Utah's gender wage gap has shrunk over the years, but it has remained one of the largest in the country since at least 1989, according to data from the Institute for Women's Policy Research.

In 2019, Utah women earned 70.2% of what men made in the Beehive State, according to a report released by the Institute in June. Nationally, U.S. women earned 81.1%, while women in Idaho made 76%. These figures are based on median annual earnings for year-round, full-time workers.

## Utah has had one of the largest gender wage gaps for decades

Utah's gender wage gap has shrunk over the years, but the Beehive State has still had one of the largest gender wage gaps in the country since at least 1989.

*Ratio of women's to men's earnings for median annual earnings for full-time, year-round workers, age 16 and older*

90%

U.S. women ⸺ Utah women

80%



(Christopher Cherrington | The Salt Lake Tribune)

In the workplace environment category, WalletHub also considered disparities in rates of higher income, executive positions, minimum-wage workers, unemployment, entrepreneurship, average number of work hours, job security, economic security and poverty.

According to WalletHub, Utah ranked 46th for the largest executive positions gap, 50th for the largest work hours gap, 50th for the largest educational attainment gap among advanced degree holders, and 49th for the largest political representation gap.

Utah also ranked 50th in the overall education and health category, the same place as it was last year. Idaho landed 49th.

To compile the rankings released Monday, WalletHub evaluated the states using 17 metrics and a 100-point scale, "with a score of 100 representing the most favorable conditions for women's equality." The metrics compared men and women on issues such

as entrepreneurship rate, poverty rate, doctor-visit affordability and disparity in math test scores.

What's notable to Archuleta in the WalletHub report, and other similar studies, she said, is that these rankings clump women into one broad category, and don't break down experiences by race.

"It would be even more powerful to show what it would look like for women of color,"

☰ SEARCH                    The Salt Lake Tribune          SUBSCRIBE        LOG IN        SUBSCRIBE    👤

For instance, she said, women of color are paid far less than white women. While women overall earn 70.2% of men's pay in Utah, Black women in the Beehive State earn 52.6% of white men's pay in the state, according to a July report from the Institute.

## Closing the gap

In order to get rid of Utah's gender wage gap, there may need to be mandates or economic incentives for businesses to meet diversity ratios and examine employees' pay and fix any inequalities, some respondents to The Tribune's survey said. One person suggested penalties for those who don't comply.

Utah is one of the last states, and the only state in the Rocky Mountain West, that does not have a standalone equal pay law.

"Instead, women workers must rely on the comparatively narrow recourse provided by the Utah Antidiscrimination Act, which, among other things, does not provide a private right of action" in state civil court, according to a report published in June from the Utah Women and Leadership Project at Utah State University.

Utah should enact an equal pay act that allows women to "challenge pay discrimination on their own without resorting to a state agency or protracted federal process with the U.S. Equal Employment Opportunity Commission," the report states.

The statute of limitations for claims should be between one and three years, and there should be an "anti-retaliation provision to protect workers pursuing their rights to equal pay for equal work," L. Jenna Gould, the report's author, wrote.

Women need to earn a living wage, Archuleta said, including the many women who work in caregiving fields.

"Child care wages are so low that most people who work in child care can't afford to put their own child in the centers where they're working," she said.

Archuleta said she doesn't think there will be movement in terms of women's pay "unless

☰ SEARCH · The Salt Lake Tribune · SUBSCRIBE · LOG IN · SUBSCRIBE · 👤




(Francisco Kjolseth | The Salt Lake Tribune) Kelly White Jones, left, and Jody England Hansen dress up as Silent Sentinels (women who protested outside the White House a century ago for suffrage), as they attend the legislative session on Tuesday, Feb. 4, 2020, to encourage Utah legislators to ratify the Equal Rights Amendment.

The COVID-19 pandemic has made inequalities "even more apparent," Whited Jones said, as women in Utah, and across the country, left the workforce at higher rates than men.

There is a need for more affordable and accessible child care, according to Archuleta and Whited Jones. And until their partners "step up" and take on more of caregiving responsibilities, "women will not be equal," Whited Jones.

On Thursday, Whited Jones and the Utah ERA Coalition and other partner organizations are holding a rally on the steps of the state Capitol on Women's Equality Day, to celebrate the female heroes from Utah's history and "outline needed steps toward the completion of permanent equality, including ratifying the Equal Rights Amendment."

SEARCH    The Salt Lake Tribune    SUBSCRIBE    LOG IN    SUBSCRIBE

Writin's ones said.

"Sometimes in our state we throw crumbs. We give a little bit here and a little bit there," she said. "But I think we have to do even better."



(Illustration by Christopher Cherrington | The Salt Lake Tribune)

*Becky Jacobs is a* Report for America *corps member and writes about the status of women in Utah for The Salt Lake Tribune. Your donation to match our RFA grant helps keep her writing stories like this one; please consider making a tax-deductible gift of any amount today by clicking* here.



**bjacobs@sltrib.com**
Follow @ruthyjacobs

**Donate to the newsroom now.** The Salt Lake Tribune, Inc. is a 501(c)(3) public charity and contributions are tax deductible

'I felt like a crap mom and crap employee': Utah women share caregiving struggles during COVID-19

NEWS

Is it fair to label Utah the worst state for women's equality? Female leaders weigh in.

NEWS

Here's what you said would improve the lives of Utah women

NEWS

Fact-checking Utah's reputation as the worst state for women's equality

NEWS

Quiz: See if you can tell whether this quote is about Utah women in 1964 or 2019

NEWS

I dug into Utah's reputation as the worst state for women. Here's what I found.

RELIGION

Piety and pay: Why religious states like Utah have larger gender wage gaps

## THE LATEST

Flash flood hits Hanksville with 6 feet of water

Latest from Mormon Land: The conflicting forces at BYU that may have led to Jeffrey Holland's talk

Rachel Barnes: Helping teenagers' mental health can be as simple as getting enough sleep



Claims report frustrations and long waits trying to get tested for COVID-19

'The Rundown': Blake Moore draws the wrath of election conspiracy theorists

Return to Story

## CONNECT

Facebook

Twitter

Instagram

YouTube

RSS

## SUBSCRIPTIONS

Subscribe to print + digital

Subscribe to digital only

Free digital for print subscribers

Email newsletters

Login to your print account

Login to your digital account

Subscription FAQs

Help and contact info

## ABOUT US

History and mission

Our nonprofit model

Board and advisers

Officers and staff

First Amendment Society

Donors and tax filing

Privacy policy

California privacy

Editorial policies and ethics

## MORE

Advertise with us

Legal notices

Store

Podcasts

Archives

Story tip line

Support The Tribune

Donate

Cookie Preferences

Commenting Policy

  



TERMS OF SERVICE                          WEEKLY PRINT EDITION

PRIVACY POLICY                            EMAIL NEWSLETTERS

EDITORIAL POLICY                          PODCASTS

ADVERTISE                                 NEWS TIPS

CONTACT US                                APP STORE

HELP                                      GOOGLE PLAY

COOKIE PREFERENCES                        DONATE


Report a missed paper by emailing subscribe@sltrib.com or calling 801-237-2900

For e-edition questions or comments, contact customer support 801-237-2900 or email subscribe@sltrib.com

sltrib.com © 1996-2021 The Salt Lake Tribune. All rights reserved.









U.S. News    World New

# Seven years of sex abuse: How Mormon officials let it happen



BY MICHAEL REZENDES

Mike is a member of
the AP's global
investigative team.

MikeRezendes
mrezendes@ap.org

BISBEE, Ariz. (AP) — MJ was a tiny, black-haired girl, just 5 years old, when her father
admitted to his bishop that he was sexually abusing her.

The father, a member of The Church of Jesus Christ of Latter-day Saints and an admitted
pornography addict, was in counseling with his bishop when he revealed the abuse. The
bishop, who was also a family physician, followed church policy and called what church
officials have dubbed the "help line" for guidance.

But the call offered little help for MJ. Lawyers for the church, widely known as the
Mormon church, who staff the help line around the clock told Bishop John Herrod not to
                                        elfare officials. Instead he kept the abuse secret.

**U.S. News     World New**

"They said, 'You absolutely can do nothing,'" Herrod said in a recorded interview with
law enforcement.

Herrod continued to counsel MJ's father, Paul Douglas Adams, for another year, and
brought in Adams' wife, Leizza Adams, in hopes she would do something to protect the
children. She didn't. Herrod later told a second bishop, who also kept the matter secret
after consulting with church officials who maintain that the bishops were excused from
reporting the abuse to police under the state's so-called clergy-penitent privilege.

Adams continued raping MJ for as many as seven more years, into her adolescence, and
also abused her infant sister, who was born during that time. He frequently recorded the
abuse on video and posted the video on the internet.

Adams was finally arrested by Homeland Security agents in 2017 with no help from the
church, after law enforcement officials in New Zealand discovered one of the videos. He
died by suicide in custody before he could stand trial.

The Associated Press has obtained nearly 12,000 pages of sealed records from an
  elated child sex abuse lawsuit against the Mormon church in West Virginia. The
  cuments offer the most detailed and comprehensive look yet at the so-called help line
Herrod called. Families of survivors who filed the lawsuit said they show it's part of a

leaving victims in harm's way.



MJ embraces her adoptive mother, Nancy Salminen, in Sierra Vista, Ariz., Oct. 27, 2021. State authorities placed MJ in foster care after learning that her father, the late Paul Adams, sexually assaulted her and posted video of the assaults on the Internet. (AP Photo/Dario Lopez-Mills).

The help line has been criticized by abuse victims and their attorneys for being inadequate to quickly stop abuse and protect victims. Yet the Utah-based faith has stuck by the system despite the criticism and increasing scrutiny from attorneys and prosecutors, including those in the Adams case.

"'I just think that the Mormon church really sucks. Seriously sucks," said MJ, who is now 16, during an interview with the AP. "They are just the worst type of people, from what I've experienced and what other people have also experienced."

MJ and her adoptive mother asked the AP to use only her initials in part because videos of her abuse posted by her father are still circulating on the internet. The AP does not publish the names of sexual abuse survivors without their consent.

William Maledon, an Arizona attorney representing the bishops and the church in a lawsuit filed by three of the Adams' six children, told the AP last month that the bishops were not required to report the abuse.

"These bishops did nothing wrong. They didn't violate the law, and therefore they can't be held liable," he said. Maledon referred to the suit as "a money grab."

In his AP interview, Maledon also insisted Herrod did not know that Adams was continuing to sexually assault his daughter after learning of the abuse in a single counseling session.

U.S. News    World Newnterview with the agent obtained by the AP, Herrod said he asked Leizza Adams in mutiple sessions if the abuse was ongoing and asked her, "What are we going to do to stop it?"

"At least for a period of time I assumed they had stopped things, but — and then I never asked if they picked up again."

'THE PERFECT LIFESTYLE'



An old-fashioned gas station stands at Erie Street in Bisbee, Ariz., Oct. 26, 2021. Erie Street is what remains of Lowell, a small town incorporated into Bisbee in the early 1900s. The Adams family lived on a lonely dirt road about 8 miles from the center of Bisbee and become recognized to residents who noticed the reclusive nature and laid-back attitude of AP

The Adams family lived on a lonely dirt road about 8 miles from the center of Bisbee, an old copper-mining town in southeastern Arizona known today for its antique shops and laid-back attitude. Far from prying eyes, the Adams home — a three-bedroom, open concept affair surrounded by desert — was often littered with piles of clothing and containers of lubricant Adams used to sexually abuse his children, according to legal documents reviewed by the AP.

Paul's wife, Leizza, assumed most of the child-rearing responsibilities, including getting their six children off to school and chauffeuring them to church and religious instruction on Sundays. Paul, who worked for the U.S. Border Patrol, spent much of his time online looking at porn, often with his children watching, or wandering the house naked or in nothing but his underwear.

He had a short fuse and would frequently throw things, yell at his wife and beat his kids. "He just had this explosive personality," said Shaunice Warr, a Border Patrol agent and a Mormon who worked with Paul and described herself as Leizza's best friend. "He had a horrible temper."

Paul was more relaxed while coaxing his older daughter to hold a smartphone camera and record him while he sexually abused her. He also seemed to revel in the abuse in online chat rooms, where he once bragged that he had "the perfect lifestyle" because he could have sex with his daughters whenever he pleased, while his wife knew and "doesn't care."





Collage of Leizza Adams, wife of Paul Adams. (AP Illustration based on legal documents/Peter Hamlin)



Clouds hang over the area that what was once the home of Paul Adams and his family on the outskirts of Bisbee, Ariz., Oct. 26, 2021. (AP Photo/Dario Lopez-Mills)



A "playground ahead" warning stands by the side of a road on the outskirts of Bisbee, Ariz., Oct. 26, 2021. Bisbee was home to Paul and Leizza Adams, and their six children, before Paul and Leizza were charged with child sexual abuse. (AP Photo/Dario Lopez-Mills)

He would later tell investigators the abuse was a compulsion he couldn't stop. "I got into something too deep that I just couldn't pull myself out of," he said. "I'm not trying to say the devil made me do it."

The Adams family was deeply involved in the Mormon community, and on Sundays they ⬤ ended services in Bisbee. So Adams turned to his church, and to Bishop Herrod, when sought help and revealed his abuse of MJ.

sessions. The bishop, who was also Leizza's personal physician, said she seemed "pretty emotionally dead" when her husband recounted his abuse of their daughter. The bishop also recognized the harm being done to MJ. "I doubt (she) will ever do well," he said in his recorded interview with Homeland Security agents.

Herrod also told Edwards that when he called the help line, church officials told him the state's clergy-penitent privilege required him to keep Adams's abuse confidential.

But the law required no such thing.

Arizona's child sex abuse reporting law, and similar laws in more than 20 states that require clergy to report child sex abuse and neglect, says that clergy, physicians, nurses, or anyone caring for a child who "reasonably believes" a child has been abused or neglected has a legal obligation to report the information to police or the state Department of Child Safety. But it also says that clergy who receive information about child neglect or sexual abuse during spiritual confessions "may withhold" that information from authorities if the clergy determine it is "reasonable and necessary" under church doctrine.



One victim was 5 when her father told his bishop that he was sexually abusing her. The abuse went on for seven more years even though Mormon church leaders used a so-called help line to report accusations of her abuse. (AP

In 2012, when Herrod rotated out of his position as Bishop of the Bisbee ward — a Mormon jurisdiction similar to a Catholic parish — he told incoming Bishop Robert

"Kim" Mauzy about the abuse in the Adams household. Instead of rescuing MJ by reporting the abuse to authorities, Mauzy also kept the information within the church.

In a separate recorded interview with federal agents obtained by the AP, Mauzy said church officials told him he should convene a confidential disciplinary hearing for Adams, after which Adams was ex-communicated in 2013. Mauzy and other church leaders still didn't report Adams to the police.

Two years later, in 2015, Leizza Adams gave birth to a second daughter. It took her husband just six weeks to start sexually assaulting her, recording the abuse, and uploading the videos to the internet.

The revelation that Mormon officials may have directed an effort to conceal years of abuse in the Adams household sparked a criminal investigation of the church by Cochise County Attorney Brian McIntyre, and the civil lawsuit by three of the Adams children.

"Who's really responsible for Herrod not disclosing?" McIntyre asked in an AP interview. "Is it Herrod," who says he followed the church lawyers' instruction not to report the abuse to authorities? "Or is it the people who gave him that advice?"

'THE CALL COMES TO MY CELL PHONE'



https://apnews.com/article/Mormon-church-sexual-abuse-investigation-e0e39cf9aa4fbe0d8c1442033b894660                    9/21

bishop called the help line and was told to keep the abuse secret, because Adams admitted to the abuse during confession. (AP Photo/Dario Lopez-Mills)

When it comes to child sexual abuse, the Mormon church says "the first responsibility of the church in abuse cases is to help those who have been abused and protect those who may be vulnerable to future abuse," according to its 2010 handbook for church leaders. The handbook also says, "Abuse cannot be tolerated in any form."

But church officials, from the bishops in the Bisbee ward to officials in Salt Lake City, tolerated abuse in the Adams family for years.

"They just let it keep happening," said MJ, in her AP interview. "They just said, 'Hey, let's excommunicate her father.' It didn't stop. 'Let's have them do therapy.' It didn't stop. 'Hey, let's forgive and forget and all this will go away.' It didn't go away."

A similar dynamic played out in West Virginia, where church leaders were accused of covering up the crimes committed by a young abuser from a prominent Mormon family even after he'd been convicted on child sex abuse charges in Utah. The abuser, Michael Jensen, today is serving a 35- to 75-year prison sentence for abusing two children in West Virginia. Their family, along with others, sued the church and settled out of court for an undisclosed sum.

"Child abuse festers and grows in secrecy," said Lynne Cadigan, a lawyer for the Adams children who filed suit. "That is why the mandatory reporting came into effect. It's the most important thing in the world to immediately report to the police."

The lawsuit filed by the three Adams children accuses The Church of Jesus Christ of Latter-day Saints and several members, including Bishops Herrod and Mauzy, of negligence and conspiring to cover up child sex abuse to avoid "costly lawsuits" and protect the reputation of the church, which relies on proselytizing and tithing to attract new members and raise money. In 2020, the church claimed approximately 16 million members worldwide, most of them living outside the United States.



An old, disconnected pay phone stands near the post office in Bisbee, Ariz., Oct. 26, 2021. AP Photo/Dario Lopez-Mills)

"The failure to prevent or report abuse was part of the policy of the defendants, which was to block public disclosure to avoid scandals, to avoid the disclosure of their tolerance of child sexual molestation and assault, to preserve a false appearance of propriety, and to avoid investigation and action by public authority, including law enforcement," the suit alleges. "Plaintiffs are informed and believe that such actions were motivated by a desire to protect the reputation of the defendants."

Very few of the scores of lawsuits against The Church of Jesus Christ of Latter-day Saints mention the help line, in part because details of its operations have been a closely guarded secret. The documents in the sealed court records show how it works.

"...he help line is certainly there to help — to help the church keep its secrets and to cover up abuse," said Craig Vernon, an Idaho attorney who has filed several sex abuse lawsuits

Vernon, a former member, routinely demands that the church require bishops to report sex abuse to police or state authorities rather than the help line.

The sealed records say calls to the help line are answered by social workers or professional counselors who determine whether the information they receive is serious enough to be referred to an attorney with Kirton McConkie, a Salt Lake City firm that represents the church.

A document with the heading "Protocol for abuse help line calls," which was among the sealed records obtained by the AP, laid out the questions social workers were to ask before determining whether the calls should be referred to the lawyers.

Mormon officials in the West Virginia case said they did not recognize the Protocol and could not authenticate it. But a ranking church official in a separate sex abuse lawsuit in Oregon confirmed that those answering the help line used a "written protocol" to guide them.

"There would be a page containing various topics to discuss and handle," said Harold C. Brown, then director of the church's Welfare Services Department.

Collage of the protocol for abuse help line calls. (AP Illustration based on legal documents/Peter Hamlin)

The Protocol instructs those staffing the help line to tell callers they are to use first names only. "No identifying information should be given." Under the heading "High Risk Cases," it also instructs staffers to ask a series of questions, including whether calls concerned possible abuse by a church leader, an employee, or abuse at "a church-sponsored activity."

The protocol advises those taking the calls to instruct a "priesthood leader," which includes bishops and stake presidents, to encourage the perpetrator, the victim, or others who know of the abuse to report it. But it also says, in capital letters, that those taking the calls "should never advise a priesthood leader to report abuse. Counsel of this nature should come only from legal counsel."

That counsel comes from attorneys from Kirton McConkie, which represents the church.

Joseph Osmond, one of the Kirton McConkie lawyers assigned to take help line calls, said in a sealed deposition that he's always ready to deal with sex abuse complaints.

"Wherever I am. The call comes to my cell phone," he said. He then acknowledged that he did not refer calls to a social worker and wouldn't know how to do so.

Osmond declined to comment through church officials. Peter Schofield, a Kirton McConkie lawyer long associated with the help line, also declined to answer questions from the AP.

Maledon, the attorney for the church in the Adams lawsuit, said church clergy or church attorneys have made "hundreds of reports" of child abuse to civil authorities in Arizona over an unspecified number of years. But he could not say how many calls to the help line were not referred to police or child welfare officials and could not provide a referral rate.

o church practices, identified in the sealed records, work together to ensure that the contents of all help lines calls remain confidential. First, all records of calls to the help

sealed records.

Second, church officials say that all calls referred to Kirton McConkie lawyers are covered by attorney-client privilege and remain out of the reach of prosecutors and victims' attorneys. "The church has always regarded those communications between its lawyers and local leaders as attorney-client privileged," said Paul Rytting, the director of Risk Management, in a sealed affidavit.

AN OMINOUS TIME



The sun sets over the fence of the Lavender Pit Mining Overlook in Bisbee, Ariz., Oct. 26, 2021. The year 1995, when The Church of Jesus Christ of Latter-day Saints established the "help line," was a pivotal time for the church and other organized religions. Child sex abuse lawsuits were on the rise and juries were awarding victims millions of dollars. Perhaps more ominous for religious institutions, insurance companies were canceling their coverage of child sex abuse claims. (AP Photo/Dario Lopez-Mills)

Mormon leaders established the help line in 1995 and it operated not within its Department of Family Services, but instead in its Office of Risk Management, whose role is to protect the church and members from injury and liability in an array of circumstances, including fires, explosions, hazardous chemical spills and severe weather. The department ultimately reports to the First Presidency, the three officials at the very top of the church hierarchy, according to records in the sealed documents.

Risk management also tracks all sex abuse lawsuits against the church, according to a sealed affidavit by Dwayne Liddell, a past director of the department who helped

"I have been in those type of meetings where … the training of ecclesiastical leaders (and) the establishment of a help line have been discussed," Liddell said. When asked who attended the meetings, he answered, "Members of the First Presidency and the presiding bishopric," or the top leaders of the church.

Before establishing the help line in 1995, the Mormon church simply instructed bishops to comply with local child sex abuse reporting laws.

At the time, child sex abuse lawsuits were on the rise and juries were awarding victims millions of dollars. The Mormon church is largely self-insured, leaving it especially vulnerable to costly lawsuits.

"There is nothing inconsistent between identifying cases that may pose litigation risks to the church and complying with reporting obligations," church lawyers said in a sealed legal filing.

But one affidavit in the sealed records which repeatedly says the church condemns child sexual abuse, also suggests the church is more concerned about the spiritual well-being of perpetrators than the physical and emotional well-being of young victims, who also may be members of the faith.

"Disciplinary proceedings are subject to the highest confidentiality possible," said Rytting. "If members had any concerns that their disciplinary files could be read by a secular judge or attorneys or be presented to a jury as evidence in a public trial, their willingness to confess and repent and for their souls to be saved would be seriously compromised."

A GLOBAL INVESTIGATION





Collage of Paul Adams. (AP Illustration based on legal documents/Peter Hamlin)

In 2016 police in New Zealand arrested a 47-year-old farm worker on child pornography charges and found a nine-minute video on his cell phone, downloaded from the internet, showing a man in his 30s raping a 10-year-old girl.

A global search for the rapist and his victim was on. It started with Interpol and led to the U.S. State Department, where investigators using facial recognition technology matched the rapist with a passport card photo of a U.S. Border Patrol employee living in Bisbee, Arizona, according to a Homeland Security synopsis obtained by the AP.

Agents rushed to the Naco, Arizona, Border Station and arrested Adams, then a lanky, bearded mission support specialist with the Border Patrol. After some coaxing, Adams admitted to raping MJ and to sexually assaulting her younger sister, and to posting video of the assaults on the internet. When agents raided his home, they seized phones and computers holding more than 4,000 photos and nearly 1,000 videos depicting child sex abuse, many featuring the Adams daughters.

But the nine-minute video stood out. "This video is one of the worst I've ever seen," Homeland Security agent Edwards later testified, adding that haunting dialogue between Adams and his older daughter helped make the video "stand out in my mind and continue

unnecessary trauma for MJ — and a lifetime of abuse for her tiny sister — while Bishops

Herrod and Mauzy and church representatives in Salt Lake City stood by.

After Paul Adams died by suicide, Leizza Adams pleaded no contest to child sex abuse charges and served two-and-a-half years in state prison. Three of the Adams children went to live with members of Leizza's extended family in California. The other three were taken in by local families.

THE SURVIVORS



A view of a swing set at a lonely playground in Bisbee, Ariz., Oct. 26, 2021. Bisbee was home to Paul and Leizza Adams, and their six children, before Paul and Leizza were charged with child sexual abuse. (AP Photo/Dario Lopez-Mills)

MJ's little sister was only 2 when she met her adoptive mother for the first time. The toddler wrapped her arms and legs around Miranda Whitworth's head, buried her face in her neck, and refused to look up to say good-bye to members of Leizza's family. "It was the craziest thing," said Whitworth who, with her husband, Matthew, welcomed the toddler into their family. "It was like when you see a baby monkey or baby gorilla cling to their mother, and they just won't let go."

Over the next few days and weeks, the Whitworths would see additional markers of the unfathomable abuse the toddler endured at the hands of her father — much of it recorded on video. She would howl in terror when any man attempted to touch her.

said.

The 2-year-old was also terrified of the water, which made bathing an ear-splitting ordeal. She wouldn't tolerate anything wrapped around her wrists. And at church, she would run and hide behind Miranda whenever anyone greeted her by an old family nickname.

When they took in the toddler, neither Miranda nor Matthew knew very much about what had happened to her. But while sitting in on Leizza Adams's sentencing hearing, they learned about the repeated rapes, the videos, and the fact that church bishops knew about the abuse of the older daughter and did nothing to stop it.

The Whitworths were converts to the Mormon faith and, like many new followers of a religion, they were especially enthusiastic about The Church of Jesus Christ of Latter-day Saints. In particular, they appreciated the efforts Mormons make to help fellow church members in times of need through church organizations established to give special attention to women, teens and children.

"It's all about family," Miranda said. "That's one of the things we absolutely loved."

But after learning about what Adams did to their new daughter, and the failure of the church to stop him, the scales fell from their eyes. "We decided to remove our records from the church," said Matthew Whitworth. "I personally couldn't continue to provide tithing money to a church that would allow young children to be abused and not do anything to prevent it."

Unlike the Whitworths, Nancy Salminen has never been a member of the Mormon church. But as a special needs teacher and a rape victim herself, she has a special affinity for MJ and others like her. Over the last five years, she has opened her home to 17 girls and boys who needed a safe place to stay. Her house is a modest, ranch-style structure she bought out of foreclosure.

Case 3:20-cv-00321-RBM-KSC   Document 193   Filed 09/25/22   PageID.10480

Salminen said she met MJ after receiving an urgent call on a Friday evening to rescue a 12-year-old from another family. "She was pretty scared and pretty confused when I picked her up," Salminen recalled. "She spent a lot of time in her closet in her room when we got home, but we got to know each other and got to like each other."

Like the Whitworths, Salminen knew very little about what MJ had endured until Leizza Adams's sentencing hearing.

"What I heard made me want to throw up," she said. "And the more I learned the more I wanted to help her fight this fight that she didn't even know about."

Safely settled in Salminen's household — which today includes a foster girl Salminen also plans to adopt — MJ has been transformed from a victim of unimaginable abuse to a bubbly 16-year-old who plays in the high school band and proudly dons a crisp, new uniform for her job at a fast-food restaurant.

"She had every excuse to fail and to just fold into herself and run away," Salminen said. "But instead, she came back stronger than anyone I've ever known."

So strong that she appears eager to play an active role in the battle she and her two siblings are waging against The Church of Jesus Christ of Latter-day Saints. "I just want them to do what they're supposed to do and report to the police," MJ said.

The adoptive parents of the third Adams child who has filed suit declined to speak to the AP about the case. Like MJ, Miranda and Matthew Whitworth said they joined the lawsuit against the church on behalf of their young daughter not in hopes of a payday, but to change church policy so that any instance of child sexual abuse is immediately reported to civil authorities. "We just don't understand why they're paying all these lawyers to fight this," Matthew Whitworth said. "Just change the policy."

THE PRIVILEGE

That policy is the key to the church's defense. In a recent filing asking a Superior Court judge to dismiss the case, Maledon and other lawyers for the church said the case "hinges

entirely on whether Arizona's child abuse reporting statute required two church bishops ... to report to authorities confidential confessions made to them by plaintiffs' father."

Whatever moral or public policy arguments one could make that the church should have told authorities that Paul Adams was raping his daughters are irrelevant, the lawyers argued. "Arizona's reporting statute broadly exempts confidential communications with clergy, as determined by the clergyman himself," according to the church motion to dismiss the case. "Reasonable people can debate whether this is the best public policy choice. But that is not an issue for a jury or this court."

Bishop Herrod, in his recorded interview, said church officials told him he had to keep what Adams told him confidential or he could be sued if he went to authorities.

But McIntyre, the Cochise County attorney, said that's false, noting the Arizona reporting law says that anyone reporting a belief that child sex abuse occurred "is immune from any civil or criminal liability."

Aside from the legal arguments over whether Bishops Herrod and Mauzy were excused from their reporting obligations under the clergy-penitent privilege, critics of the inaction by the two bishops and the broader church have raised ethical issues.

Gerard Moretz, a seasoned child sex abuse investigator for the Pima County, Arizona, Sheriff's Department and an expert witness for the Adams children, is one of them.

"What aspect of your religious practice are you advancing if you don't report something like this?" he asked.

——

sociated Press editor Brady McCombs in Salt Lake City and investigative researcher dy Herschaft in New York contributed to this story.

Associated Press religion coverage receives support through the AP's collaboration with
The Conversation US, with funding from Lilly Endowment Inc. The AP is solely
responsible for this content.

**AP NEWS**

Top Stories

Video

Contact Us

Accessibility Statement

**DOWNLOAD AP NEWS**

Connect with the definitive source for global and local news

**MORE FROM AP**

ap.org

AP Insights

AP Definitive Source Blog

AP Images Spotlight

AP Explore

AP Books

AP Stylebook

**FOLLOW AP**

**THE ASSOCIATED PRESS**

About    Contact    Customer Support    Careers    Terms & Conditions    Privacy

All contents © copyright 2022 The Associated Press. All rights reserved.





☰                          Los Angeles Times                    SUBSCRIBE     LOG IN    🔍

# Mormons feel the backlash over their support of Prop. 8

BY NICHOLAS RICCARDI

NOV. 17, 2008 12 AM PT



RICCARDI IS A TIMES STAFF WRITER.

SALT LAKE CITY — In June, leaders of the Church of Jesus Christ of Latter-day Saints made a fateful decision. They called on California Mormons to donate their time and money to the campaign for Proposition 8, which would overturn a state Supreme Court ruling that permitted gay marriage.

That push helped the initiative win narrow passage on election day. And it has made the Mormon Church, which for years has striven to be seen as part of the American mainstream, a political target.

Protesters have massed outside Mormon temples nationwide. For every donation to a fund to overturn Proposition 8, a postcard is sent to the president of the Mormon Church. Supporters of gay marriage have proposed a boycott of Utah businesses, and someone burned a Book of Mormon outside a temple near Denver.

"It's disconcerting to Latter-day Saints that Mormonism is still the religious tradition

✕

LIMITED-TIME OFFER

## $1 for 6 Months

SUBSCRIBE NOW

Already a Subscriber? LOG IN

"People of faith have been intimidated for simply exercising their democratic rights," the statement said. "These are not actions that are worthy of the democratic ideals of our nation. The end of a free and fair election should not be the beginning of a hostile response in America."

Jim Key, a spokesman for the L.A. Gay & Lesbian Center, said barbs by gay marriage activists were directed at church leadership, not individual Mormons.

"We're making a statement that no one's religious beliefs should be used to deny fundamental rights to others," he said.

Proposition 8 opponents estimate that members of the Mormon Church gave more than $20 million to the effort to pass the measure, though that is difficult to confirm because records of campaign donations do not include religious affiliation.

For years, church leaders have tried to blunt the assertion that Mormonism is somehow out of the political and cultural mainstream. The backlash over gay marriage carries risks and rewards toward that goal.

To support Proposition 8, the Mormon Church entered into a coalition with other religious organizations, including evangelical groups that have tended to view Mormons warily. It was a Catholic bishop, Mormon officials said, who requested the Mormon Church bring its members into the fight. Now those groups are rallying behind the embattled church.

X

LIMITED-TIME OFFER

$1 for 6 Months

SUBSCRIBE NOW

Already a Subscriber? LOG IN

Case 3:20-cv-00321-RBM-KSC   Document 193   Filed 09/25/23   PageID.10485   Page 111 of 173

"The backlash is going on all over the country," said Jan Shipps, a prominent scholar of modern Mormonism who is an emeritus professor at Indiana University-Purdue University Indianapolis. "There are people who had a lot of respect for the Mormons who now say, 'Well, they're just like the Christian right.' "

That's ironic, Shipps said, given that the Mormon Church has a more tolerant stance on homosexuality than some evangelical groups. The church has pointedly declined to state that homosexuality is a choice. And it has cautioned against programs that purport to "cure" same-sex attraction, even though Mormon theology holds that marriage is a divine relationship between men and women that continues into the afterlife.

Also, Shipps said, though the church had been riding high ever since the successful 2002 Winter Olympics in Salt Lake City, the gay marriage fight and other recent setbacks have forced the church to deal with skepticism over its faith and history.

First there was former Massachusetts Gov. Mitt Romney's unsuccessful run for the Republican presidential nomination. Many in the church were shocked that Romney's Mormon faith was a source of discomfort for some voters.

"Latter-day Saints were just amazed to think there was such bigotry in the country," church spokesman Michael Otterson said.

And a raid on a polygamous breakaway sect in Texas last spring was a reminder of the church's practice of multiple marriages in the 19th century, even though the Mormon

LIMITED-TIME OFFER

## $1 for 6 Months

SUBSCRIBE NOW

Already a Subscriber? LOG IN

Romney's faith.

But Otterson dismissed that possibility. "That kind of thinking would never even factor into the thinking of church leadership," he said. "The church couldn't remain silent on a pivotal issue like this."

--

[nicholas.riccardi@latimes.com](mailto:nicholas.riccardi@latimes.com)

**SUBSCRIBERS ARE READING**  〉

Coronavirus cases are soaring in L.A. County, but this wave is different

Move thousands of homeless people into landmark L.A. Sears building? Some say no way

The SoCal housing market is cooling. Here's how far prices have fallen

**FOR SUBSCRIBERS**
Why are so many people hiking this rustic valley in Mammoth's shadow?

**FOR SUBSCRIBERS**
The man who played Hollywood: Inside Randall Emmett's crumbling empire

LIMITED-TIME OFFER

$1 for 6 Months

SUBSCRIBE NOW

Already a Subscriber? LOG IN

Subscribe for unlimited access

Follow Us

eNewspaper

Coupons

Find/Post Jobs

Place an Ad

Media Kit: Why the
L. A. Times?

Bestcovery

Copyright © 2022, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell My Personal Information

LIMITED-TIME OFFER

# $1 for 6 Months

SUBSCRIBE NOW

Already a Subscriber? LOG IN

☰  🔍        *The Salt Lake Tribune*        **SUBSCRIBE**    **LOG IN**    SUBSCRIBE    👤

# Utah's Sean Reyes falls from breath of fresh air to fascist toady, George Pyle writes.

## Today having attorneys general who consort with shady businessmen seems downright quaint.



(Rick Bowmer | AP photo) Utah Attorney General Sean Reyes speaks during the Utah Republican Party convention on April 26, 2014, in Sandy, Utah.

By George Pyle  |  June 1, 2022, 5:00 a.m.

I'm old enough to remember when Utah Attorney General Sean Reyes was a hope of better things to come in Utah government.

Reyes was appointed to fill the seat of Attorney General John Swallow, who resigned in disgrace in 2013. Swallow quit before the release of a report by a special committee of the Utah House that described the attorney general's office of having a "For Sale" sign

on its front door, trading favors and taking benefits from people whom Swallow and his
predecessor, Mark Shurtleff, should have been — and sometimes were — prosecuting.

Swallow and Shurtleff denied wrongdoing, got arrested and charged with corruption,
watched those criminal cases implode, and walked away with big taxpayer-funded
settlements — $600,000 for Shurtleff, $1.5 million for Swallow.

Even though the charges against Shurtleff were dismissed and Swallow eventually was
acquitted by a jury, the goings-on around the attorney general's office during those years
were a disgrace, involving expensive resort vacations and unethical dealings. The telling
of that tale is not complete without such details as a key prosecution witness refusing to
testify, citing possible self-incrimination, and a U.S. Supreme Court decision that made
it nigh impossible to convict anyone of corruption in office.

In the wake of all that, the arrival of a literally fresh-faced Sean Reyes, pledging honesty
and rightly proud of his accomplishment as the first person of color to achieve such high
office in Utah, felt like a clean breeze in the smelly stable of Utah politics.

For a while, anyway.

Now the memory of a Utah attorney general getting cozy with the sharks in the payday
lending game and helping people accused of violating banking laws seems almost
quaint.

At least Shurtleff and Swallow had the decency to deny that their questionable
associations affected their conduct in office.

Reyes, on the other hand, travels to other states, and files papers with the U.S. Supreme
Court, hoping to bask in the reflected light of the fascist former president who fomented
an attempt to violently overthrow the government of the United States.

While the ballots in the 2020 election were still being counted, Reyes took a jaunt to
Nevada to wave the flag of the Big Lie. It creates a serious threat to the integrity of

Utah's own process — even though elections are not usually in the attorney general's
portfolio — if we fear that Reyes might intervene in a close election this year, say in
contested GOP primaries for seats in Congress, or the independent Evan McMullin
challenge of another Trumpist Republican candidate, Sen. Mike Lee.

And just last Saturday, Utah's chief law enforcement officer scurried to a political rally
in Casper, Wyoming, headlined by Donald Trump himself, where he thoroughly
embarrassed himself, his office, his party and his state by telling more falsehoods about
what's going on in our nation.

"The federal government is coming for your lands," Reyes lied, failing, as Utah
politicians often do, to distinguish between land that belongs to Utahns and land that is
owned by the people of the United States that happens to be in Utah.

He said the federal government is forcing public schools to tell students "that they were
bigots by birth, telling them that America is irredeemable" — a charge against our
educators that is despicably and empirically false but which fits right in in any forum
where people don't think Donald Trump should live out his life at Guantanamo Bay
(Spandau Prison having been torn down many years ago).

Reyes has also joined — in the name of the state of Utah, its residents and its taxpayers
— in a number of extremist lawsuits brought by a collection of Republican attorneys
general around the nation. He has sought to block federal mandates that health care
workers and members of the armed forces be vaccinated against COVID-19. The latter
argument is based on the utterly ludicrous grounds that, unlike all the other vaccines
soldiers are required to receive, the COVID jabs somehow violate someone's religious
freedom — when not a single religion opposes vaccines.

So, because of decisions Reyes made, in consultation with nobody, Utah is on the record
arguing that it is within the rights of health care workers to spread disease and of
soldiers to host a virus that clearly threatens any unit's military readiness.

7/28/22, 11:05 AM    Utah's Sean Reyes having quite a year, behind his devotion to Trump with disastrous consequences, George Pyle writes | The Salt Lake Tribune

Case 3:20-cv-00321-RBM-KSC   Document 93   Filed 09/25/22   PageID.10491   Page 117 of 173

Reyes has been elected attorney general three times after his appointment, all with comfortable margins of victory. He needs no one's help to hang onto that job in virtual perpetuity. The only reason he might want Trump's anointment would be if he plans to challenge Sen. Mitt Romney in 2024.

If Utah is quite fortunate, Reyes will give up his current gig to challenge Romney in 2024, Reyes will be crushed by the well-regarded and well-funded incumbent, further tarnishing Trump's reputation as a political kingmaker, and Utah will have a chance to elect an attorney general who is not a deep embarrassment.

That's something that hasn't happened for a long time.

George Pyle, reading The New York Times at The Rose Establishment.

**George Pyle**, *opinion editor of The Salt Lake Tribune, is also old enough to remember when Lyndon Johnson was a hope of better things to come.*

*gpyle@sltrib.com*

*Twitter, @debatestate*



**gpyle@sltrib.com**
Follow @DebateState

**Donate to the newsroom now.** The Salt Lake Tribune, Inc. is a 501(c)(3) public charity and contributions are tax deductible

## RELATED STORIES

Democracy itself is on the line unless Republicans do more to denounce racism, George Pyle writes

# The Washington Post

*Democracy Dies in Darkness*

**VOICES ACROSS AMERICA**

# Opinion   An obscene anti-Mormon chant marks a grim irony in the church's history

By Matthew Bowman

September 21, 2022 at 5:12 p.m. EDT

*Matthew Bowman is an associate professor of history and religion and Howard W. Hunter Chair of Mormon Studies at Claremont Graduate University in Claremont, Calif.*

How did we get to the point in which fans seated in the student section at the University of Oregon's Autzen Stadium in Eugene chanted "F--- the Mormons" while their football team soundly defeated Brigham Young University on Saturday?

More precisely, how did we get to the point where the BYU graduate who captured the chant on video could tell a reporter that she was disappointed, though not necessarily surprised because "you don't make fun of a lot of religions, but Mormons are free game"?

The next day, University of Oregon officials apologized, calling the chant "offensive and disgraceful." But that those students did not seem to feel the same way struck me, both as a historian of religion in the United States and a member of the Church of Jesus Christ of Latter-day Saints. The arc of the church's history, from an object of fear and confusion in the 19th century, to hard-won respectability by the mid-20th century, to "free game" today, tells us a great deal about the church itself, but also about the place of religion in the United States.

Joseph Smith began telling his family that he was receiving revelations in the 1820s. After publishing the Book of Mormon in 1829, he claimed the mantle of a prophet and founded the church in 1830. Until his assassination at the hands of a mob in 1844, he led the church across the country and toward ever-more-countercultural practices and beliefs. The practice of polygamy is the best known of these, but the church also experimented with economic communalism for decades.

After Smith's death, thousands of members of the LDS church fled west under the leadership of Brigham Young, eventually finding relative safety in the Utah territory in 1847. For decades afterward, the territory was casually theocratic, as church leaders selected the candidates in virtually every election.

But from the 1880s through the 1910s, through a combination of sustained prosecutions, confiscation of property and bad publicity, Congress beat much of the countercultural impulse out of the church. LDS leaders enacted a concerted, mostly successful effort to drive polygamists out of their church. They instructed members to embrace conventional U.S. politics. LDS businessmen reached out across the country, and LDS students enrolled at universities nationwide.

By the 1950s, the LDS church had attained such respectability that Ezra Taft Benson, one of the highest church leaders, could be named agriculture secretary in the Eisenhower administration and be featured, along with his wife and children, on Edward R. Murrow's popular news show as an exemplary American family. The Mormon Tabernacle Choir (as it was then called) regularly toured the nation. All seemed well.

But by the 1980s, though, this assimilation and acceptance had begun to fade.

American evangelical Christians were storming back into politics, and alongside campaigns against abortion and no-fault divorce, some conservative religious leaders engaged in "anti-cult" efforts that targeted relatively small religious movements, including the LDS church. Baptist minister Ed Decker, a former Mormon, attracted attention in the 1980s with a book and film called the "God Makers," presenting LDS history and beliefs in the most lurid light possible.

By the 1990s, this parodic version of the church entered mainstream U.S. culture in the work of Trey Parker and Matt Stone, the creators of the television show "South Park" and the Broadway musical the "Book of Mormon," both of which lampoon LDS church members as ostensibly nice, but also terminally stupid and ridiculous.

So, what seemed in the 1950s to be the epitome of wholesome Americanness had become by the turn of the 21st century simultaneously naïve and stodgy. Many Democrats mocked Mitt Romney's nomination as Republican candidate for the presidency in 2012 on just those grounds – he was a "Ken doll" of a candidate, his hair too perfect, his family too healthy, his life profoundly disconnected from gritty American reality.

By the early 21st century, the ideals the church had embraced in order to find acceptance in the United States made the church seem alien again, and particularly so to many progressives. And this might help explain the chant at the Oregon football game. (BYU fans reportedly heard the same chant last fall during a game against the University of Southern California.)

In the early 1980s, the LDS church joined the successful conservative fight against the Equal Rights Amendment. Later, the church became perhaps the most prominent opponent of the campaign to legalize same-sex marriage. More recently, Brigham Young University's masters' program in speech-language pathology was subjected to an accreditation review due to the university's determination that treating transgender students in the program's clinic was against the university's religious mission.

And, of course, though a BYU investigation said it found no evidence to support the story, a Duke volleyball player's claim that students shouted racial slurs at her during a recent game at BYU has shined light on the church's troubled history with race.

Put bluntly, the LDS church has found itself, willingly or not, on the side of cultural issues decidedly not favored by most young people in the United States.

It is a grim irony that a church that tried so hard to gain respectability found the prize slipping away again almost as soon as it was achieved.

August 4, 2022

Mr. Howell's family has more connections in Cache. Mr. Howell's mom, **Ms. Kathleen Howell** used to be the Cache County Assessor since the age of 18. https://www.youtube.com/watch?v=AX1UnJ82w8A



1. That's Mr. Justin Howell (Mr. Chris Howell's brother) on the photo board at 0.12 seconds into the video.

2. He is the 5th photo from the top left in the plaid shirt.



Meet Cache County Assessor Kathleen Howell.

241 views...     👍 3     👎 DISLIKE     ↗ SHARE     ↓ DOWNLOAD     ☰+ SAVE     ...



1. Mr. Justin Howell is 4th from the standing people (left side) on Mr. Verlo Howell's Facebook page.

2. Ms. Kathleen Howell is 5th from the standing people on the right side.





Mr. Verlo Howell used to be a Bishop.  Mormons are generally not well liked.

Utah research: 1.) "I just think that the Mormon church really sucks. Seriously sucks," said MJ, who is now 16, during an interview with the AP. "They are just the worst type of people, from what I've experienced and what other people have also experienced" https://apnews.com/article/Mormon-church-sexual-abuse-investigation-e0e39cf9aa4fbe0d8c1442033b894660

Prop 8: https://www.latimes.com/archives/la-xpm-2008-nov-17-na-mormons17-story.html

Aparna Vashisht-Rota



https://www.instagram.com/p/CgNe8RHlYoI/

Tennessee found the COVID tests were faulty and canceled Nomi's contract after less than 2 months — even though it cost the state

# $5.9 million.

USA TODAY MONEY

Email records among health department officials in Utah, Iowa, Nebraska and Tennessee show infectious disease and health experts expressed concern about the reporting and accuracy of the Nomi tests.

No other state ended its contracts.

USA TODAY MONEY

"

**Would you rather have 1,000 tests at 90% (accuracy) or 100 tests at 100% accuracy? Yes, they may not have been as accurate, but they were not deeply flawed.**

— **Spencer Cox**
Governor of Utah who served as the state's
COVID-19 czar early in the pandemic

USA TODAY MONEY

EXHIBIT 3

# Chapter 24
# Uniform Trade Secrets Act

**13-24-1 Short title.**
This chapter is known as the "Uniform Trade Secrets Act."

Enacted by Chapter 60, 1989 General Session

**13-24-2 Definitions.**
As used in this chapter, unless the context requires otherwise:
(1) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.
(2) "Misappropriation" means:
  (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
  (b) disclosure or use of a trade secret of another without express or implied consent by a person who:
    (i) used improper means to acquire knowledge of the trade secret; or
    (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
    (A) derived from or through a person who had utilized improper means to acquire it;
    (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
    (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
    (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.
(3) "Person" means a natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity.
(4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
  (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
  (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Enacted by Chapter 60, 1989 General Session

**13-24-3 Injunctive relief.**
(1) Actual or threatened misappropriation may be enjoined.  Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.
(2) In exceptional circumstances, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time for which use could have been prohibited.  Exceptional circumstances include, but are not limited to, a material and prejudicial

change of position prior to acquiring knowledge or reason to know of misappropriation that renders a prohibitive injunction inequitable.

(3) In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.

Enacted by Chapter 60, 1989 General Session

**13-24-4 Damages.**

(1) Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation.  Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

(2) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under Subsection (1).

Enacted by Chapter 60, 1989 General Session

**13-24-5 Attorneys' fees.**

    If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorneys' fees to the prevailing party.

Enacted by Chapter 60, 1989 General Session

**13-24-6 Preservation of secrecy.**

    In an action under this chapter, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.

Enacted by Chapter 60, 1989 General Session

**13-24-7 Statute of limitations.**

    An action for misappropriation shall be brought within three years after the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered.  For the purposes of this section, a continuing misappropriation constitutes a single claim.

Enacted by Chapter 60, 1989 General Session

**13-24-8 Effect on other law.**

(1) Except as provided in Subsection (2), this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret.

(2) This chapter does not affect:

  (a) contractual remedies, whether or not based upon misappropriation of a trade secret;

(b) other civil remedies that are not based upon misappropriation of a trade secret; or
(c) criminal remedies, whether or not based upon misappropriation of a trade secret.

Enacted by Chapter 60, 1989 General Session

**13-24-9 Uniformity of application and construction.**
    This chapter shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of the chapter among states enacting it.

Enacted by Chapter 60, 1989 General Session

Dr. Aparna Vashisht-Rota
Pro Se Litigant
12396 Dormouse Road,
San Diego, CA 92129
Aps.Rota@gmail.com
858-348-7068

## IN THE FIRST JUDICIAL DISTRICT COURT
## CACHE COUNTY, STATE OF UTAH

| | |
|---|---|
| APARNA VASHISHT-ROTA, an individual,<br><br>                  Plaintiff,<br><br>vs.<br><br>HMS, LLC, a Utah limited liability company; and CHRIS HOWELL, an individual<br><br>                Defendants. | **SUPPLEMENT TO THE COMPLAINT:**<br><br>1. **SPECIFIC PEFORMANCE**<br>2. **MISAPPROPRIATION OF TRADE SECRETS**<br><br>Civil No. 20010119<br><br>Judge Connell: |

       Dr. Rota submits this supplement to argue specific performance under Utah law for an abundance of caution to show deference and neutrality. Dr. Rota filed in California to enforce the entire Second Agreement via specific performance. Dr. Rota has sued for breach of contract but monetary compensation will not be a sufficient resolution for Dr. Rota in the rare, exclusive, and unique international education business. In addition, Dr. Rota wishes to claim its intellectual property, trade secrets, methods, strategies, and information not readily available that can provide any business in international education with an immediate competitive edge in the market place and is independently valuable. For an abundance of caution, Dr. Rota has included arguments with Utah law, first for specific performance (pages 2-7) and then for misappropriation of her trade secrets and (pages 8-16) in this supplement to be proper in both jurisdictions.

1

A. **SPECIFIC PERFORMANCE**

**CONCISE STATEMENT OF RELIEF REQUESTED**

Dr. Rota worked with HMS from October 2015 till May 2017. The parties are in the 'international education business with University contracts such as those for 'CPT Universities'. HMS did not pay Dr. Rota for her work for 18 months, stole her contacts, solicited her, and then breached its contract by falsely stating that her work was 'paltry'. HMS then started defaming Dr. Rota with university officials with intentional and malicious lies. HMS further blocked Dr. Rota from approaching the universities she brought to HMS with money investments out of her own pocket.

University contracts that are exclusive are rare and unique and can last for up to 30 years. The contracts between the parties were long term e.g. 10 years between Hernandez and Dr. Rota. The contract between the parties (Dr. Rota and HMS) was for five years with royalties payable perpetually. Within international education, the contracts are a unique good of lasting value. They are essentially long-term rental property agreements. For both from the point of view of 'requirements contract' and 'CPT Universities' as a unique good or property, specific performance is a suitable equitable remedy. This supplement establishes a 'right' under the contract via specific performance that HMS usurped by denying her credit and role as a founding partner.

It is not unusual for a university to 'grandfather' a vendor such as Dr. Rota's company, AEG. In the alternative, a university can grant an exception to any exclusive contracts to accommodate such extraordinary situations, or as in this case, accommodate a party that brought the university business.  Universities have a variety of methods to accommodate vendors. As late as March 2020, despite being ordered to act in good faith to resolve dispute, HMS has refused to process applications and applicants referred by Dr. Rota.

2

## GROUNDS FOR RELIEF AVAILABLE[1]

1. On December 17, 2015 (First Agreement), AEG and HMS executed an agreement whereby the AEG Parties were to find suitable university partners for HMS.

2. The First Agreement provides at paragraph 11 as follows:  "In the event that a dispute arises between the parties concerning the contract, performance, breach or any other provision that required dispute resolution, the parties hereby agree to submit the dispute to a three-person arbitration panel for binding arbitration.  The terms and obligations of the arbitration shall be in accordance with the standard terms as set forth by the American Arbitration Association for commercial dispute resolution.  *The foregoing notwithstanding, should either party re-quire that a breach of the agreement requires the enforcement of the agreement by specific performance or other equitable relief not requiring damages, the arbitration provision above shall not be impediment or bar to the pursuit of the parties equitable remedies.*  Upon con-clusion of the arbitration or litigation, the prevailing party shall be entitled to the recovery of reasonable attorney's fees for every stage including collection and appeals." The contract clearly envisioned either arbitration or litigation.

3. On August 3, 2016 (Second Agreement), AEG and HMS executed an agreement whereby the AEG Parties were supposed to add agents for some of HMS' partners.

4. Any work performed by AEG from December 17, 2015 to August 2, 2016 was performed pursuant to the First Agreement.

5. The Second Agreement provides as paragraph 4 as follows: "Representative agrees not to solicit, divert, accept business from, perform business for or otherwise take away or interfere

---

[1] There are no active contracts between the parties and this section refers to the contract that Dr. Rota has required to be performed to its term in CA effective February 16, 2020. Either party can require it and by requiring it, Dr. Rota has created a superseding event "Fifth Agreement" modifying Dr. Rota's employment and bonus terms. Dr. Rota has requested her cases to be consolidated under CA action 3: 20-cv-00321-JLS-KSC.

with any client or customer of HMS; nor solicit, divert or induce any HMS' other contractors or employees to leave HMS' employ at anytime during or after termination of this agreement irrespective of the circumstances or reason for such termination.  *This is not applicable in certain instances where Representative develops new business opportunities and/or educational partnerships on behalf of HMS.*"

6.  The Second Agreement was in effect at least until March 31st, 2017 when it was terminated.

7.  Any work performed by AEG from August 3, 2016 till April 23, 2017 was performed pursuant to the Second Agreement.

8.  The Second Agreement at paragraph 12 "in the event that a dispute arises between the parties concerning the contract, performance, breach of any other provision that requires dispute resolution, the parties hereby agree to submit the dispute to a three-person arbitration panel for binding arbitration. "*The foregoing notwithstanding, should either party require that a breach of the agreement requires the enforcement of the agreement by specific performance or other equitable relief not requiring damages, the arbitration provision above shall not be impediment or bar to the pursuit of the parties equitable remedies*. Upon conclusion of the arbitration or litigation, the prevailing party shall be entitled to the recovery of reasonable attorney's fees for every stage including collection and appeals"

## SPECIFIC PERFORMANCE ANALYSIS

Specific performance is an equitable remedy. See Fischer v. Johnson, 525 P.2d 45, 46 (Utah 1974).  "To obtain a decree for specific performance against a defaulting party, the aggrieved party must make an unconditional tender of the performance required by the agreement." Kelley, 846 P.2d at 1243 (emphasis added) " An action for specific performance is an action

seeking "precise fulfillment of a legal or contractual obligation." Black's Law Dictionary 1407 (7th ed.1999);  see also Kelley v. Leucadia Fin. Corp., 846 P.2d 1238, 1243 (Utah 1992)

**Why Specific Performance is Applicable in this Context**

**1. The contracts between the parties were a 'requirements contract'**

See, e.g., Laclede Gas Co. v. Amoco Oil Co., 522 F.2d 33, 40 (8th Cir. 1975); Eastern Air Lines, Inc. v. Gulf Oil Corp., 415 F. Supp. 429, 442-43 (S.D. Fla. 1975); cf. U.C.C. ? 2-716 (Comment 2) (requirements contracts considered "unique goods")

"Laclede was to "(i)nstall, own, maintain and operate all distribution facilities from the point of delivery as defined in Paragraph 3(b) . . . ." Paragraph 3(b) provided: "the point of delivery shall be at the outlet of (Amoco) header piping." Also under Paragraph 3(b) Amoco was to own and operate all the facilities on the bulk side of that header piping. Laclede thus bound itself to buy all its requirements from Amoco by agreeing to attach its distribution lines to Amoco's header piping; and even if a change of suppliers could be made under the contract, Laclede could not own and operate a separate distribution system hooked up to some other supplier's propane storage tanks without substantially altering the supply route to its distribution system or making a very substantial investment in its own storage equipment and site. As a practical matter, then, Laclede is bound to buy all the propane it distributes from Amoco in any subdivision to which the supplemental agreement applies and for which the distribution system has been established."

Here, Dr. Rota was tasked to build large databases of channels to deliver up to 8,000 students per year. HMS, at the last minute, refused to accept delivery of the students and blocked her access to her own property. HMS repeatedly informed Dr. Rota that it was the 'sole provider' of the universities, agents, staffing, and immigration attorney channels. On numerous instances, they have noted that Dr. Rota was essential and expressly and implicitly promised that it would

obtain its students from those channels from Dr. Rota only. They mentioned they had no 'other resources' focused on the channels that can lead to 8,000 students per year (staffing, agents, immigration, and direct referrals).

"Additionally, there was uncontradicted expert testimony that Laclede probably could not find another supplier of propane willing to enter into a long-term contract such as the Amoco agreement, given the uncertain future of worldwide energy supplies. And, even if Laclede could obtain supplies of propane for the affected developments through its present contracts or newly negotiated ones, it would still face considerable expense and trouble which cannot be estimated in advance in making arrangements for its distribution to the subdivisions."

Rebuttal experts have noted that HMS destroyed Dr. Rota's reputation in a reputation-based industry and that it would be impossible for Dr. Rota to enter into long term contracts with the properties she acquired and developed such as "LU" and "OU" or properties she developed by adding recruitment channels such as "HUST" and "TCOSR". Those channels benefit all of HMS' current and future university partners. Reputation is key in this industry as noted by Mr. O'Connor, an alleged industry expert hired by HMS. Nearly all the contracts between the parties such as Hernandez and August had a term of 10 years. The contracts between HMS and Dr. Rota were for 5 years. Dr. Rota had students as seen in the disclosures noting the losses and it will take considerable efforts to set up another 'CPT University'. In addition, generally speaking, international education is subject to fluctuations due to politics and even if Dr. Rota were able to find another university to place all its students, it would face significant investment of money and time. COVID-19 has made this a harsher reality. Dr. Rota does not have a way to know the expenses either because it is not foreseeable to know how long it would take to find another 'exclusive' partner that pays on all student placements in a program. HMS wasted Dr. Rota's re-

sources and time in a fruitless dispute that further prevented her from adding her own universi-

ties. HMS has refused to let Dr. Rota place her applications despite being ordered to act in good

faith to resolve the dispute. Dr. Rota lost money, time, and her long-term access.

"Generally the determination of whether or not to order specific performance of a con-

tract lies within the sound discretion of the trial court Landau v. St. Louis Public Service Co.,

364 Mo. 1134, 273 S.W.2d 255, 259 (1954). Here the court has the inherent power to restore Dr.

Rota' long-term property rights and her role as a founder.

### CONCLUSION

The First and Second Agreement allow equitable remedies. They allow for the pursuit of

all legal remedies. "*The foregoing notwithstanding, should either party require that a breach of*

*the agreement requires the enforcement of the agreement by specific performance or other equi-*

*table relief not requiring damages, the arbitration provision above shall not be impediment or*

*bar to the pursuit of the parties equitable remedies*." (Emphasis added).

As the contracts between the parties were a part of a 'requirements contract', Dr. Rota

has sought the enforcement of the entire Second Agreement as of February 16, 2020 in her Cali-

fornia action as well as AAA as Rota completed all the work under those agreements. For abun-

dance of caution and to be transparent, Dr. Rota supplements the complaint with UT arguments.

### B.  MISAPPROPRIATION OF TRADE SECRETS AS PER UTAH LAW

Dr. Aparna Vashisht Rota's submit this supplement to the Complaint to honor Utah law

to appropriate its trade secrets pursuant to UTSA 13-24-4 (1) "unjust enrichment caused by mis-

appropriation that is not taken into account in computing actual loss."

Opposing counsel is quick to mis-characterize to imply contempt of Utah law.

Here, the arguments for both misappropriation of trade secrets is made using Utah law. Dr. Rota

asked for a stay to add its claims and to go through all the evidence as she was completing her thesis, had another matter in arbitration, and a full time business but she was denied. HMS vehemently opposed any stays for Dr. Rota. HMS' obstruction games do not negate Dr. Rota's valid claims that can't be added to the pending Utah action. As opposing counsel is quick to label Dr. Rota as overly litigious and various other nonsensical and bizarre labels, for an abundance of caution, Dr. Rota, provides a brief basis for her ongoing misappropriation of trade secrets claims in AAA.

## MISAPPROPRIATION OF TRADE SECRETS

## CONCISE STATEMENT OF RELIEF REQUESTED

From October 2015 till May 2017, Dr. Rota worked with HMS. During this time, Dr. Rota developed a series of trade secrets and confidential that HMS now has in its possession. Dr. Rota wishes to appropriate its trade secrets and intellectual property that she developed. Dr. Rota faces ongoing theft of her intellectual property and timely filed in AAA. Dr. Rota sent HMS propriety and custom work marked 'Confidential". Dr. Rota wishes to provide her analysis under Utah law out of respect and deference to show that Dr. Rota has no objection to Utah laws.

## TRADE SECRET ANALYSIS

Utah has adopted the Uniform Trade Secrets Act and under Utah Code section 13-24-2(4) (2009) denotes trade secret as information that includes a combination that (1) derives economic value from not being known or readily ascertainable by others, and (2) is the subject of reasonable efforts to maintain its secrecy:

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Here, each database and contact Dr. Rota developed (See Exhibit A) through the Agreements derives independent value and potential value and it is not easy to obtain and is the subject of efforts to maintain its secrecy. Note that Dr. Rota sent nearly all its emails, strategy, and most importantly, databases clearly marked 'confidential' which means 'intended to keep secret".  Dr. Rota compiled universities, channels, and marketing in such a way that it tripped HMS' market footprint from one to three 'CPT' universities. In 1981, Utah supreme court in *Microbiological Research Crop. V. Muna,* 625 P.2d 690 (Utah 1981), that a unique combination of generally known elements may qualify as a trade secret.

"[A] unique combination of generally known elements or steps can qualify as a trade secret, it if represents a valuable contribution attributable to the independent efforts of the one claiming to have conceived it…The subject matter of the trade secret must be unknown; it should not be in the public domain nor within the knowledge of the trade…"

 Dr. Rota produced unique methods, technique and processes, that are unique and not readily available via ordinary efforts. In, USA Power, LLC v. PacifiCorp, 235 P.3d 749, 760 (Utah 2010), the court noted in paragraph 45 "We hold that a compilation of information within the public domain may constitute a trade secret". The Utah courts have also recognized that while individual parts may be in the public domain but if there is an effective, valuable, and successful combination of certain elements such that the owner derives competitive advantage from

it. <u>Enter. Leasing Co. v. Ehmke</u>, 3 P. 3d 1064, 1069 (Ariz. Ct. App. 1999); see also <u>Minn. Min-ing & Mfg. Co. v. Pribyl</u>, 259 F. 3d 587, 595-96 (7th Cir. 2001); <u>Rivendell Forest Prods., Ltd. V. Georgia-Pac. Corp.</u>, 28 F. 3d 1042, 1045-46 (10th Cir. 1994).

Dr. Rota meets the first part of the designation of the "trade secret" and Dr. Rota took more than reasonable measures to keep the information secret.

a)  is the subject of efforts that are reasonable under the circumstances to maintain its secre-cy.

All emails transmitted to HMS with proprietary lists, customer list, marketing lists, and other strategic data are all marked as below in the email's signature.

<u>PRIVILEGED AND CONFIDENTIAL</u>

"This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited. Moreover, any such disclosure shall not compromise or waive client-consultant or any other privileges as to his communications or otherwise. If you have received this communication in error, please contract me at the above email address. Thank you." ROTA002516[2] and there are numerous such examples.

Utah courts have long held that hard to find data can be protected as trade secrets if cus-tomer identities are discoverable only by extraordinary efforts ((Hammerton, Inc. v. Heisterman, No. 2:06–CV–00806 TS, 2008 WL 2004327, at *8 (D. Utah May 9, 2008).) Dr. Rota wishes to appropriate its trade secrets and to protect its trade secrets as an equitable remedy pursuant to UTSA 13-24-1.

---

[2] From Case No. 170100325

**The Restatement of Torts section 757 provides the following factors for the Court's consideration:**

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in its business; (3) the extent of measures taken by the business to guard the secrecy of its information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

An analysis of the facts as per the above factors yields trade secret designation for Dr. Rota's databases.

1. The information provided to HMS is not known outside the business and

2.  Dr. Rota was a sole member company.

3.  Dr. Rota marked all of its information as 'confidential' and took necessary steps to keep her business contacts a secret.

4. The value of all of Dr. Rota's contacts is very high as HMS has been able to place roughly 1,000 students at the rate of $12,000 per student thus far resulting in $12 million dollars.

5.  Dr. Rota has expended considerable sums of money to defend its property via this litigation as well as in developing the custom lists and research techniques and the breakdown of costs is available upon request.  Dr. Rota spent considerable money in acquiring those skills necessary to deliver results in such a short time and Dr. Rota has provided her educational and professional background.

6. The information and trade secrets provided to HMS is rare. It is not replicable.

Dr. Rota produced high value marketing lists that delivered immediate revenue to HMS and it is not easily obtainable by the Defendants, as they had no prior knowledge. The Courts use the standard of whether it was known to the Defendants (in this case) not whether it was generally knowable *USA Power, LLC v. PacifiCorp,* 2010 UT 31, paragraph 44, 235 P. 3d 749 (alterations in original) (quoting *Utah Med. Prods.,* 79 F. Supp. 2d at 1312).

Here, HMS has been in business since 2005 and Hernandez in business for over 20 years. Dr. Rota's ability to find the right contact to deliver regionally accredited and exclusive universities reduced HMS' time to market. Here, the contact was not easily ascertainable to HMS and Dr. Rota's marketing and business development skillset enabled her to deliver rapid results to HMS. HMS only had one university in 2015 and had 'fired' a client when HMS met Dr. Rota. By mid 2016, HMS added two additional regionally accredited exclusive contracts with STEM programs directly due to Dr. Rota's trade contact. STEM Exclusive contracts are rare and high commissions such as $12,000/student and $10,000/student are rarer still.  Dr. Rota spent nearly 20 years developing the ability to pinpoint resources to produce rapid results. As a marketing firm, that is her invaluable trade secret. She added other agents, staffing channels, and other ideas that can provide immediate competitive edge to a company. HMS was able to earn nearly $12 million in revenue to date by placing roughly 1,000 students it has reported. HMS only had one other university HUST, so the impact of Dr. Rota's work and value added to HMS' business is easily ascertainable.

Within the context of international education, the skillset is even more valuable because Dr. Aparna Vashisht-Rota is a former international student that attended nearly all levels of its higher education in the United States. Its contacts, business abilities, and acumen are rare and suited for this industry and are her trade secrets that HMS misappropriated.

## CONCLUSION

The combination of universities, contacts that can deliver universities, agents, staffing, immigration provides a company in international education an immediate advantage and head start.  Dr. Rota's trade secrets resulted in revenue for HMS. HMS was able to add two additional universities within a year of meeting Dr. Rota. Universities in the US have long sales cycles and to deliver two exclusive regionally accredited contracts is a rarity and not an easy task.

HMS, an industry veteran, stole Dr. Rota's intellectual property and claimed it as its own. Thus, the claim in AAA forum as they arose under the prior agreements that cover vastly different topics, channels, and outreach methods. It could not have been added in the present Utah as the time to add claims discovered later has passed. Dr. Rota asked for a stay in that matter but was denied.

Respectfully submitted on April 17th, 2020.

## VERIFICATION

I, Aparna Vashisht-Rota, hereby attest and affirm that the facts set forth herein are true and accurate to the best of my ability.

/s/ Aparna Vashisht-Rota (signed with permission)

13

**EXHIBIT A[3]**

**University Outreach:**

    a)  Hernandez (AEG Agent)

    b)  Lindenwood

    c)  Ottawa

    d)  The College of Saint Rose

    e)  University database:

    f)  HMS_PROD06019

    g)  HMS_PROD06020

    h)  HMS_PROD06021

**Agents Outreach:**

    a)  Agents assigned: HMS_PROD03822 March 21, 2016.

    b)  Agent database: AEG001372-1380 built August 28, 2016.

    c)  Agent database: AEG001398-1423 updated August 30th, 2016.

    d)  Agent database: AEG001424-1431 North America Miami Agents 2015 obtained from ICEF.

    e)  Agent database: AEG001432-1437: USA Agents

    f)  Agent database: AEG001438: USA Canada Agents

    g)  Agent database: AEG001381-1384: Vietnam Agents

    h)  Agent outreach: AEG001387-1397: March 1, 2017.

    i)  Message for Agents: AEG001371

---

[3] From Case No. 170100325

**Staffing Companies:**

a) Staffing commenced: HMS_PROD07575 October 3rd, 2016.

b) Method for companies: AEG001285.

c) Messaging for Staffing: AEG001307 completed April 15, 2017.

d) Messaging for Staffing: AEG001368-1370

e) Meeting for Staffing: March 14th, 2017 and March 15th, 2017 ((ROTA002513, Artesia Software)

f) AEG001308-1353: Outreach completed May 15, 2017.

g) AEG001354-1367: Staffing Leads completed May 16, 2017.

**Immigration Channels:**

a) Immigration outreach: AEG001304-1305: Lindenwood University completed March 29th, 2017.

b) Messaging for Lawyers: AEG001306 completed April 16, 2017.

c) Messaging for Lawyers: AEG001368-1370.

d) Immigration attorney outreach: AEG001295: May 22, 2017: An Attorney responded.

e) Immigration attorney connect: ROTA002575: HMS directs AEG on immigration outreach. May 4, 2017.

**Figure 1: AEG's Trade Secrets**





***Source:*** Chad Williamson's Expert Rebuttal Report

16

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

**Consistent with its global mission to help international students, August International Education Journal publishes topics of interest to students, agents, and educators. The journal will publish twice a year in August and January each year. The first issue is included.**

**Call for Authors:** Volume 2, No. 2, January 2023 Edition: August International Education Journal, Spring 2023 Edition

**Submission Guidelines:** Articles should run 4,500-7,000 words with citations. All contributions should be original with proper attribution. All articles should be submitted in Word or pdf, as an attachment. Articles should adhere to academic journal style APA or MLA style.

There should be an abstract for each article not more than 250 words. There should be an author biography, address, email address, phone number, with a two or three-sentence summary of the article.

**Submission Deadline:** November 30, 2022

If you have any questions, you can email
avrota@augusteducationgroup.com

Topics:

1. **STEM**
2. **International student stories**
3. **Data driven recruitment changes**
4. **Policy changes**
5. **Top 15 frustration points**

Dr. Aparna Vashisht-Rota
August Education Group
Private Research Institute

1

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

## The Best STEM Recruitment Strategy begins with Improving STEM Retention:  The STEM Innovation Imperative of the proposed 2022 America COMPETES Act & How to Leverage Existing Talent Through Immigration Reform.

**Summary:** What is knowledge ultimately? It is thought leadership. The United States is known for its innovation and advancements in nearly all fields. Once the United States loses its leadership, the value of its degrees, knowledge, and expertise will fall precipitously. This article examines current problems faced by F-1 students in the context of the Biden-Harris administration's proposed America COMPETES ACT and its goal to facilitate the US's ability to remain a global leader in STEM research.  An analysis of U.S. policy alongside that of China, shows that China is a global leader in STEM, and it is a credible threat to the United States. Through thoughtful analysis of the Indian Nationals' experience with U.S. international education system, this article offers solutions to the current flaws in the immigration system. These timely fixes would make the U.S. immediately more competitive, invariably improve the student experience, and facilitate word-of-mouth recruiting of other top scientists and students to pursue STEM research in the U.S. The following changes are equivalent to overhauling the entire immigration system and allow the US to retain, recruit, and grow talent.

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

## TABLE OF CONTENTS

### 1

**The Best STEM Recruitment Strategy begins with Improving STEM Retention:  The STEM Innovation Imperative of the proposed 2022 America COMPETES Act & How to Leverage Existing Talent Through Immigration Reform.**

The Best STEM Recruitment Strategy begins with Improving STEM Retention:  The STEM Innovation Imperative of the proposed 2022 America COMPETES Act & How to Leverage Existing Talent Through Immigration Reform. ............... 2

**Introduction** ............................................................... 4

**The Challenge** ............................................................ 4

Part 1: Background .......................................................... 5
Table Two 2018 ............................................................. 6
Part II Discriminatory System ............................................. 7
EMPLOYMENT-BASED PREFERENCES ............................................. 9
A. FINAL ACTION DATES FOR EMPLOYMENT-BASED PREFERENCE CASES ............. 9
Part III: Simple Changes ................................................. 11
1. Extend the Final Rule from 24 months to 108 months. ............... 11
2. Allow Concurrent H-1 and OPT for immigrants so that the ........... 12
3. Allow 180 days for initial Post Completion OPT from current 30 days. ........................................................... 12
4. Allow Double Master's CPT students more OPT or CPT which is easier to implement. ........................................... 12
5. Current Band-Aid for Indian Nationals for the immigration issue is CPT Day One Universities. ...................................... 14
6. Allow scholars and MS students from the United States ............. 15
7. Allow STEM Indian Students from Ukraine .......................... 17
8. Allow Agents to Recommend STEM Professionals for green card exemptions as the United States already uses agents. ........... 17
9. Experiential CPT Grant ............................................ 18
10. CPT Better than Staffing: ........................................ 19
11. Value U.S. Education Institutes by g ............................. 19

**CONCLUSION** ............................................................. 20

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

## Introduction

Since taking office in February 2020, the Biden-Harris Administration has worked to advance STEM policies, including the introduction of 22 new STEM majors. The proposed America COMPETES ACT of 2022 is a further advancement of the U.S. aimed at cultivation maintain a competitive scholarly advantage in STEM research.  The America COMPETES Act is a response to China's gains in the doctoral degree grants which shows the administration's commitment to United States' academic leadership. For the United States to remain competitive and maintain its lead, the immigration community needs to address and fix challenges for STEM talent already in the United States. The taxpayers in the United States have spent the money. Thus, making the process simpler will retain current talent, recruit the best future STEM talent through word-of-mouth marketing, and grow STEM leadership. This article offers practical problems faced by F-1 students and some immediate solutions that will retain current STEM talent, relieve the pressure on both the immigration system as well as the students, and result in immediate competitive advantage with minimal financial investment.

## The Challenge

India and China account for the highest number of students in the United States. China competes with the United States in STEM research. As of 2018, it is within 3,000 STEM graduates at the doctoral level[1]. Once they take over the academic journals or thought leadership, the pursuit of American     education will become less attractive to international students around the world. The investment in these students has already been made so one of the best ways to remain competitive is to retain this talent through minor and specific immigration reform. By valuing its own education more, the United States can further enhance its ability to attract new STEM professionals.

From the perspective of an active practitioner  working with students possessing expiring OPTs or H seeking full time work options, the approach proposed in this paper seeks maximum gains with the lowest investment. The article highlights the often overlooked areas of immigration policy, that have the potential to, with minor improvements

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

such as visa extensions, result in a more diverse immigrant STEM population.

Part 1 discusses the background and context of the article. Part Two, examines the particular case of the experience of Indian nationals' receiving a STEM degree in the U.S. alongside the practical and logistical challenges that current US immigration policy presents as a result of its discriminatory principals. The article argues that these discriminatory clauses are causing America to miss out on existing top STEM talent.  Part 3 lists 12 recommendations to fix the problems identified in Part 1 and Part 2 that are low cost with highest returns in the highly competitive recruitment market.

# Part 1: Background

**On January 21, 2022**, DOS and DHS announced new actions related to STEM work authorization, J-1 Researchers, National Interest Waivers (NIWs), and O-1 Extraordinary Ability Workers. According to the Biden-Harris administration, "These actions will allow international STEM talent to continue to make meaningful contributions to America's scholarly, research and development, and innovation communities."[1]

On the same day, the Biden-Harris administration introduced new STEM fields, wherein the DHS expanded opportunities in the U.S. for STEM Professionals. The 22 new fields of study are bioenergy, general forestry, forest resources production and management, human-centered technology design, cloud computing, anthrozoology, climate science, earth systems science, economics and computer science, environmental geosciences, geobiology, geography and environmental studies, mathematical economics, mathematics and atmospheric and oceanic science, general data science, general data analytics, business analytics, data visualization, financial analytics, other data analytics, industrial and organizational psychology, and social sciences, research methodology, and quantitative methods.[2]

On January 25, 2022, The America COMPETES Act of 2022, H.R. 4521, 117th Cong. (2022) was introduced that exempts green cards caps for any U.S. equivalent STEM Ph.D. programs to counter China's advances in the doctoral field and funds STEM education for low-income U.S. citizens with a $1,000 supplemental fee.[3,4] The new fields provide new channels but

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

the immigration process still has to move through the same eye of the needle.



*Table One: S&E doctoral degrees, by selected countries: 2000-18*

| Doctoral Degree by Country 2018 | |
|---|---|
| United States | 41,071 |
| China | 39,768 |
| India | 26,890 |
| United Kingdom | 17,366 |
| Germany | 15,061 |
| Brazil | 11,365 |
| Spain | 9,480 |
| France | 8,987 |
| South Korea | 7,077 |
| Japan | 6,754 |

*Table Two: S&E doctoral degrees, by selected countries: 2018*

Table Two 2018[5] shows that as of 2018, China produced 39,768 doctoral to the United States 41,071. India and China are the leading suppliers of STEM talent for the United States. China is catching up in key

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

measures of research output. This means that it is producing research at a faster rate as noted in the 2018 data. America relies on international students to maintain its position in the global market so creating incentives for existing STEM Professionals is key to success in academic research. But the system is not immigrant friendly. The immigration process lacks reliability, transparency, and trust in the marketplace. Students are savvy and demand a return on investment (ROI). There are known issues with budgets[6] and immigration courts[7] and a system overhaul is required. But the overhaul represents large investments.

The immigration community has to understand that academic journals are tough to break into and once Chinese universities have strong foothold over global research output, the United States won't be able to catch up. The pandemic further exacerbates the need to add talent as per the CDC "COVID-19 data shows losses[8,9]." The best recruitment strategy is a good retention strategy.  This means that in order to recruit and attract new talent, the best vehicle for that marketing is existing students.

The article shows that on the one hand the administration is adding new fields and addressing the competition with respect to China, on the other hand, it is largely ignoring existing STEM Indian Nationals. Although all nationals are offered the same STEM OPT extension which was approved by the Final Rule for 24-months (ICEB-2021-0011)[10], that time period is insufficient for Indian Nationals that face longer processing due to no fault of their own. But they face delays as described next.

# Part II Discriminatory System

India and China are the top sources of students to the United States.

| Rank | Place of Origin | Scholars | % of Total | % Change |
|---:|---|---:|---:|---:|
| 1 | China | 26,254 | 30.7 | -38.7 |
| 2 | India | 12,714 | 14.9 | -5.9 |
| 3 | South Korea | 4,928 | 5.8 | -29.7 |
| 4 | Canada | 3,863 | 4.5 | -12.2 |
| 5 | Brazil | 2,584 | 3.0 | -39.5 |
| 6 | Germany | 2,419 | 2.8 | -42.1 |
| 7 | Italy | 2,275 | 2.7 | -36.4 |

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

| 8 | Japan | 2,243 | 2.6 | -37.1 |
|---|---|---|---|---|
| 9 | France | 2,117 | 2.5 | -38.4 |
| 10 | United Kingdom | 1,736 | 2.0 | -29.4 |
| 11 | Spain | 1,553 | 1.8 | -35.9 |
| 12 | Mexico | 1,345 | 1.6 | -15.7 |
| 13 | Iran | 1,315 | 1.5 | -14.6 |
| 14 | Taiwan | 1,164 | 1.4 | -31.7 |
| 15 | Turkey | 1,084 | 1.3 | -32.0 |
| 16 | Israel | 1,065 | 1.2 | -26.8 |
| 17 | Pakistan | 820 | 1.0 | -14.1 |
| 18 | Colombia | 777 | 0.9 | -28.6 |
| 19 | Australia | 743 | 0.9 | -29.9 |
| 20 | Egypt | 650 | 0.8 | -26.1 |
| 21 | Russia | 625 | 0.7 | -28.0 |
| 22 | Greece | 584 | 0.7 | -25.6 |
| 23 | Netherlands | 553 | 0.6 | -44.2 |
| 24 | Argentina | 506 | 0.6 | -19.9 |
| 25 | Poland | 461 | 0.5 | -40.3 |

Table Three: Source: Leading Places of Origin
https://opendoorsdata.org/data/international-scholars/leading-places-of-origin/

Indian passport holders generally suffer from longer processing because of the visa caps in employment-based preferences for work visas. However, that is discriminatory to them for several reasons, which will be further discussed in the following arguments. As seen in Table 4, the snapshot of the employment-based preferences shows that Indian Nationals are 6 years behind China in employment based 2 and 3. They are one of the main sources of STEM talent as seen in Table 3.

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

## EMPLOYMENT-BASED PREFERENCES[11]

## A.  FINAL ACTION DATES FOR EMPLOYMENT-BASED PREFERENCE CASES

On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are authorized for issuance to all qualified applicants; and "U" means unauthorized, i.e., numbers are not authorized for issuance. (NOTE: Numbers are authorized for issuance only for applicants whose priority date is **earlier** than the final action date listed below.)

| Employment-based | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01MAR19 | C | 01SEP13 | C | C |
| 3rd | C | 22MAR18 | C | 15JAN12 | C | C |
| Other Workers | C | 01JUN12 | C | 15JAN12 | C | C |
| 4th | C | C | 01MAY17 | C | 01APR20 | C |
| Certain Religious Workers | C | C | 01MAY17 | C | 01APR20 | C |
| 5th Unreserved (C5, T5, and all others) | C | C | C | C | C | C |
| 5th Unreserved (I5 and R5) | C | 22NOV15 | C | C | C | C |
| 5th Set Aside: Rural (20%) | C | C | C | C | C | C |
| 5th Set Aside: High Unemployment (10%) | C | C | C | C | C | C |
| 5th Set Aside: Infrastructure (2%) | C | C | C | C | C | C |

9

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

*Table Four: *Employment Third Preference Other Workers Category:* Section 203(e) of the Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997, as amended by Section 1(e) of Pub. L. 105-139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW final action date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002. For Fiscal Year 2022 this reduction will be limited to approximately 150.

**Costs of Discrimination:**

The students from India complete their first MS STEM degree. Post degree, they get their first initial OPT. Once they run out of that period, those that have not found a sponsor or survived the H-1 process, they end up attending so called CPT universities. These universities offer CPT or curricular practical training from day one which means that students can work from the first day. Indian Nationals spend at least $20,000 to $25,000/year on tuition at these universities to continue working.

The good thing about the CPT programs is that as students have already exhausted their CPT at the first master's OPT level, they can work full time on CPT while they wait. As seen in Table Four, comparing China and India processing, Indian nationals have an additional 6 years. That is 6 years at a cost of at least $25,000 in tuition costs or $150,000. It takes years for Indian Nationals to get their green card. The students will take 15+ years or at a minimum cost of $375,000 ($25,000/year*15 years) to complete the entire US Immigration cycle. Rather than make them spend their money on education, they don't need, the United States should allow higher OPT time periods to equalize the system for all passport holders.

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

# Part III: Simple Changes

The following changes are equivalent to overhauling the entire immigration system and allow the US to retain, recruit, and grow talent. This is because it will eliminate needless hurdles for STEM Professionals already in the United States. These professionals will recruit other STEM Professionals which will enable the United States to be competitive in immigration offers, and both of these steps will arguably grow STEM talent.

1.  Extend the Final Rule from 24 months to 108 months. Modification of Final Rule by Executive Order or through public comment can provide the fastest three automatic 36-month extensions of OPT (108 months) for F-1 nonimmigrant students who majored in a designated STEM field of study. The Final Rule Order adopted at Docket Number: ICEB-2021-0011. In 2016[12], "DHS published a Final Rule providing a 24-month extension of OPT for F-1 nonimmigrant students who majored in a designated STEM field of study. (*See* 81 FR 13039 (Mar. 11, 2016) ("Improving *and Expanding Training Opportunities for F-1 Nonimmigrant Students With STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students*") ("2016 STEM Rule"). By modifying the Final Rule by Executive Order and providing three automatic 36-month extensions of OPT (108 months) for F-1 nonimmigrant students who majored in a designated STEM field of study. The Secretary has broad authority to administer and enforce the nation's immigration laws. *See generally* 8 U.S.C. 202; Immigration and Nationality Act of 1952, as amended (INA), 8 U.S.C. 1103. Section 101(a)(15)(F)(i) of the INA Establishes the F-1 nonimmigrant classification for individuals who wish to enter the United States temporarily and solely for the purpose of pursuing a full course of study at an academic institution or accredited language training school certified by the U.S. Immigration and Customs Enforcement's (ICE) SEVP. *See* INA Sec. 101(a)(15)(F)(i), 8 U.S.C. 1101(a)(15)(F)(i). The INA provides the Secretary with broad authority to determine the time and conditions under which nonimmigrants, including F-1 students, may be admitted to the United States. *See* INA Sec. 214(a)(1), 8 U.S.C. 1184(a)(1). The Secretary also has broad authority to determine which individuals are authorized for employment in the

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

United States. *See* INA Sec. 274A(h)(3), 8 U.S.C. 1324a(h)(3). Finally, the Secretary, or his or her designee, has authority to maintain the STEM list, which is a complete list of qualifying degree program categories published on the SEVP website at *http://www.ice.gov/sevis.* Changes that are made to the STEM list may also be published in a notice in the **Federal Register**. *See* 8 CFR 214.2(f)(10)(ii)(C)( *2* )( *ii* )."

2.  <u>Allow Concurrent H-1 and OPT</u> for immigrants so that the immigrants can concurrently pursue their H-1 visas and green cards while they work on Optional Practical Training. As OPT originates at the university level, it is easier to implement.

3.  <u>Allow 180 days for initial Post Completion OPT</u> from current 30 days. The USCIS may consider increasing the time window to apply for OPT to 180 days from the present 30 days[13]. The increase in application period for applying for the OPT as a simple change that results in profound efficiency.

4.  <u>Allow Double Master's CPT students more OPT or CPT</u> which is easier to implement. Students in a double master's degree on CPT ("Curricular Practical Training") programs should either be allowed to apply for two additional STEM OPT extensions for a total of 6 years concurrent with H-1 processing or they should be granted CPT Experiential Grants with credits enrollment from any university.
    a.  "Authorities for CPT and OPT[14]
        i.   8 CFR 214.2(f)(10)-(12)
        ii.  8 CFR 274a.12(b)(6)(iv)
    b.  Practical Training
        i.   If you are an F student, you have the option of training in the United States by engaging in practical training during your program or after it ends. Practical training can provide valuable work experience by sharpening and adding to the skills you are learning in school. There are two types of practical training available for F-1 students: curricular practical training (CPT) and optional practical training (OPT).

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

*CPT*

    i.    CPT is integral to your major and the experience must be part of your program of study. When you enroll at the graduate level, your designated school official (DSO) may authorize CPT during your first semester if your program requires this type of experience. Ask your DSO for details.

    ii.    *Your DSO will provide you a new Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status," that shows that the DSO has approved you for this employment.*[15]

    iii.    You can work on CPT either full-time or part-time.

    iv.    CPT requires a signed cooperative agreement or a letter from your employer.

    v.    *If you have 12 months or more of full-time CPT, you are ineligible for OPT, but part-time CPT is fine and will not stop you from doing OPT.*[16]

*OPT*

    i.    OPT must relate to your major or course of study.

    ii.    You can apply for 12 months of OPT at each education level, (i.e., you may have 12 months of OPT at the bachelor's level and another 12 months of OPT at the master's level).

    iii.    Your DSO will provide you with a new Form I-20 that shows the DSO recommendation for this employment.

    iv.    For work authorization, you must mail a completed Form I-765, "Application for Employment Authorization," to U.S. Citizenship and Immigration Services (USCIS) and pay a filing fee. USCIS will send you a Form I-766, "Employment Authorization Document," (EAD) upon approving your Form I-765.

    v.    Wait to start work until after you receive your EAD.

    vi.    While school is in session, you may only work 20 hours per week.

## 24-Month STEM OPT Extension

    i.    All F-1 students who are currently on a regular period of OPT and are eligible for a STEM OPT extension must apply for the 24-month STEM OPT extension.

    ii.    You may qualify for an additional 24 months of OPT under the following circumstances:

    iii.    You are currently participating in a regular period of OPT.

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

    iv.   You received a science, technology, engineering or mathematics (STEM) degree at an undergraduate level or higher and seek a training opportunity related to this degree.

    v.   You received your qualifying STEM degree from a currently accredited SEVP-certified college or university.

    vi.   The employer from which you are seeking employment uses the E-Verify program.

    vii.   You and your prospective employer have completed and signed the Form I-983, "Training Plan for STEM OPT Students."

    viii.   For more information about the specific eligibility requirements for the 24-month STEM OPT extension, please visit the STEM OPT Hub on Study in the States.

    ix.   Once your DSO verifies that your Form I-983 is complete and keeps it in your student record, they will provide you with a new Form I-20 that shows their recommendation for this training opportunity.

    x.   You must apply for work authorization by filing a Form I-765 with USCIS and paying a filing fee. USCIS will send you an EAD upon approving your petition.

    xi.   You may continue to work on your expired EAD for OPT up to 180 days while your 24-month extension petition is pending if you meet the following conditions:

    xii.   You are currently in a period of post-completion OPT.

    xiii.   You properly and in a timely manner filed your application for the 24-month extension with USCIS.

    xiv.   You must report changes in name, address, employer and loss of employment to your DSO within 10 days of any change."

5.  <u>Current Band-Aid for Indian Nationals</u> for the immigration issue is CPT Day One Universities. Students enroll in so called CPT universities that offer full time CPT to students that have already completed their master's degree and their STEM OPT of 36 months. As the students wait for the next steps, they need work authorization. These programs on its face are effective and solve a problem in the market. The easiest alternative is that the immigration services allow CPT authorization after initial OPT of 36 months. The only criteria that should be used is whether the student is gainfully employed in STEM or not. If the student is employed in a STEM field, then the DHS may allow students

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

to additional OPT or CPT authorization. There is no point in bringing immigrants to the United States and then making it impossible for them to produce the revenue. The result is inefficient expenditure of taxpayer dollars as it produces sub-optimal results for United States citizens. These immigrants are needlessly having to go through a perilous process when the system should use its existing tools to make it simpler. Once they are here, it is passive aggressive to not let them settle down especially in STEM fields.

6. Allow scholars and MS students from the United States to be eligible for STEM OPT extensions and concurrent H/green card processing. The United Kingdom recently recognized certain universities whose students would be fast tracked. In addition to the below, the United States should add state universities as the money on those Ph.D. students has already been spent. The list should be 400-500[17] in each category with tiers to allow maximum coverage to all types of institutions.

| Rank | Institution | City | State | Scholars |
|---|---|---|---|---|
| 1 | Harvard University | Cambridge | MA | 3,204 |
| 2 | Columbia University | New York | NY | 2,272 |
| 3 | Yale University | New Haven | CT | 2,100 |
| 4 | University of California - Los Angeles | Los Angeles | CA | 1,942 |
| 5 | University of Michigan - Ann Arbor | Ann Arbor | MI | 1,848 |
| 6 | Johns Hopkins University | Baltimore | MD | 1,835 |
| 7 | University of California - San Diego | La Jolla | CA | 1,831 |
| 8 | Massachusetts Institute of Technology | Cambridge | MA | 1,808 |
| 9 | University of Pittsburgh - Pittsburgh | Pittsburgh | PA | 1,668 |
| 10 | Stanford University | Stanford | CA | 1,602 |
| 11 | University of Pennsylvania | Philadelphia | PA | 1,530 |
| 12 | University of California - Berkeley | Berkeley | CA | 1,478 |

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

| 13 | Washington University in St. Louis | Saint Louis | MO | 1,478 |
|---|---|---|---|---|
| 14 | University of California - San Francisco | San Francisco | CA | 1,439 |
| 15 | University of Minnesota - Twin Cities | Minneapolis | MN | 1,313 |
| 16 | University of Wisconsin - Madison | Madison | WI | 1,272 |
| 17 | University of California - Davis | Davis | CA | 1,212 |
| 18 | Purdue University - West Lafayette | West Lafayette | IN | 1,154 |
| 19 | University of Illinois - Urbana-Champaign | Champaign | IL | 1,116 |
| 20 | Duke University and Medical Center | Durham | NC | 1,102 |
| 21 | Northwestern University | Evanston | IL | 1,066 |
| 22 | Ohio State University - Columbus | Columbus | OH | 1,064 |
| 23 | University of Arizona | Tucson | AZ | 1,062 |
| 24 | Princeton University | Princeton | NJ | 942 |
| 25 | University of Florida | Gainesville | FL | 941 |
| 26 | Cornell University | Ithaca | NY | 906 |
| 27 | Rutgers University - New Brunswick | New Brunswick | NJ | 903 |
| 28 | University of North Carolina - Chapel Hill | Chapel Hill | NC | 895 |
| 29 | University of Washington | Seattle | WA | 851 |
| 30 | Texas A&M University - College Station | College Station | TX | 827 |
| 31 | California Institute of Technology | Pasadena | CA | 823 |
| 32 | Michigan State University | East Lansing | MI | 820 |
| 33 | University of Texas - Austin | Austin | TX | 814 |
| 34 | New York University | New York | NY | 800 |
| 35 | Boston University | Boston | MA | 796 |
| 36 | University of Alabama - Birmingham | Birmingham | AL | 796 |

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

| 37 | Emory University | Atlanta | GA | 790 |
| 38 | University of California - Irvine | Irvine | CA | 779 |
| 39 | University of Virginia - Charlottesville | Charlottesville | VA | 764 |
| 40 | University of Illinois - Chicago | Chicago | IL | 737 |

Table Four: Institutions Hosting the Most Scholars
Source: https://opendoorsdata.org/data/international-scholars/institutions-hosting-the-most-scholars/

7. Allow STEM Indian Students from Ukraine[18] with competitive tuition offers. There are students in Ukraine. The United States can attract that talent at low costs provided that it can get universities in the United States the same tuition rate. The tuition rates at American Universities can be very high. The cost of not obtaining talent for the United States' economy is larger and an irreparable investment loss in capital at all levels. The United States should always be recruiting top talent across the world but instead it spends its time in antiquated legal system exposed to immigrants.

8. Allow Agents to Recommend STEM Professionals for green card exemptions as the United States already uses agents. On December 21, 2021, the lawmakers passed REMOTE Act, H.R. 5545, 117th Cong. (2021) Responsible Education Mitigating Options and Technical Extensions (REMOTE) Act, introduced alongside Veterans' Affairs Committee (Chairman Mark Takano (CA-41)) and Economic Opportunity Subcommittee (Chairman Mike Levin (CA-49))[19]. One part of this bill seemed to disallow[20] incentive-based recruitment for international students. Domestically, universities can't pay agents to recruit students which leads to the next issue in recruitment of international students. As the system has agents that operate for profit, it is difficult to execute and implement policies that are incongruent with the current marketplace. For instance, it is simple to state that the United States must get the best talent for STEM programs. The reality is dollar driven. The United States needs to hire agents or approve paralegals to provide direct services in these fields to help students with their paperwork and extensive follow up needed. While the incentive-based recruitment is strife with potential

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

problems, at present, the agents work well with the universities. They either need to be enabled to do more or the United States needs to step it up and provide basic guidelines to ensure that the best students and talent comes to the United States.

9. Experiential CPT Grant[21]: The immigration community and lawyers in general step in once a situation has gone sideways. However, immigration attorneys should step in at the first stage to explain other options available to F-1 students. The second area that the immigration community can influence is extend the STEM OPT from 24 months to 3 extensions of 36 months each with concurrent H/employment processing to equalize the system given the competition for STEM students. The Biden-Harris Administration of the Department of Homeland Security can open comments for creating an **Experiential CPT Grant** post completion OPT for a period of 3 years at a time renewable 3 times or 9 years. The grant to Indian nationals in particular will create parity in the system and permit all STEM foreign nationals to have the opportunity to establish themselves financially. The executive action, if implemented, for a 30-year period, will ensure that the United States gets the best talent and that talent gets the freedom to produce the most value. The action will enable agents and channel partners in the United States to become competitive again.

   **a.) Funding for the Action:** Consistent with Biden-Harris proposed America COMPETES Act, nonimmigrants that receive the STEM OPT extensions can pay a supplemental fee per $5,000-$10,000/year for automatic OPT Experiential Grants at the university. This is consistent with the supplemental fee proposed in the H.R. 4521 exempting green cards caps for any U.S. equivalent STEM Ph.D. programs with a $1,000 supplemental fee. The proposed funding is consistent with that thought process. The Experiential OPT Grant will effectively make STEM programs attractive again for Indian nationals.

   i.   50% of the Experiential OPT Grant money shall go towards development or education for Americans.

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

    ii.    50% of the Experiential OPT Grant money will go towards funding Ph.D. students for STEM Students already in the United States.

10. <u>CPT Better than Staffing:</u> For students with expiring OPT, CPT these programs offer CPT or university-based work authorization from the first day of the program so the immigrants can work through CPT on a full-time basis. As they have already completed a first master's program, they will not get another OPT so students work full time on CPT. They are called 'double master's' program. Students attend two classes at a time, CPT is built into the program with monthly to quarterly attendance/hybrid due to Coronavirus. For H students, often, they do not have a first Master's Degree in the United States, therefore, they have to balance the CPT/OPT hours noted above. This means that they can't work full time.

    As students have work authorization, the tuition works out cheaper than working through a staffing company that charges 30% of the salary earned. If the student earns $100,000, which STEM professionals do, the agent keeps $30,000. The CPT Day One Program costs $12,000-$18,000/year. Thus, there are savings for the students. The issue is that often this education is redundant, therefore, it is better to offer Experiential OPT Grants with supplemental fees paid directly to the DHS. The fee can help with the staffing problems with the agencies.

11. <u>Value U.S. Education Institutes</u> by granting immediate visa waivers with fee payment and H-1 waivers for all STEM program F-1 students from institutes in Table 4 and expand the number of institutes that are on the list that offer a variety of immediate immigration benefits.

    <u>Proposed Tier 1:</u> Institutes in Table 3. Immediate Initial F-1 Visa waiver, H-1 waiver, and green card approval.

    <u>Proposed Tier 2:</u> 200 Universities selected through rankings. Those would be ranked state and other tier 2 universities: Visa waiver and H-1 waiver.

    <u>Proposed Tier 3:</u> Tier 3 universities: Visa waiver, First H-1 waiver for 3 years pre-approved.

    The list across tiers 1-3 would be top 400 institutes each or certain STEM & Non-STEM Programs. Notably, establishing waivers for Table 4 alone will lead to savings on 50,580 cases. The U.S. government would waive the initial student visa interviews, grant an H-1 cap exemption and

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

green card waivers. It will enhance the value of a U.S. Education that the U.S. system values its own degrees.

On May 30th, 2022, the United Kingdom announced[22] "World's top graduates get new UK visa option. The government says the "high potential individual" route, which opens on Monday, will attract the "brightest and best" early in their careers. The scheme will be available to alumni of the top non-UK universities who graduated in the past five years. Graduates will be eligible regardless of where they were born and will not need a job offer in order to apply. Successful applicants will be given a work visa lasting two years if they hold a bachelor's or master's degree, and three years if they hold a PhD." The competition is high.

## DIPSLACEMENT OF US LABOR

The main issue with more OPT/CPT is that immigrants create negative job scenarios for US citizens but given the STEM Ph.D. shortage, the Biden-Hariss Administration can divert talent with fully funded programs for this segment allowing the United States to use its population for its greatest advancements. Racism exists in the United States and African American STEM talent suffers if there are more Chinese or Indian Nationals in the market because companies prefer to hire immigrants due to costs.

With the right incentives, the United States can allocate its capital to cover all its STEM bases to compete globally.

## CONCLUSION

With small, timely fixes, the DHS, USCIS, and the Biden-Harris administration with support from the immigration community can boost the STEM lead for the United States. The Final Rule for STEM OPT from 24 months to a three 36-month automatic Experiential OPT Grants with concurrent processing will attract the best STEM talent. Other countries have better offers without the needless uncertainty. It is in the national interests too because China is within 3,000 STEM graduates at the doctoral level as of 2018[2]. Once they take over the academic journals, the value of an

---

[2] Table Two

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

American education will decrease significantly. For the United States to remain competitive and maintain its lead, the immigration community needs to address and fix challenges for immigrants already in the United States. The United States needs to enable agents/immigration attorneys, and other paralegal services to allow for faster processing. The best word of mouth marketing for the United States are those immigrants already in STEM fields.

By valuing its own education more, the United States can further enhance its ability to attract new STEM Professionals.

———————————————

21

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

## NOTES

[1] Featured Issue: *Biden Administration Actions to Attract and Retain STEM Talent* (January 24, 2022) AILA Doc. No. 22012151.

[2] *DHS Notice Adding 22 Qualifying Fields of Study to STEM Designated Degree Program List* (January 21, 2022) AILA Doc. No. 22012052.

[3] Karin Fisher, *What's in the America COMPETES Act*, (January 31, 2022). https://www.getrevue.co/profile/latitudes/issues/competes-edition-1003963, Latitudes, #150.

[4] *America COMPETES Act* HR 4521: https://docs.house.gov/billsthisweek/20220131/BILLS-117HR4521RH-RCP117-31.pdf

[5] *Science and Engineering Doctoral degrees by countries 2000-2018* (January 2022). The table is available at: https://ncses.nsf.gov/pubs/nsb20221/figure/5

[6] Featured Issue: *Immigration Reforms through Budget Reconciliation* (January 11, 2022). AILA Doc. No. 21091005.

[7] Featured Issue: *How the Biden Administration Must Reform Immigration Courts* (Dated May 5, 2022). AILA Doc. No. 21041931.

[8] Daniel C. DeSimone, M.D., *COVID-19 infections by race: What's behind the health disparities?* (April 29, 2022). https://www.mayoclinic.org/diseases-conditions/coronavirus/expert-answers/coronavirus-infection-by-race/faq-20488802

[9] *Health Equity Considerations & Racial & Ethnic Minority Groups*, (January 25, 2022). https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html#:~:text=Impact%20of%20Racial%20Inequities%20on%20Our%20Nation's%20Health,-Racism%2C%20either%20structural&text=COVID%2D19%20data%20shows%20that,with%20non%2DHispanic%20White%20populations. https://opendoorsdata.org/data/international-scholars/leading-places-of-origin/

[10] *Update to the Department of Homeland Security STEM Designated Degree Program List,* (January 21, 2022) Fed. Reg. Vol. 87, No. 14.

[11] Daniel C. DeSimone, M.D., *COVID-19 infections by race: What's behind the health disparities?* (April 29, 2022). https://www.mayoclinic.org/diseases-

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

conditions/coronavirus/expert-answers/coronavirus-infection-by-race/faq-20488802

[12] *Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students.* (March 11, 2016)., Fed. Reg. 81, 13039.

[13] *Optional Practical Training (OPT) for F-1 Students,* https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/optional-practical-training-opt-for-f-1-students

[14] *Practical Training,* (December 23, 2020). https://www.ice.gov/sevis/practical-training Authorities: 8 CFR 214.2(f)(10)-(12); 8 CFR 274a.12(b)(6)(iv)

[15] DHS can authorize the initial degree granting universities to offer additional 3-year STEM CPTs after the first STEM OPT by enrolling in a so-called Experiential CPT Grant course with credits allowing the system to attain flexibility. The STEM Experiential CPT Grants will have the same effect of extending the Final Rule from 24 months to 36 month increments for up to 3 extensions after the first STEM OPT.

[16] The students should be allowed to work full time and not have a trade-off in terms of loss of OPT.

[17] BBC News: *World's top graduates get new UK visa option* (May 30, 2022), https://www.bbc.com/news/uk-61628740.

[18] Tabassum Barnagarwala, *How the Indian government took credit for Pesochin evacuation done by education firms* (March 9, 2022). https://scroll.in/article/1019052/how-the-indian-government-took-credit-for-pesochin-evacuation-done-by-education-firms

[19] REMOTE Act, H.R. 5545, 117th Cong. (2021). https://trone.house.gov/2021/10/08/trone-takano-levin-introduce-legislation-to-protect-education-benefits-for-veterans-during-covid/

[20] Karin Fisher, *The latest edition,* (December 13, 2021), https://www.getrevue.co/profile/latitudes/issues/the-latest-edition-917251, Latitudes #144.

[21] *Improving and Expanding Training Opportunities for F-1 Nonimmigrant Students with STEM Degrees and Cap-Gap Relief for All Eligible F-1 Students.* Fed. Reg. 81, 13039 (March 11, 2016). https://www.federalregister.gov/d/2016-04828/p-185

[22] *See* note 15.

August International Education Journal
Vol. 1, No. 1, August 2022
Author: Dr. Aparna Vashisht-Rota

## Author Biography

Dr. Aparna Vashisht-Rota, LinkedIn (https://www.linkedin.com/in/avrota/) runs August Network and August Education Group. August Network recruits and places students in the United States and globally. A large part of the population the Network serves is students of Indian origin in STEM fields with insufficient work authorization. August Education researches and resolves complex problems. In her idle time, Dr. Rota likes to help a student or study. She is presently a student of law.

She is working on a paper on management programs with her former supervisor at Grenoble Ecole de Management. The paper is in the final stages of data collection with an expanded 10-year dataset. In addition, Dr. Rota is in the planning stages of two papers, one on unranked MBA programs and the other on mindfulness. Dr. Rota is based out of San Diego, California where she lives with her husband, Mr. Jerome Rota, and her kids, Julian, and Jasper. Her oldest son, Joshua, is over the pond at university. The family has two cats--Georgia and Ollie that are loving, kind, and adorable. Dr. Rota can be reached at avrota@augusteducationgroup.com or avrota@augustnetwork.com or WhatsApp at +1-858-348-7068.

24

**2015-17**

| | | | | | |
|---|---|---|---|---|---|
| Wages Owed | 277,028 | 332,428 | 539,428 | 607,428 | 439,078 |
| Utah Penalties | 5% | 5% | 5% | 5% | 5% |
| Penalty Amount | 13,851 | 16,621 | 26,971 | 30,371 | 21,954 |
| CA taxes | 2.4 | 2.4 | 2.4 | 2.4 | 2.4 taxes |
| Sanction 5% (Utah §34-28-9) penalty | | | | | |
| 20 days daily | 664,867 | 797,827 | 1,294,627 | 1,457,827 | 1,053,787 |
| Total | 711,039 | 853,232 | 1,384,532 | 1,559,065 | 1,126,967 |
| 60 days Penalty (UT Code §34-28-5(1) | 46,171 | 55,405 | 89,905 | 101,238 | 73,180 |

**2017-22**

| | | | | |
|---|---|---|---|---|
| Wages Owed | 3,000,000 | 3,000,000 | 3,000,000 | 3,000,000 |
| Utah Penalties | 5% | 5% | 5% | 5% |
| Sanctions as per law | 150,000 | 150,000 | 150,000 | 150,000 |
| CA taxes | 2.4 | 2.4 | 2.4 | 2.4 |
| Sanction 5% (Utah §34-28-9) penalty | | | | |
| 20 days daily penalty | 7,200,000 | 7,200,000 | 7,200,000 | 7,200,000 |
| 60 days Penalty | 500,000 | 500,000 | 500,000 | 500,000 |
| Total | 7,700,000 | 7,700,000 | 7,700,000 | 7,700,000 |

(4) For a sales agent employed in whole or in part on a commission basis who has custody of accounts, money, or goods of the sales agent's principal, this section does not apply to the commission-based portion of the sales agent's earnings if the net amount due the agent is determined only after an audit or verification of sales, accounts, funds, or stocks.

This is annual salary divided by 12. Then that number is times 2 for 60 days or 2 months wages.

That is the minimum base rate from 2017-2022 for 250 students at $12,000 what I would have earned as a founder.

| | | |
|---|---|---|
| Total Sanctions | 8,826,966.87 | with taxes |
| Total Wages | 37,457,827.20 | This is F3+ ($3M * 5) |
| Taxes for wages | 2.4 | |
| Total | 46,284,794.07 | |

| | | |
|---|---|---|
| 8/15/22 | $185,366,304.20 | Sanction amount owed |
| 21 | This is 8.9 M * 21 | K22 |